# In the United States Court of Federal Claims

### No. 12-759C
### Filed: March 21, 2016
### Corrected Opinion: Issued April 12, 2016

| | | |
|---|---|---|
| * * * * * * * * * * * * * * | * | |
| **SECURIFORCE INTERNATIONAL AMERICA, LLC,** | * * * | **Motion to Dismiss; Subject Matter Jurisdiction; Trial; Contract Disputes Act; Termination for Convenience; Termination for Cause; Breach of Contract; Abuse of Discretion; Bad Faith.** |
| **Plaintiff,** | * | |
| **v.** | * | |
| | * | |
| **UNITED STATES,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |
| * * * * * * * * * * * * * * | * | |

**Frederick W. Claybrook, Jr.**, Crowell & Moring LLP, Washington, D.C., for plaintiff. With him were **Gordon N. Griffin** and **Mary M. Gilbert**, Crowell & Moring LLP, Washington, D.C., and **Robert J. Wagman, Jr.**, Kaye Scholer LLP, Washington, D.C.

**Russell James Upton,** Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington D.C., for defendant. With him were **Kirk T. Manhardt**, Deputy Director, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Benjamin C. Mizer**, Principal Deputy Assistant Attorney General, Civil Division, Department of Justice, Washington, D.C. Of counsel were **Jeffrey M. Lowry**, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington D.C. and **Jill Rodriguez**, Assistant Counsel, DLA Counsel-Energy, Ft. Belvoir, VA.

**O P I N I O N**

**HORN, J.**

**FINDINGS OF FACT**

Plaintiff, Securiforce International America, LLC (Securiforce),[1] was awarded a contract by the Department of Defense Logistics Agency Energy (DLA Energy) to deliver diesel fuel and commercial specification motor gasoline to eight United States Department of State (DoS) sites in Iraq.  These sites included Basrah, Umm Qasar, Embassy Baghdad, Besamaya, Sather, Shield, Taji, and Prosperity.  Within three months of the award, however, the contract was partially terminated for the government's convenience. Subsequently, the remaining portions of the contract were terminated for cause. Following the terminations, plaintiff filed its complaint in this court challenging both of defendant's termination decisions.

Prior to the contract award to Securiforce, on September 29, 2010, DLA Energy issued solicitation number SP0600-10-R-0241 (the solicitation), which sought a contractor to procure and deliver fuel to Department of Defense (DoD) sites in Iraq. On November 3, 2010, DLA Energy issued Amendment 003, which amended the solicitation in order to add and correct certain clauses and "answer questions received in accordance with Amendment 001." Securiforce submitted its bid on November 10, 2010 for all the Contract Line Item Numbers (CLINs) contained in the DoD fuel solicitation, as modified by Amendment 003. On May 3, 2011, more than five months after Securiforce submitted its bid in response to the DoD fuel solicitation, DLA Energy issued Amendment 0005 to the solicitation, which updated some clauses in the solicitation and added separate, additional CLINs to provide fuel to Department of State (DoS) sites in Iraq. On May 30, 2011, Securiforce submitted its bid for the DoS CLINs added in Amendment 0005. Securiforce received a letter from DLA Energy on July 27, 2011, stating that it was not being awarded any of the initial DoD CLINs, as amended by Amendment 0003, for the delivery of fuel to DoD locations. Between August 9, 2011 and August 17, 2011, DLA Energy entered into discussions with Securiforce and other offerors regarding the DoS CLINs that had been added in Amendment 0005. Subsequently, on September 7, 2011, DLA Energy awarded a contract to Securiforce, SP0600-11-D-1022 (the contract), for the delivery of diesel fuel and commercial specification motor gasoline (MOGAS, a/k/a gasoline) from Kuwait to eight DoS sites in Iraq, including Basrah, Umm Qasar, Embassy

---

[1] Securiforce was incorporated in 2010 in Texas as a limited liability company. Previously, in 2003, an entity related to Securiforce had been incorporated in Kuwait, through which Securiforce began its operations as a Middle East security and logistics company.

Baghdad, Besamaya, Sather, Shield, Taji, and Prosperity. Securiforce's Chief Executive Officer, Stephen Brierley[2] signed the contract for Securiforce on September 9, 2011.

The contract was a commercial-item, requirements contract. The contract included a termination for convenience clause:

> **TERMINATION FOR THE GOVERNMENT'S CONVENIENCE.** The Government reserves the right to terminate this contract, or any part thereof, for its sole convenience. In the event of such termination, the Contractor shall immediately stop all work hereunder and shall immediately cause any and all of its suppliers and subcontractors to cease work. Subject to the terms and conditions of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination. The Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose. This paragraph does not give the Government any right to audit the Contractor's records. The Contractor shall not be paid for any work performed or costs incurred which reasonably could have been avoided.

(capitalization and emphasis in original).

On or around August 29, 2011, prior to awarding the contract for DoS sites to Securiforce, DLA Energy began to draft a document intended to waive a requirement of

---

[2] Stephen Brierley was, at all times relevant to the case currently before the court, the majority owner and Chief Executive Officer of Securiforce. Due to personal health issues, Mr. Brierley was unable to travel or testify at trial, however, his deposition testimony was admitted into evidence at trial with the agreement of both parties. In his absence, Securiforce project manager Clive Reeves testified extensively to try to describe the facts and events underlying the dispute in this case from plaintiff's perspective. Clive Reeves was initially a consultant for Securiforce and subsequently an employee of Securiforce based in Kuwait, where he served as the project manager for the contract at issue in this case. Mr. Reeves was the onsite person for plaintiff and was a continuous presence in the Middle East, and Mr. Brierley was not. There were, however, certain relevant conversations and events that took place, particularly during contract formation, which Mr. Reeves was not a part of and, therefore, could not speak to based on first-hand knowledge. Mr. Brierley has since passed away.

the Trade Agreements Act of 1979 (TAA Waiver), 19 U.S.C. §§ 2501–2582 (2012), which dictates, generally, that when a government contract for goods exceeds a certain dollar threshold ($191,000.00), the government may only acquire goods made in the United States or in other, specified designated countries.[3]   Under the statute, without such a waiver, DLA Energy would not be able to contract with Securiforce for fuel to the DoS sites because Securiforce intended to procure the fuel from Kuwait and sell it to the United States government.[4] The parties disagree as to the timing of when the TAA waiver was drafted. Plaintiff suggests that the waiver justification for six of its eight sites was drafted and approved before the contract was even issued. Plaintiff also claims that defendant never intended to allow Securiforce to perform the contract as it was awarded. Defendant disagrees and states that while the waiver was initially drafted before the contract was awarded, it was not until after the contract had been awarded that the agency identified a deficiency in the waiver and revised the waiver to cover only six of plaintiff's eight awarded DoS sites.

According to trial testimony in the record, typically, when a TAA waiver is required a routing form and staff summary sheet are circulated within the agency and various individuals indicate that they have reviewed the documents, making note of any comments. If changes are made to the underlying waiver, the changes would be noted or the process may have to start over with a new routing form. In this case, the TAA waiver document began circulating in the office on September 6, 2011. The contract was awarded on September 7, 2011. Then, on September 8, 2011, DLA Energy counsel, Kay Bushman, identified, for the first time, that there was a problem with the waiver. The director of DLA Energy only possessed authority to sign a waiver for goods utilized by the Department of Defense, but the sites awarded to Securiforce were being operated by the Department of State, which would be using the fuel delivered by Securiforce. As of September 8, 2011, when the problem was identified, DLA Energy believed that a waiver would have to be submitted to the United States Trade Representative and processed through the Defense Procurement Acquisitions Policy (DPAP) process in order to cover the DoS sites, or Securiforce's CLINs would have to be terminated and re-awarded to another contractor. Kathryn Fantasia, then Director of the Direct Delivery Fuels Business Unit at DLA Energy who is now retired, testified that she understood those two options to be the agency's choices—terminate for convenience Securiforce's entire contract or try to process a waiver from the United States Trade Representative through DPAP. Mr. Reeves testified that he was told by Division Chief and Contracting Officer (contracting

---

[3] 48 C.F.R. § 52.225-5 (2016) defines "designated country."

[4] Kuwait is not included in the list of designated countries provided at 48 C.F.R. § 52.225-5.

officer) Sandra Shepherd that the TAA could not be waived for the sites Securiforce had been awarded.

Subsequently, DLA Energy came to understand that the Office of Security Cooperation-Iraq (OSC-I), which is part of the DoD, was present at six of Securiforce's eight assigned locations. DLA Energy, therefore, thought that it could execute a TAA waiver for those six sites, avoid the DPAP waiver process, and also avoid terminating Securiforce's entire contract. DLA Energy determined that it would need to terminate only the CLINs for the delivery of fuel to two of Securiforce's sites, Embassy Baghdad (one CLIN) and Prosperity (two CLINs), which did not have a DoD presence. According to trial testimony, DLA Energy, therefore, revised the TAA waiver and accompanying documents so that it was drafted to cover the remaining six of Securiforce's eight DoS sites with apparent DoD presence. The six remaining sites were Basrah, Umm Qasar, Besamaya, Sather, Shield, and Taji. The government, however, apparently did not create a new routing form to accompany the revised waiver. Consequently, there is scant documentation of the actual timing for the waiver's approval. Nonetheless, Patrick Dulin, who served as the Deputy Director and Acting Commander of DLA Energy during the time period at issue in the above-captioned case, testified at trial that he signed the waiver on September 14, 2011. E-mail documentation and trial testimony supports the government's claim that its lack of authority to sign a waiver for sites without a DoD presence was not discovered until after the contract was awarded on September 7, 2011. As of September 9, 2011, when Mr. Brierley signed the contract, DLA Energy still was determining its best course of action and deciding whether to pursue a TAA waiver or terminate the contract for convenience.

On September 20, 2011, DLA Energy sent Securiforce a proposed, bilateral modification to its contract to terminate for convenience the CLIN for MOGAS at Embassy Baghdad and the CLINs for MOGAS and diesel fuel at Prosperity at no cost. Securiforce proposed sourcing fuel from the United Arab Emirates as an alternative to removing the three CLINs. DLA Energy, however, was not receptive to this option. Because Securiforce did not agree to the proposed, bilateral modification, on September 26, 2011, DLA Energy issued Modification P0001 (Mod 0001) to Securiforce's contract, unilaterally terminating for convenience the three CLINs for fuel at Embassy Baghdad and Prosperity.

Following the partial termination for convenience, as Securiforce and DLA Energy worked towards performance at Securiforce's remaining six DoS locations, Basrah, Umm Qasar, Besamaya, Sather, Shield, and Taji, Securiforce and DLA Energy also disagreed as to whether Securiforce was entitled to government-provided security during performance under the terms of the contract. Even though the awarded contract did not include an explicit term that the government would provide security escorts, plaintiff believed that it was entitled to, and would receive, government-provided security under the contract. Securiforce representative, Mr. Reeves, testified that the questions and answers provided to offerors in Amendment 003 indicated that the "U.S. Government

would be providing security." He further stated that Amendment 003 "clearly states the U.S. Government is responsible for the escort, not the contractor." Mr. Reeves testified that there was no difference in terms of whether security would be provided based on whether the fuel was sourced from Kuwait or Turkey. Mr. Reeves also explained that the standard operating procedures included with its bid made clear that government provided security was presumed. In further support of plaintiff's argument that the government had indicated it would provide security, Mr. Reeves testified that Securiforce was asked to remove security prices from its bid "because they [the government] weren't going to pay twice for security, and by twice, we understood and they mentioned that all escorts would be provided by the U.S. Government, for Amendment 5 CLINs." Plaintiff also contends that the Price Negotiation Memorandum supports its interpretation. The Price Negotiation Memorandum Addendum for Amendment 0005 of the solicitation states:

> On 18 August 2011, DLA Energy emailed letters to all offerors indicating that the US Government will not pay for any security costs included in the offered prices since security escorts are already being provided for through a US Government contract until such time as the contract expires which is 31 December 2011. At that time, if the situation in Iraq deteriorates to the point where Contractors decide it is necessary to provide security for the delivery of fuel, DLA Energy requested that each offeror who is awarded a contract, to notify the Contracting Officer immediately. Ada, MeLt Group, Sandi Group and Securiforce all included costs for security in their initial offer prices. Each offeror confirmed that the cost will be removed from any final proposal revisions submitted.

In further support, plaintiff argues that Contract Specialist Kimberly Bass included Securiforce in the group of contractors she e-mailed to notify them that security escorts would be ending on September 15, 2011, instead of December 31, 2011. Plaintiff argues that, if Securiforce was not entitled to security under its contract, it would not have received the message that security was ending sooner than anticipated.

Defendant disagrees with plaintiff's assertions and its analysis, contending that Securiforce's contract to provide fuel at DoS sites did not provide for security, and at the time the contract was awarded, the government was not under any obligation to provide security to the contractors. Mr. Dulin testified: "The original contract, it was my understanding, did not provide for government-provided security." DLA Energy Liaison Officer Jeffrey Cannon, reiterated this idea, stating:

> I believe in -- it was May -- late April maybe of 2011, we held a meeting at the embassy to validate all the POL -- the petroleum/oil/lubricant people were brought together to meet, to have a final meeting to validate the Department of State's requirement, and to my knowledge, that was part of their requirement, to have fuel trucks unescorted.

6

When asked if she knew of any provision in Securiforce's contract that provided plaintiff with government security, contracting officer Shepherd replied: "I know of none." Repeatedly, throughout her testimony, Ms. Shepherd stated that it was not intended that Securiforce receive government security and its contract to provide fuel to DoS sites did not provide for government security or escorts. Ms. Fantasia reiterated this sentiment, testifying: "The guidance that I received was that the fuel contracts were to be awarded without armed security escorts." She also indicated that she passed this guidance on to those who were working on the solicitation and the award. Ms. Fantasia was asked: "Did you have an understanding as of September I believe maybe 12th when you returned from leave as to whether or not Securiforce's contract required the government to provide security?" She responded: "Yes. And the contract did not provide for security." Colonel Rush, then Commander of DLA Energy Middle East, also testified regarding DoS policy, stating that "there was discussion that the State Department did not want to have armed escorts escorting fuel into Iraq at the beginning of Operation New Dawn on 1 January 2012."

Contract Specialist Kimberly Bass testified that Amendment 003 to the solicitation only applies to the DoD CLINs contained in the original solicitation for which Securiforce did not receive a contract. Thus, according to Ms. Bass, DLA Energy's answer in response to a contractor's questions regarding Amendment 003 that providing security was the government's responsibility did not apply to plaintiff's contract for DoS sites. She noted that the DoS CLINs, added by Amendment 005, did not exist at the time Amendment 003 was issued. Ms. Bass also explained that although she included Securiforce in her September 13, 2011 e-mail about the September 15, 2011 end date for security escorts, this was an error, and Ms. Shepherd informed her of her mistake within a day or two of when Ms. Bass sent the message. Additionally, Ms. Shepherd testified that the Price Negotiation Memorandum Addendum statement in which DLA Energy indicated that the government would not pay for security escorts since they were already being provided was incorrect. She testified that the statement indicating security may be provided applied to the DoD CLINs, but not to the DoS CLINs. She also suggested that the statement applied to the shipments delivered from north of Iraq, but not those from the south, and only for a limited amount of time.  Ms. Shepherd admitted, however, that the geographical restriction was not noted in the Price Negotiation Memorandum Addendum. Lieutenant Colonel Musgrove, who was the Northwest Subregion Commander of DLA Energy, indicated his understanding that Securiforce was not supposed to deliver with security. He testified: "As far as Securiforce was concerned and their contract, they weren't supposed to be going with armed security, and when I say anything in here about security, that's what I mean, is they can't have armed security going into Iraq." Colonel Rush also testified: "Let me be more specific, they [Securiforce] were of the understanding that they would be provided government-provided security, the contract did not specify that they were entitled to government-provided security."

In an attempt to facilitate Securiforce's performance, even though the government did not believe Securiforce was entitled to security under its existing contract to deliver fuel to DoS sites, and after prolonged discussion and debate, on October 13, 2011, DLA Energy and Securiforce signed Modification P0002 (Mod 0002) to the contract, which stated that the government was to provide security escorts for Securiforce's fuel deliveries. Ms. Shepherd explained:

> If they already had security under their contract, a modification to provide security was not needed. So, my knowledge of the contract, they did not have security, under their contract, as it was awarded. So, to provide security, that's why we made the modification to their contract, to allow security escorts.
>
> . . .
>
> We wanted to work with this -- this vendor, this contractor, and it was very important to us to provide for our mission in Iraq, and they were coming from the south, and it was very important to keep that operational line open for our operational personnel. So, that was the reason we wanted to work with them in order to perform, and have a successful contract.

Plaintiff claims that shortly after Mod 0002 was executed, the government again repudiated its obligation to provide security by sending Securiforce an e-mail on October 24, 2011 stating that the government would not provide military escorts north of Cedar, and it was "working towards a solution to line Securiforce with a DoS task order for security but this has not been finalized as of the writing of this email." Mr. Reeves testified that following the October 24, 2011 e-mail, which promised there would be "more to come," he was never told about a security solution for the sites north of Cedar. He also testified, however, that: "Major Musgrove had telephoned or emailed me and said that they were looking at Olive Group to be the solution." Ms. Shepherd tried to explain the October 24, 2011 e-mail when she testified: "It states the Do -- the DoS locations north of Cedar under your contract, Besamaya, Sather, Shield and Taji, we are working towards a solution to line Securiforce with a Department of State task order for security that has not been finalized as of the writing of the email." Ms. Shepherd testified that nobody from Securiforce ever accused the government of breaching its obligation under Mod 0002 of the contract or complained that security was not being provided. Ms. Fantasia reiterated her understanding that although Ms. Shepherd informed Securiforce that military escorts were no longer available, that the government was working to line up a private security contractor for Securiforce. When asked whether "working toward a solution" was sufficient to meet the government's obligation to provide security, Ms. Fantasia replied:

> In this particular -- in this particular circumstance, I believe that it is, that Securiforce -- if Securiforce had tendered a truck for movement across the

border in conjunction with our regional office, Colonel Rush, Major Musgrove, and his relationships with folks on the ground, we would have had security for those trucks if the Department of State task order was not in place.

Lieutenant Colonel Musgrove also testified that, after Mod 0002 was issued, he was working to set up the escorts and spoke confidently about the logistical aspects of this task, noting the various plans and back up plans he put into place for Securiforce. Colonel Rush explained in further detail:

What's going on there is we had coordinated, as I've indicated, during this time frame U.S. Forces-Iraq are withdrawing, a major synchronization endeavor to bring all forces out, logistical support, security, as we move sites, collapse sites in the north, move them to the south and then eventually retrograde into Kuwait.

As you're moving all of these forces, they require -- they require fuel, really kind of movement time, security, which is all being synchronized. We had coordinated security escorts through the ESC or the TSC to escort fuel. Those security escorts had apparently not been coordinated between the TSC and USF-I and they were planned to be used somewhere else. So, those security escorts weren't available to us.

Within at least within 48 hours, maybe even within 24 hours, we had made other arrangements, we had found another security venue to do it. So, what we're talking about here is I think this is probably before that, but we're trying to -- we're trying to arrange security for Securiforce to operate in that period before we lose that authority, before 31 December, and as this email was written, Major General Richardson, who was the USF-I J-4, had said, no, these security assets that the TSC promised you are going to be needed for this other mission, so they're going to go and you need to find another solution. This was written probably before we had worked the other solution, the next day or the day after.

Shortly after Mod 0002 was issued, and before the subsequent correspondence between DLA Energy and Securiforce about the nature of available security for sites north of Cedar, the government states that it issued two orders for fuel to Securiforce.[5] Plaintiff disagrees, arguing that the e-mails containing the requested fuel amounts and the

---

[5] Although the parties dispute these "orders," two DD Form 1155s were sent to plaintiff on October 20, 2011, designated as order numbers "0001" and "0002," and both forms indicated that the orders were placed on October 14, 2011.

subsequent Form DD1155s were not orders because they were not for actual requirements and they were not followed up in the Paperless Ordering Receipt & Transaction Screens (PORTS), as plaintiff states was required by the contract. The contract states:

> Orders, and calls against orders, may be issued orally or in writing. An oral delivery, order for fuel shall be considered issued by the Government when it is verbally assigned a delivery, order number. For all orders, the appropriate ordering office/officer will provide the Contractor, via the PORTS internet application, with an electronically signed written order, SF 1449, within 24 hours or one business day after issuing the oral order. (Once the Ordering Officer has completed the web page order, an email will be sent to the Contractor to provide notice that the order is available on the contract-specific web page. The order will also be submitted to the payment office.) An oral order shall provide the required advance notice to the Contractor and the following information: Order number; contract number; item number; quantity; delivery location; any applicable taxes, which should be billed as a separate item on the invoice; and the required delivery date. Regardless of the unit price cited on the written order, the office designated to make payments on the written order will pay the applicable unit price in effect under the ECONOMIC PRICE ADJUSTMENT (PC&S) clause.

(capitalization in original).

Plaintiff contends that the orders also did not meet the requirements to be considered emergency orders, in which event the requirement for the government to enter the orders into PORTS would have been excused. Mr. Reeves testified that he viewed the "orders" as requests, and although he attempted to deliver, the "orders" were not valid under the contract.

Defendant disagrees with plaintiff's characterization of what have been labeled Delivery Orders 0001 and 0002. The government states that on October 14, 2011, DLA Energy placed two verbal orders with Securiforce, which were followed up with written orders on Form DD1155 on October 20, 2011. Defendant argues that the orders were valid, despite the fact that they were not placed into PORTS. The contract made clear that even if an order was not received in writing by the contractor or placed into PORTS by the government, the contractor was still required to perform. The contract states:

> The Contractor's nonreceipt of a written or electronic confirmation of an oral order or oral call against a written or electronic order does not itself relieve the Contractor from its obligation to perform in accordance with the oral order or oral call against a written or electronic order. The Contactor should

contact the DLA ENERGY Contracting Officer if problems are experienced with receipt of the electronic or written confirmation.

Mr. Reeves testified at trial that an "oral order . . . must be confirmed in writing via a PORTS-generated order within 24 hours or one business day." When Mr. Reeves was asked at trial whether Securiforce would be relieved of its duty to perform if an oral order was not confirmed in writing with a PORTS-generated order, Mr. Reeves explained that it was his "understanding" that Securiforce would not be relieved, but that "it's a little bit ambiguous."    Nonetheless, plaintiff repeatedly argues that the government impeded Securiforce's ability to perform by failing to enter the orders into PORTS and neglecting to provide required assistance with logistical and ministerial steps that were necessary to facilitate performance by Securiforce.

Plaintiff also argues that Orders 0001 and 0002 were Proof of Principle (PoP) shipments, in which it was asked to deliver small amounts to prove the company's capability to perform, and that it was not required under the contract to conduct PoP shipments. The government claims that despite the orders being described as PoP shipments, the use of the phrase "Proof of Principle" was not determinative. For example, Mr. Cannon stated:

> Well, definitely -- the military can call it a proof of principle all they want, but contractually, it turns into a -- it becomes an order, and we don't use the term "proof of principle," but when we sent out a notice like this, it -- things become an order, and if it's followed up -- if a verbal order is followed up by a written order, it becomes an order.

The government maintains that the orders were proper under the contract and plaintiff was required to deliver fuel as it had been directed.

Orders 0001 and 0002 set October 24, 2011 as the delivery date. Securiforce indicated that it would be unable to deliver fuel on or around October 24, 2011. Originally plaintiff stated it would need until approximately November 14, 2011, and subsequently stated it would aim for delivery on or around November 4, 2011, but then retreated to its November 14, 2011 estimated delivery date. Although plaintiff explains that it never agreed to October 24, 2011 as a delivery date, and it claims that such timeframe was unrealistic, defendant notes that plaintiff was not entitled to input in setting the delivery date. When Mr. Cannon was asked about whether Securiforce was consulted in establishing the delivery date, he stated:

> For that reason, that when the delivery date is placed on the order, that is now the delivery date, and it's not a -- at that point, we're in a unilateral situation. They've -- the contractor's already entered into the contract, he's

aware of this, and we are not in a bilateral negotiation when an order is placed.

Therefore, defendant argues, it is not determinative that plaintiff did not agree to the delivery deadline because plaintiff's consent to a specific date was not required in order for plaintiff to be obligated under the contract to deliver by date set by the government.

On November 4, 2011, DLA Energy sent a letter to Securiforce to inform Securiforce that it was considering terminating for cause plaintiff's remaining contract to deliver fuel to six DoS sites and to ask Securiforce to present any facts that would be relevant to a government decision to terminate the contract for cause.[6] The letter stated:

> Since you have failed to deliver orders 0001 and 0002, the Government is considering terminating the contract under the provisions for default of this contract. Pending a final decision in this matter, it will be necessary to determine whether your failure to perform arose from causes beyond your control and without fault or negligence on your part.

The contract contemplated a termination for cause and included the following clause:

> **TERMINATION FOR CAUSE.** The Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance. In the event of termination for cause, the Government shall not be liable to the Contractor for any amount for supplies or services not accepted, and the Contractor shall be liable to the Government for any and all rights and remedies provided by law. If it is determined that the Government improperly terminated this contract for default, such termination shall be deemed a termination for convenience.

(capitalization and emphasis in original). The contract also addressed excusable delays:

> **EXCUSABLE DELAYS.** The Contractor shall be liable for default unless nonperformance is caused by an occurrence beyond the reasonable control of the Contractor and without its fault or negligence, such as acts of God or the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions,

---

[6] The parties use the terms "termination for cause" and "termination for default" interchangeably. Although they are understood to refer to the same government action in the above-captioned case, the court will use "termination for cause" throughout this opinion, in conformance with the language used in the contract.

strikes, unusually severe weather, and delays of common carriers. The Contractor shall notify the Contracting Officer in writing as soon as it is reasonably possible after the commencement of any excusable delay, setting forth the full particulars in connection therewith, shall remedy such occurrence with all reasonable dispatch, and shall promptly give written notice to the Contracting Officer of the cessation of such occurrence.

(capitalization and emphasis in original).

As of November 4, 2011, Securiforce had not delivered any fuel and was estimating that the earliest it could deliver was November 20, 2011. Securiforce responded to the government's letter on November 8, 2011. In its response letter, Securiforce contended that, under the terms of the contract, it was not late in delivering fuel. Securiforce argued that DLA Energy's letter also ignored significant government-caused delays, including "the State Department (who is not a party to this contract) continues to create a 'moving target,'" and the government's failure to set up PORTS, the government's failure to assist with driver badging, and the government's failure to arrange for Mr. Reeves and Mr. Brierley to receive Common Access Cards (CACs). Plaintiff also argues that the government continually changed the operating procedures for Securiforce, despite having earlier accepted Securiforce's Concept of Operations, Logistical Procedures, and Quality Control Plan. Plaintiff argued in its letter that because of the government caused the delays, Securiforce was entitled to relief under the contract's Excusable Delays clause.[7]

On November 15, 2011, DLA Energy issued Modification P0003 (Mod 0003) to Securiforce's contract, unilaterally terminating for cause the entire remaining contract. Securiforce's counsel sent a letter to DLA Energy requesting the government to rescind the termination of Securiforce's contract. DLA Energy responded to Securiforce's letter and declined to rescind the termination for cause. Thereafter, Securiforce filed an initial

---

[7] At trial, plaintiff reiterated its arguments that the government was at fault for obstructing Securiforce's ability to perform. Mr. Reeves stated that Securiforce was not able to begin delivering fuel 30 days after it was awarded the contract: "[b]ecause there were certain elements the U.S. Government had to implement to allow us to perform." Mr. Reeves expanded, stating, for example, that the government failed to provide information and assistance, including PORTS training and support, necessary information regarding crossing the border and driver badging, CACs to allow Mr. Brierley and Mr. Reeves unescorted access to the military bases, which they needed to access to facilitate performance of the contract, and support with Synchronized Predeployment Operational and Tracker (SPOT) registration. Mr. Reeves repeatedly expressed frustration: "I have had no information from DLA on what to do, even though I've asked for it. So, we're still finding out processes and procedures for being able to perform."

complaint in this court seeking declaratory relief with respect to the termination for cause, which had been implemented through the government's issuance of Mod 0003. Subsequently, Securiforce sent a letter to DLA Energy requesting a contracting officer's final decision relating to Mod 0001, the prior partial termination for convenience. In that letter, Securiforce stated that it was requesting a contracting officer's final decision "declaring that the government's termination for convenience dated September 26, 2011, through Modification P00001 was a material breach of contract." Securiforce then proceeded to explain six reasons why it believed that "DLA Energy's actions in partially terminating the contract for Convenience was a material breach of the Contract." DLA Energy responded to Securiforce's letter on January 16, 2013, stating that it could not provide a final decision based on the contents of Securiforce's letter and explaining why Securiforce's claim was likely without merit. The contracting officer stated that the letter did not present a cognizable claim, because it failed to state a sum certain and it did not "make any reference to seeking an adjustment or interpretation of the contract terms." She then explained that although the question was not before her, "SIA's [Securiforce's] allegation that the Government lacked the ability to terminate these three line items for convenience is likely without merit."

Securiforce then filed a complaint in this court, followed by a first amended complaint (the complaint), seeking declaratory relief with respect to both the termination for cause (Mod 0003) and the termination for convenience (Mod 0001). Count I states that DLA Energy unilaterally repudiated its obligation to provide Securiforce with security, materially breaching its obligations under the contract. Plaintiff alleges that the contract required DLA Energy to provide security escorts through December 31, 2011, and changes were only allowed to be made by written agreement of the parties. Nonetheless, plaintiff states it received an e-mail on September 13, 2011 announcing that the government would not provide escorts after September 15, 2011. DLA Energy executed Mod 0002 on October 13, 2011, which guaranteed security would be provided for Securiforce, at least until the end of 2011, by stating: "ADD 'U.S. Government provided escorts required' to each location on the schedule," listing plaintiff's six DoS locations on the schedule, and noting that the provision will expire on December 31, 2011. Plaintiff states, however, that DLA Energy again repudiated its obligation to provide security escorts in an e-mail dated October 24, 2011. Securiforce alleges that it repeatedly objected to performing without security escorts and never waived the government's material breach.

Count II of plaintiff's complaint states that DLA Energy materially breached the contract by failing to place orders with Securiforce for the government's actual requirements and instead procured fuel from other sources to satisfy its requirements. Plaintiff contends that the government had estimated over 2.3 million gallons of fuel would be required each month, but, throughout the life of the contract, the government never placed orders for its actual requirements. Plaintiff also alleges: "DLA Energy partially terminated for convenience two sites awarded so that it could obtain those requirements

from another supplier." Further, plaintiff argues that "orders" 0001 and 0002 were unauthorized "Proof of Principle" orders which did not reflect the government's actual fuel requirements. Securiforce contends that DLA Energy admitted it was supplying fuel to the sites covered by Securiforce's contract throughout the duration of the contract. Securiforce states that it never waived the material breaches the government committed when it failed to order the amount of fuel the DoS sites actually required and supplied those sites by other means.

In Count III, plaintiff argues that DLA Energy materially breached the contract by implementing numerous unilateral changes immediately after the contract was awarded, changing the parties' bargain. Specifically, plaintiff contends that DLA Energy repudiated its obligation to provide it with security six days after the contract was awarded. DLA Energy terminated for convenience more than half of the estimated fuel requirements less than two weeks after the contract was awarded when it partially terminated for convenience the CLINs at Prosperity and Embassy Baghdad because of what DLA Energy described as a mistake. According to plaintiff, DLA Energy could have, but refused to, seek a waiver from the United States Trade Representative to avoid partially terminating plaintiff's contract for convenience. Finally, approximately three weeks after the contract was awarded, DLA Energy began requesting Securiforce conduct unescorted PoP shipments, which Securiforce contends the contract did not provide for and "fundamentally changed the parties' bargain from a requirements contract to deliver over 200 tanker trucks each month to a demonstration contract." Plaintiff also contends that the government repudiated its obligation to provide Securiforce with security a second time, shortly after Mod 0002 had been executed.  Plaintiff alleges that the government knew its PoP orders were not legitimate orders under the contract, that the government was aware its actions and inactions had delayed Securiforce's ability to perform, and that, because no delivery dates had ever been agreed upon, Securiforce's alleged late delivery of the PoP orders was a pretext for terminating the contract for cause. Plaintiff also alleges that DLA Energy's reasons for partially terminating for convenience two of the awarded sites and terminating for cause the remaining sites were pretexts "DLA Energy used to avoid its express and implied contractual obligations to Securiforce." Plaintiff claims that these contract changes indicate the government knew even before the contract was awarded that it would not allow plaintiff to perform the contract as it was awarded. Moreover, even if the government was not aware that it was going to drastically change the contract immediately after it was awarded, its immediate changes to the contract demonstrate defendant was negligent in preparing the solicitation and that the solicitation did not accurately reflect the government's requirements. Securiforce states that it objected repeatedly to the government's actions and inactions and did not waive any material breaches.

Count IV contends that the government's implied duties of good faith and fair dealing were breached by failing to allow Securiforce to provide fuel from an alternative source that would have been TAA compliant and by refusing to request a TAA waiver

through the DPAP waiver process in order to avoid terminating any part of plaintiff's contract for convenience. Plaintiff argues that partially terminating the contract for convenience instead of pursuing either of the preceding two options was a breach of the government's duty to facilitate Securiforce's performance. Further, plaintiff reiterates its allegations that the termination for cause due to the alleged late deliveries was pretextual. Plaintiff argues that DLA Energy's pretextual termination occurred in order to "avoid its remaining obligations under the Contract" and DLA Energy "defaulted Securiforce's remaining obligations under the Contract to leverage its negotiation of the government's remedies related to the Contract." Plaintiff also contends that the government's cancellation of "its POP order of one tanker for Umm Qasar" was based on a pretext. Plaintiff claims that DLA Energy failed to "timely or reasonably assist" with necessary administrative tasks. Finally, plaintiff argues that the terminations for convenience and cause were improper because there was a continuing need for fuel to be delivered to the sites awarded under the contract.

Count V contends that even if the allegations of Counts I through IV do not individually constitute material breaches, collectively, they are a material breach of the contract. Securiforce also reiterates that it has not waived any of the government's breaches.

After extensive discovery and motions practice by both parties, a trial was held at which multiple witnesses for both sides testified.[8]

## DISCUSSION

Defendant's Partial Motion to Dismiss for Lack of Subject Matter Jurisdiction

As a threshold issue, the court will address defendant's allegations that plaintiff's amended complaint should be partially dismissed for lack of subject matter jurisdiction. Specifically, defendant asserts that this court does not have jurisdiction to consider Counts I-V in plaintiff's complaint or the claims raised in plaintiff's November 16, 2012 letter to the contracting officer requesting a final decision declaring that the termination

---

[8] In addition to the witnesses discussed in the fact section above, the other witnesses who testified at trial, and their titles at the time of the events underlying the above-captioned case, included Kathleen Austin-Ferguson (Executive Assistant to the Under Secretary of Management at the Department of State) and Phyllis Watson (Contracting Officer, then Contracting Specialist). The deposition testimony of Roger Torgeson (Quality Assurance Representative) also was admitted at trial. A number of DLA Energy personnel were called by both the plaintiff and the defendant as part of their case.

for convenience was a material breach of Securiforce's contract. The statute at 28 U.S.C. § 1491 (2012), known as the Tucker Act, grants jurisdiction to this court as follows:

> (a)(1) The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. . . .

28 U.S.C. § 1491(a)(1). The Tucker Act also states:

> (2) . . . In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just. The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41, including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act.

28 U.S.C. § 1491(a)(2). As interpreted by the United States Supreme Court, this Act waives sovereign immunity to allow jurisdiction over claims (1) founded on an express or implied contract with the United States, (2) seeking a refund from a prior payment made to the government, or (3) based on federal constitutional, statutory, or regulatory law mandating compensation by the federal government for damages sustained. See United States v. Navajo Nation, 556 U.S. 287, 289–90 (2009); United States v. Testan, 424 U.S. 392, 400 (1976) (citing Eastport Steamship Corp. v. United States, 178 Ct. Cl. 599, 605–06, 372 F.2d 1002, 1009 (1967)); United States v. Mitchell, 463 U.S. 206, 216 (1983); see also Greenlee Cnty., Ariz. v. United States, 487 F.3d 871, 875 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 552 U.S. 1142 (2008); Palmer v. United States, 168 F.3d 1310, 1314 (Fed. Cir. 1999); Stinson, Lyons & Bustamante, P.A. v. United States, 33 Fed. Cl. 474, 478 (1995), aff'd, 79 F.3d 136 (Fed. Cir. 1996).

Section 1491(a)(2) of the Tucker Act provides this court with broad jurisdiction over issues that arise under the Contract Disputes Act (CDA), including "any claim by or against, or dispute with a contractor arising under section 7104(b)(1) of title 41, including a dispute concerning termination of a contract . . . ." 28 U.S.C. § 1491(a)(2); see also Todd Constr., L.P. v. United States, 656 F.3d 1306, 1311 (Fed. Cir. 2011). By its terms, the CDA gives this court jurisdiction to hear claims relating to "any express or implied contract . . . made by an executive agency for-- . . . (1) the procurement of property, other than real property in being; [and] (2) the procurement of services[.]" 41 U.S.C. § 7102

17

(2012) (brackets added); see also Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1344-45 (Fed. Cir. 2008); North Start Steel Co. v. United States, 477 F.3d 1324, 1331 (Fed. Cir. 2007). The Federal Circuit has explained that "Congress's decision to limit the applicability of the [CDA's] procedures to those claims 'relating to' a contract indicates that the claim at issue must have some relationship to the terms or performance of a government contract." Applied Cos. v. United States, 144 F.3d 1470, 1478 (Fed. Cir. 1998).

Before this court can exercise jurisdiction pursuant to the CDA, however, the CDA requires that a contractor's claim first must be submitted in writing to the contracting officer, and the contracting officer must render a final decision on the claim. See 41 U.S.C. § 7103(a)(1) (2012). The CDA does not define "claim," but the United States Court of Appeals for the Federal Circuit has explained that "the definition of the term 'claim' in the FAR governs." Todd Constr., L.P. v. United States, 656 F.3d at 1312; see also H.L. Smith, Inc. v. United States, 49 F.3d 1563, 1564 (Fed. Cir. 1995) (explaining that the Federal Circuit "has identified three requirements for a valid CDA claim: (1) the contractor must submit the demand in writing to the contracting officer, (2) the contractor must submit the demand as a matter of right, and (3) the demand must include a sum certain"). Therefore, courts look to the FAR, which defines "claim" as a "written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract." 48 C.F.R. § 2.101 ("Definitions") (2016); see also Todd Constr., L.P. v. United States, 656 F.3d at 1312 (explaining that the court should read the definition of "claim" broadly). As this language indicates, a CDA claim can seek monetary or non-monetary relief. See Todd Constr., L.P. v. United States, 656 F.3d at 1311.

The Federal Circuit has explained that "the phrase 'as a matter of right' in the FAR's definition of a 'claim' requires only that the contractor specifically assert entitlement to the relief sought. That is, the claim must be a demand for something due or believed to be due . . . ." Alliant Techsystems, Inc. v. United States, 178 F.3d 1260, 1265 (Fed. Cir.), reh'g denied, 186 F.3d 1379 (Fed. Cir. 1999); see also Todd Constr., L.P. v. United States, 656 F.3d at 1311 ("The Tucker Act provides the Claims Court with jurisdiction over 'any claim by or against, or dispute with, a contractor arising under [the CDA], including . . . non-monetary disputes on which a decision of the contracting officer has been issued under section 6 of [the CDA].'") (brackets in original). The content, not the form, determines what is sought in the claim; no magic language is required. See Placeway Constr. Corp. v. United States, 920 F.2d 903, 908 (Fed. Cir. 1990) ("In fact, this court de-emphasized the importance of the form in which claims are submitted, stating, 'We know of no requirement in the Disputes Act that a "claim" must be submitted in a particular form or use any particular wording.'" (quoting Contract Cleaning Maint., Inc. v. United States, 811 F.2d at 592)); CW Gov't Travel, Inc. v. United States, 63 Fed. Cl. at 382–83 ("The CDA does not require 'that a "claim" . . . use any particular wording. All that

is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis . . . of the claim.'" (quoting Contract Cleaning Maint., Inc. v. United States, 811 F.2d at 592)). In CW Government Travel, Inc. v. United States, the court indicated, "[t]he Federal Circuit 'has definitively stated that certain "magic words" need not be used [to establish a claim under the CDA;] . . . [rather,] the intent of the "claim" governs.'" Id. at 383 (quoting Transamerica Ins. Corp. v. United States, 973 F.2d 1572, 1578 (Fed. Cir. 1992), overruled on other grounds by Reflectone, Inc. v. Dalton, 60 F.3d 1572))) (brackets and omissions in CW Gov't Travel, Inc. v. United States).

When a claim is not a claim for money, the sum certain requirement does not apply. See Alliant Techsystems, Inc. v. United States, 178 F.3d at 1266–67 (stating that according to the FAR, a claim may be a request for "'payment of money in a sum certain'" or it may be a request for an "'adjustment or interpretation of contract terms, or other relief arising from or relating to the contract,'" therefore indicating that the "sum certain" requirement only applies to claims requesting a payment of money (quoting FAR 33.201); CW Gov't Travel, Inc. v. United States, 63 Fed. Cl. at 382 ("The court recognizes that, '[t]o state a [valid] non-monetary claim, there is no requirement that the contractor make a request for a sum certain.'" (quoting Clearwater Constructors, Inc. v. United States, 56 Fed. Cl. 303, 309 (2003))) (brackets in CW Gov't Travel, Inc. v. United States); Clearwater Constructors, Inc. v. United States, 56 Fed. Cl. at 309 ("[T]he contractor is required to satisfy just two requirements to set forth a non-monetary claim: (i) the contractor must make a 'written demand . . . seeking as a matter of right . . . the adjustment or interpretation of contract terms;' and (ii) that request must be submitted to the contracting officer for a decision." (citing GPA-I, LP v. United States, 46 Fed. Cl. 762, 767 (2000))) (italics in original); GPA-I, LP v. United States, 46 Fed. Cl. at 766 (finding a sum certain was not required under 28 U.S.C. § 1491(a)(2) when the parties sought an "'adjustment or interpretation of contract terms, or other relief arising under or relating to the contract'" (quoting FAR 33.201)). Furthermore, "[i]n defining the jurisdiction of the Court of Federal Claims over CDA disputes, Congress has chosen expansive, not restrictive, language." Alliant Techsystems, Inc. v. United States, 178 F.3d at 1268.

In addition to submitting a valid claim to a contracting officer, a "prerequisite for jurisdiction of the Court of Federal Claims over a CDA claim is a final decision by a contracting officer." Northrop Grumman Comp. Sys. v. United States, 709 F.3d 1107, 1111 (Fed. Cir. 2013). For this court to exercise jurisdiction over a CDA claim, "the contractor must have received the contracting officer's final decision on that claim." M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1328 (Fed. Cir. 2010); see also James M. Ellet Constr. Co., Inc. v. United States, 93 F.3d 1537, 1542 (Fed. Cir. 1996). When a contracting officer has not issued a final decision on a contractor's claim, the Court of Federal Claims lacks subject matter jurisdiction to consider the claim. See England v. The Swanson Grp., Inc., 353 F.3d 1375, 1379 (Fed. Cir. 2004); see also Tidewater Contractors, Inc. v. United States, 107 Fed. Cl. 779, 784 (2012); Deponte

Investments, Inc. v. United States, 54 Fed. Cl. 112, 115 (2002). If, however, within sixty days of submitting a claim, the contracting officer has not issued a final decision or notified the contractor of a reasonable time in which a final decision will be issued, the claim may be deemed denied for purposes of appeal or judicial review.  See 41 U.S.C. § 7103(f).

As previously stated, after the CDA prerequisites discussed above are satisfied, this court can exercise jurisdiction over a claim brought pursuant to the CDA and award monetary and/or non-monetary relief, when appropriate.  "[N]onmonetary claims are not outside the jurisdiction of the Court of Federal Claims simply because the contractor could convert the claims to monetary claims" at a later time. Alliant Techsystems, Inc. v. United States, 178 F.3d at 1268. As amended by the CDA, "the Tucker Act grants the Court of Federal Claims jurisdiction to grant nonmonetary relief in connection with contractor claims." Id. Further, this court has jurisdiction to grant declaratory relief for nonmonetary contractor claims.  See Tiger Natural Gas, Inc. v. United States, 61 Fed. Cl. 287, 292 (2004) ("As amended, 28 U.S.C. § 1491(a)(2) contemplates suits in this Court for declaratory judgments on nonmonetary claims."). In a case brought under the CDA, this court has jurisdiction to grant a declaratory judgment finding, for example, that a termination for default was improper or that a breach of contract occurred, absent a request by plaintiff for monetary damages. See Tiger Natural Gas, Inc. v. United States, 61 Fed. Cl. at 292 (quoting Alliant Techsystems v. United States, 178 F.3d at 1270, for the proposition that "'"nonmonetary claims are not outside the jurisdiction of the Court of Federal Claims simply because the contractor could convert the claims to monetary claims by doing the requested work and seeking compensation afterwards'"); Maryland Enterprise, L.L.C. v. United States., 91 Fed. Cl. 511, 522–23 & n.8 (2010) (holding that the court had jurisdiction to adjudicate plaintiff's claim for a declaratory judgment that the defendant's actions constituted a breach of contract in a case in which the complaint was "devoid of any request that [the] Court award monetary relief" (citing Alliant Techsystems, Inc. v. United States, 178 F.3d at 1268)); Armour of Am. v. United States, 69 Fed. Cl. 587, 592 (2006); Ho v. United States, 49 Fed. Cl. 96, 98, 101 (2001) aff'd, 30 F. App'x 964 (Fed. Cir. 2002) (noting that "[t]his court has heard claims arising under the CDA requesting only nonmonetary relief" and finding that the court had jurisdiction to decide plaintiff's claim for a declaratory judgment of plaintiff's "rights and duties under the contract" despite the dismissal of plaintiff's monetary breach of contract claims (citing Alliant Techsystems, Inc. v. United States, 178 F.3d at 1267–70); Libertatia Assocs., Inc. v. United States, 46 Fed. Cl. 702, 702–03 & n.1 (2000); Newport News Shipbuilding. & Dry Dock Co. v. United States, 44 Fed. Cl. 613, 614 (1999))).

Additionally, this court has jurisdiction to hear claims for monetary relief under the CDA. The United States Court of Appeals for the Federal Circuit, in Reflectone, Inc. v. Dalton, explained that a claim for money must satisfy three requirements: "that it be (1) a written demand, (2) seeking, as a matter of right, (3) the payment of money in a sum certain."  Reflectone v. Dalton, 60 F.3d at 1575; see also Williams v. United States, 118 Fed. Cl. 533, 538 (2014) ("The CDA requires a contractor to submit a written claim against

20

the federal government to the contracting officer for decision."); see also England v. Swanson Grp., Inc., 353 F.3d at 1379.  Additionally, plaintiff bears the burden of proving that this court possesses jurisdiction over the plaintiff's claims by a preponderance of the evidence.  See Baldwin v. United States, 95 Fed. Cl. 238, 241 (2010) (citing Sanders v. United States, 252 F.3d 1329, 1333 (Fed. Cir. 2001) (burden of proof); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988) (preponderance of the evidence).

In the above-captioned case, plaintiff, Securiforce, filed an amended complaint seeking a declaratory judgment that DLA Energy's partial termination for convenience, and subsequent termination for cause, of Securiforce's contract was improper because "DLA Energy committed multiple, material breaches of its commercial-item, three-year, requirements contract with Securiforce for fuel deliveries to eight locations in Iraq." Defendant filed a motion to dismiss the claims in plaintiff's amended complaint "related to the September 2011 partial termination for convenience of Securiforce's contract" because, according to defendant, plaintiff has not satisfied the prerequisites of the CDA that are necessary for this court to exercise jurisdiction over these claims: the submission of a claim to the contracting officer, and a final, written decision from the contracting officer. Defendant argues that, as a result, this court does not have jurisdiction to entertain Securiforce's claims in its amended complaint that relate to the September 26, 2011 termination for convenience.

As previously discussed, in September 2011, DLA Energy issued a termination for convenience applicable to the contract requirements for two of the eight DoS fuel delivery sites in the contract, Embassy Baghdad and Camp Prosperity, thereafter, DLA Energy terminated the contract for cause. Subsequently, plaintiff filed a complaint in this court on November 6, 2012 seeking a declaratory judgment that the termination for cause was improper, however, at that time, plaintiff did not seek relief for the termination for convenience. After filing its initial complaint in this court, plaintiff wrote a letter to the contracting officer on November 16, 2012, seeking a contracting officer's final decision pursuant to the CDA "declaring that the government's termination for convenience dated September 26, 2011, through Modification P00001 was a material breach of contract." The November 16, 2012 letter explained that:

> On or about September 26, 2011, DLA Energy e-mailed Securiforce Modification P0001 to the Contract, which purported to terminate unilaterally all the requirements for Embassy Baghdad and Camp Prosperity. . . . The total estimated Contract value decreased by $173,250,504.68, to $137,978,348.20. The putative explanation provided by the CO in the cover letter was that the Commander of DLA was authorized to waive the TAA only at some of the locations included in the Solicitation.  Further, DLA Energy stated it could have requested a waiver from the U.S. Trade Representative allegedly needed under the TAA for

Case 1:12-cv-00759-MBH   Document 162   Filed 04/12/16   Page 22 of 65

those two sites, but it simply chose not to do so.

The November 16, 2012 letter provided several reasons why, according to plaintiff, the termination for convenience was a material breach that would render the termination for convenience ineffective and, as a result, entitle plaintiff to breach damages, including that the government previously breached the contract when it unilaterally repudiated its obligation to provide security escorts to plaintiff's fuel transports over plaintiff's objections. The letter also alleged that the government's decision to change the terms of the contract immediately after award demonstrated that it never intended to honor the contract, and that the government's justification for issuing the termination for convenience was a pretext. The letter further alleged that the government breached its implied duties of good faith and fair dealing by refusing to seek a TAA waiver or accept TAA-compliant fuel, and that the government was negligent in erroneously preparing its solicitation. In conclusion, the letter stated:

> DLA Energy's actions, individually and collectively, in partially terminating the Contract for convenience resulted in a material breach of the Contract. Accordingly, Securiforce respectfully requests a final decision declaring that DLA Energy's partial termination for convenience issued in Mod P00001 to the Contract was a material breach of contract and that Securiforce is entitled to breach damages.

Defendant argues that this court lacks subject matter jurisdiction to review the termination for convenience because Securiforce's November 16, 2012 letter was not a valid claim to the contracting officer as it did not state a sum certain, which is required for claims seeking monetary relief. In response, plaintiff argues that the letter was a valid claim seeking declaratory, nonmonetary relief and that "[s]eeking a declaration of entitlement to breach damages, which follows necessarily from a declaration of breach, does not transform a claim for declaratory relief into a claim for monetary damages," so that plaintiff was not required to state a sum certain.

As explained above, to present a non-monetary claim, a contractor must make a written demand, as a matter of right, seeking "relief arising from or relating to the contract" or "the adjustment or interpretation of contract terms." 48 C.F.R. § 2.101. Non-monetary claims generally do not need to be certified under the CDA. 41 U.S.C. § 7103(b) (only specifying that a claim must be certified if it is a monetary claim for more than $100,000); see also Placeway Constr. Corp. v. United States, 920 F.2d at 907 ("As a final decision on a government claim, the Claims Court has jurisdiction, even though the claim was not certified.")

Defendant tries to rely on Kellogg Brown & Root Services, Inc. v. United States, 115 Fed. Cl. 168 (2014), to support its contention that plaintiff's letter seeking a final decision regarding the partial termination for convenience actually is a monetary claim,

disguised as a non-monetary claim, and, thus, should be treated as a monetary claim. In Kellogg Brown & Root, the plaintiff submitted two letters to the contracting officer requesting relief under the indemnification clause of its contract. Kellogg Brown & Root Servs., Inc. v. United States, 115 Fed. Cl. at 174–75. Plaintiff characterized its request as a nonmonetary claim seeking the "'"interpretation of contract terms, or other relief arising under or relating to the contract."'" Id. at 175. Plaintiff asked the government to participate in the relevant litigation, pursuant to the indemnification provision in its contract, and noted the significant costs it was currently incurring. See id. at 175–77.  Defendant in that case alleged that plaintiff's indemnification claim was monetary because the complaint was essentially about money and the plaintiff's complaint was "nothing more than an artful attempt to disguise a claim for money damages as a claim for contract interpretation, in order to avoid CDA requirements."  See id. at 176. On review, the court agreed with the defendant that "the gravamen of the complaint is a request for money."  Id. at 184. The court stated that, "KBR, no matter how indirectly, is invoking its right to compensation from the government" because the contractor's letter to the contracting officer "contains a heavy, if somewhat obscured, emphasis on the monetary aspects of indemnification, and a very light but direct emphasis on encouraging the Corps to actively participate in the litigation of the third-party suits against KBR." Id. at 176. In finding that the plaintiff's attempt to characterize its claim as nonmonetary failed, the Kellogg Brown & Root court determined that plaintiff's complaint repeatedly referenced money damages owed to the plaintiff under the indemnification provision of its contract, indicating that, in fact, their claim was for money damages. See id. at 183.

Plaintiff, Securiforce, in the above-captioned case requested "a final decision declaring that DLA Energy's partial termination for convenience issued in Mod P00001 to the Contract was a material breach of contract and that Securiforce is entitled to breach damages." In the November 16, 2012 letter, Securiforce briefly mentioned possible entitlement to breach damages, however, the focus of the letter clearly was on DLA Energy's conduct during contract formation and administration.  The letter discussed plaintiff's grounds for asserting that the termination for convenience was improper and focused on previous alleged contract breaches by DLA Energy. The letter did not mention the financial impact of defendant's allegedly improper conduct on plaintiff or reference costs or damages incurred by plaintiff.  The gravamen of the November 16, 2012 letter revolved around the propriety of the September 2011 termination for convenience, given plaintiff's allegations that DLA Energy had materially breached the contract prior to issuing the termination for convenience modification. The essence of plaintiff's letter is non-monetary.  Also, even though plaintiff noted in its letter to the contracting officer that the value of its contract had been decreased by $173,250,504.68 to $137,978,348.20 following the termination for convenience, plaintiff did not indicate that it was seeking to recover this difference in value as breach damages.  As the contracting officer noted, other than asking for a declaration that the termination for convenience was improper such that plaintiff would be entitled to breach damages, the other indicia of a specific monetary claim were absent from plaintiff's November 16, 2012 letter.

It is also appropriate to consider plaintiff's November 16, 2012 letter in the context of this litigation in order to determine whether the relief sought was monetary, such that a sum certain was required, or non-monetary.  The record plainly demonstrates that plaintiff pursued a contracting officer's final decision declaring that the termination for convenience was a material breach in order to support its argument that the ensuing termination for cause against plaintiff was improper.  It is evident that plaintiff intended to rely on a declaration of material breach to strengthen its position against the termination for cause and not, as defendant asserts, solely to recover monetary relief.  Accordingly, notwithstanding defendant's argument that plaintiff's termination for convenience claim is monetary, the evidence before this court indicates that plaintiff's letter on November 16, 2012 was a claim for non-monetary relief.

Based on the specific facts presented in the above-captioned case, this court does not conclude that what plaintiff has styled as a non-monetary claim should be recharacterized as a monetary claim by the court. Contrary to defendant's contentions, Securiforce's claim seeking a final decision regarding the partial termination for convenience can be viewed as a request for non-monetary relief.  Plaintiff presented its claim, in compliance with the CDA, requesting a contracting officer's final decision on whether the government had breached the contract when it issued the partial termination for convenience. Because the claim in the above-captioned case was submitted in writing and sought a final decision on plaintiff's non-monetary claim, the court finds that plaintiff submitted a valid claim to the contracting officer over which this court can exercise jurisdiction. See England v. The Swanson Grp., Inc., 353 F.3d at 1379.

Defendant also argues that this court does not have jurisdiction over plaintiff's termination for convenience allegations because the contracting officer did not issue a final decision on plaintiff's November 16, 2012 letter.  Despite plaintiff's contention that its amended complaint is an appeal of the contracting officer's deemed denial of Securiforce's November 16, 2012 claim, defendant argues that the contracting officer did, in fact, respond to plaintiff's November 16, 2012 letter and explained that the response was not a final decision and that more information was needed. In response, plaintiff argues that there was "at a minimum, a deemed denial to Securiforce's request for final decision on the termination for convenience" set forth in the letter to the contracting officer on November 16, 2012.

Like the words of a claim, specific language is not required in order for a contracting officer's response to be considered a final decision.  "Under the CDA, a contractor may obtain an actual or a deemed final decision on [a] claim." Rudolph & Sletten, Inc. v. United States, 120 Fed. Cl. 137, 141 (2015).  In Alliant Techsystems, Inc. v. United States, the Federal Circuit found, "[a] letter can be a final decision under the CDA even if it lacks the standard language announcing that it constitutes a final decision." Alliant Techsystems, Inc. v. United States, 178 F.3d at 1267. Whether or not a letter constituted a final decision also was addressed in CW Government Travel, Inc. v. United States, in which this court

relied on <u>Alliant Techsystems, Inc. v. United States</u>, and noted that it is the substance, not the form, of a letter which determines whether it constitutes a final decision. <u>CW Gov't Travel, Inc. v. United States</u>, 63 Fed. Cl. at 384 ("A contracting officer's written refusal to render a 'final decision' does not provide an end-run around this court's jurisdiction; the substance, rather than the form of the letter is determinative. 'Whether a contracting officer's letter may be taken as a final expression of an agency's position on a claim . . . is ultimately to be judged by what the letter says and not by how it is labeled.'" (quoting <u>Litton Sys., Inc. v. United States</u>, 27 Fed. Cl. 306, 309 (1992))). In <u>CW Government Travel</u>, the court found that, to the extent the contracting officer interpreted the terms of the contract, it constituted a final decision. <u>CW Gov't Travel, Inc. v. United States</u>, 63 Fed. Cl. at 385. Also, failure to issue a decision within the required time is deemed to be a decision by the contracting officer denying the claim. <u>See</u> 41 U.S.C. § 7103(f)(5) ("Failure by a contracting officer to issue a decision on a claim within the required time period is deemed to be a decision by the contracting officer denying the claim and authorizes an appeal or action on the claim as otherwise provided in this chapter."); <u>see also</u> <u>Placeway Constr. Corp. v. United States</u>, 920 F.2d at 906–07 ("[W]e conclude that the contracting officer effectively made a final decision on the government claim. . . . The decision is no less final because it failed to include boilerplate language usually present for the protection of the contractor."); <u>Rudolph & Sletten, Inc. v. United States</u>, 120 Fed. Cl. at 141 ("A denial actual or deemed, authorizes an 'appeal or action on the claim as otherwise provided in [the CDA].'") (quoting 41 U.S.C. § 7103(f)(5)).

Although plaintiff argues that this court has jurisdiction pursuant to the CDA and the Tucker Act to hear its appeal of defendant's deemed denial of plaintiff's claim to the contracting officer on November 16, 2012, defendant contends that the contracting officer responded to plaintiff's claim and explained that the response was not a final decision. Following the receipt of plaintiff's November 16, 2012 letter, which requested a final decision "declaring that DLA Energy's partial termination for convenience issued in Mod P00001 to the Contract was a material breach of contract and that Securiforce is entitled to breach damages," the contracting officer sent a letter to plaintiff's counsel. In that letter, the contracting officer said that she "cannot issue a final decision based on the November 16 letter because the letter does not present a claim cognizable under the Contracts [sic] Disputes Act 1978, as amended, 41 U.S.C. §§ 701-709 (CDA)." The letter explained that "the Contracting Officer cannot issue a final decision on SIA's claim because the claim fails to state a 'sum certain' as required by 48 C.F.R. § 2.101 (2012)." "The November 16 letter does not make any reference to seeking an adjustment or interpretation of the contract terms.  However, the November 16 letter does request that the Contract [sic] Officer determine that SIA is entitled to unspecified 'breach damages.'" The contracting officer concluded that the "only possible interpretation of the letter is that SIA is pursuing a monetary claim for damages it believes it incurred resulting from the termination of those three line items for convenience." Based on this conclusion, the contracting officer ordered Securiforce to "please resubmit SIA's claim with a 'sum certain' and adequate supporting information to support SIA's claim."  The contracting officer then proceeded to

interpret the contract:

> Additionally, please note that while the question is not now before the Contracting Officer, SIA's allegation that the Government lacked the ability to terminate these three line items for convenience is likely without merit. Contracting Officers have broad discretion to take corrective action when the agency determines that it is necessary to ensure a fair and impartial competition. . . . This discretion extends to rescinding improperly awarded contracts through terminations for convenience.

The contracting officer's letter stated, "[i]n this particular case, the Contracting Officer was well within her discretion to terminate the Contract for convenience because the [sic] failed to properly apply its stated evaluation criteria," citing DFARS clause 252.225-7021 on Trade Agreements. The contracting officer explained:

> DLA Energy was required by the terms of the Solicitation to only award the Contract to offerors who complied with the sourcing restrictions set forth in DFARS 252.7021 to the extent that the restriction could not be waived by DFARS 225.403. . . . DLA Energy waived compliance with Trade Agreements Act for all 12 of the line items eligible for waiver under DFARS 225.403. The remaining 3 line items were terminated because the Contracting Officer decided to make the award in compliance with DFARS 252.225-7021 rather than seek a waiver from the U.S. Trade Representative.

Plaintiff's November 16, 2012 letter plainly requested a contracting officer's final decision pursuant to the CDA "declaring that the government's termination for convenience dated September 26, 2011" was "a material breach of contract," and, yet, the contracting officer concluded that "the only possible interpretation of the letter is that [Securiforce] is pursuing a monetary claim for damages." In refusing to issue a final decision on the issues presented by plaintiff in its letter, the contracting officer explained that a contractor must assert a sum certain if "the essence of a claim is to seek additional compensation for costs incurred under the contract." Although plaintiff's letter makes cursory mention of an entitlement to breach damages, as discussed previously, the essence of the letter and request for a decision by the contracting office was not monetary. Plaintiff did not focus on costs or damages in its letter, but, instead, discussed at length its allegations that the government previously breached the contract so as to render the subsequent termination for convenience against plaintiff null. Plaintiff's letter clearly presents its intention to pursue a declaration by the contracting officer that the government's termination for convenience was a material breach, and not a desire to recover costs or other monetary relief. The contracting officer's letter on January 16, 2013, in response to plaintiff's November 16, 2012 letter, demonstrates the contracting officer's conclusion that the essence of plaintiff's letter was monetary and that, without a

sum certain, the agency would not consider plaintiff's claim such that there a was a refusal to address plaintiff's claim for non-monetary relief.   The contracting officer's letter expressed with finality that plaintiff's claim could only be construed as a monetary claim when it indicated that no other interpretation of plaintiff's letter was possible.

Moreover, in addition to concluding that plaintiff's letter could only be viewed as a request for monetary relief, the contracting officer, nonetheless, considered the merits of plaintiff's material breach allegations.  Notwithstanding the contracting officer's attempt to qualify her discussion of the merits by stating that "while the question is not now before the Contracting Officer," the contracting officer's January 16, 2013 letter may be taken as a final expression of DLA Energy's position on plaintiff's termination for convenience claim.  It appears that the contracting officer thought, incorrectly, that a final decision may be rendered only in response to a proper claim, and, because the contracting officer concluded plaintiff's letter was not a proper monetary claim, her conclusions would not be considered final.   The Federal Circuit, however, has unequivocally decided that a contracting officer's decision may be considered final even when the contracting officer believes that a proper claim has not been submitted and states that its decision is not final.  See Alliant Techsystems, Inc. v. United States, 178 F.3d at 1267.  In the above-captioned case, the contracting officer stated that Securiforce's allegations were likely without merit and the government's action partially terminating for convenience plaintiff's contract was valid.  The contracting officer determined that "the Contracting Officer was well within her discretion to terminate the Contract for convenience because the [sic] failed to properly apply its stated evaluation criteria," and that the three contract line items "were terminated because the Contracting Officer decided to make the award in compliance with DFARS 252.225-702, rather than seek a waiver from the U.S. Trade Representative." Despite stating that her letter was not a final decision regarding the partial termination for convenience of Securiforce's contract, the contracting officer provided the substance of a final decision and a conclusion that plaintiff's claim was without merit. Plaintiff then properly appealed that decision to this court, having little other recourse.

Furthermore, even if this court agreed with defendant and found that the contracting officer did not provide a final decision, jurisdiction in this court over the partial termination for convenience would still be proper because the contracting officer's failure to respond to plaintiff's claim within 60 days, or provide an expected date of issuance for a final decision, would have constituted a deemed denial of plaintiff's claim.  See 41 U.S.C. § 7103(f); see also Dalton v. Cessna Aircraft Co., 98 F.3d 1298, 1301 (Fed. Cir. 1996); Orbas & Assocs. v. United States, 26 Cl. Ct. 647, 650 n.3 (1992) (explaining that a request by the contracting officer for additional information does not necessarily serve to extend the CDA's 60 day deadline and may result in a deemed denial); Tuba City Reg'l Health Care Corp. v. United States, 39 F. Supp. 3d 66, 71 (D.D.C. 2014) ("The CDA provides no exception to the § 7103(f) timing requirements for claims that the contracting officer later determines to be insufficiently supported by documentation.") (citing Orbas &

Assocs. v. United States, 26 Cl. Ct. at 650 n.3).  "Failure by a contracting officer to issue a decision on a claim within the required time period is deemed to be a decision by the contracting officer denying the claim and authorizes an appeal or action on the claim."  41 U.S.C. § 7103(f)(5).

In addition to arguing that this court does not have subject matter jurisdiction over plaintiff's termination for convenience claim because plaintiff did not satisfy the CDA's jurisdictional prerequisites, defendant also contends that plaintiff obviated the contracting officer's ability to decide the November 16, 2012 claim because plaintiff put the termination for convenience claim into litigation on November 6, 2012, when it filed its initial complaint in this court.  According to defendant, plaintiff's allegations in its initial complaint removed the contracting officer's authority to issue a final decision on the termination for convenience claim, thus, there was not a contracting officer's final decision. As noted above, however, plaintiff's initial complaint in this court did not assert a claim that the termination for convenience was an improper breach of contract.

Defendant correctly states the rule that "once a claim is in litigation, the contracting officer may not rule on it." K-Con Bldg. Sys., Inc. v. United States, 778 F.3d 1000, 1005 (Fed. Cir. 2015).  "Once a claim is in litigation, the Department of Justice gains exclusive authority to act in the pending litigation. 28 U.S.C. §§516-20 [2012]." Sharman Co., Inc. v. United States, 2 F.3d 1564, 1571 (Fed. Cir. 1993), overruled on other grounds, Reflectone, Inc. v. Dalton, 60 F.3d 1572.  In K-Con Building Systems, Inc. v. United States, the United States Court of Appeals for the Federal Circuit explained that it is important to properly identify claims in order to apply this rule. K-Con Bldg. Sys., Inc. v. United States, 778 F.3d at 1005. In that case, the Federal Circuit explained that the court "should treat requests as involving separate claims if they *either* request different remedies (whether monetary or non-monetary) *or* assert grounds that are materially different from each other factually or legally." K-Con Bldg. Sys., Inc. v. United States, 778 F.3d at 1005 (emphasis in original).

Applying the test for discerning whether claims are separate, as explained in K-Con Building Systems, Inc. v. United States, to the facts in the case currently before the court, requires a comparison of plaintiff's termination for convenience allegations in its initial complaint on November 6, 2012 and plaintiff's November 16, 2012 letter to the contracting officer. In its initial complaint, plaintiff sought "a declaratory judgment that its default by [DLA Energy] was improper."  Notably, plaintiff did not seek a declaratory judgment that the government's termination for convenience was improper.  In its initial complaint, plaintiff put forth several breach of contract allegations in its effort to prove that the termination for cause was improper. Specifically, plaintiff alleged that DLA Energy breached its contract with Securiforce because it did not intend to perform the contract at the time of award.  To support this assertion, plaintiff listed several allegedly "unilateral steps" that defendant took "to avoid its obligations and to change the benefits of the parties' bargain."  Included in this list is plaintiff's allegation that "DLA Energy terminated

for convenience more than half of the government's estimated requirements less than two weeks after Contract award because of a purported mistake." This allegation is one of several listed as steps that defendant took to avoid its contractual obligations. Plaintiff does not, however, explicitly allege in its initial complaint that the termination for convenience was a material breach of contract, nor does plaintiff seek relief for the termination for convenience. In fact, it was not until its letter to the contracting officer on November 16, 2012, that plaintiff asserted that the termination for convenience was a material breach of contract such that Securiforce may be entitled to relief. Plaintiff submitted this letter to the contracting officer on November 16, 2012, shortly after filing its initial complaint in this court. In the letter, plaintiff submitted a claim to the DLA Energy contracting officer seeking a "final decision declaring that DLA Energy's partial termination for convenience issued in Mod P00001 to the Contract was a material breach of contract." Later, after receiving a denial of its claim, plaintiff filed its amended complaint, in which it is now seeking declaratory relief that the termination for convenience was "improper and was itself a material breach of contract."  As these facts demonstrate, plaintiff's request for relief in its initial complaint was focused on the termination for cause. Plaintiff's references in its initial complaint regarding the termination for convenience did not amount to a claim because it did not seek any relief, instead, the claim in that complaint only concerned the termination for cause.  While claims are considered separate if they request different remedies, plaintiff did not seek a remedy or relief for the termination for convenience in its initial complaint filed in this court.  Instead, in its initial complaint, plaintiff requested declaratory relief because of the allegedly improper termination for cause. Plaintiff's claim to the contracting officer on November 16, 2012 specifically requested, for the first time, a declaration that the termination for convenience was improper.  These facts demonstrate that plaintiff's termination for convenience allegation in its initial complaint was not a claim, and, furthermore, the termination for convenience allegation is separate and distinguishable from plaintiff's subsequent claim to the contracting officer on November 16, 2012 seeking nonmonetary relief for the allegedly improper termination for convenience.

Applying the second consideration of the K-Con Building Systems, Inc. v. United States test for determining if requests are separate claims, which is whether plaintiff's requests "assert grounds that are materially different from each other factually or legally," the record in the above-captioned case demonstrates that plaintiff's November 16, 2012 claim to the contracting officer regarding the termination for convenience rests on multiple theories that were not asserted in plaintiff's initial complaint. K-Con Bldg. Sys., Inc. v. United States, 778 F.3d at 1005. In its initial complaint, in which it appealed DLA Energy's termination for cause, plaintiff alleged that the termination for convenience was one of many steps that defendant took to avoid its contractual obligations.  The allegation in the initial complaint, in its entirety, alleged:

> DLA Energy terminated for convenience more than half of the government's estimated requirements less than two weeks after Contract award because

of a purported mistake.  DLA Energy admitted that it could have sought a waiver from the US Trade representative but refused to do so, in breach of its good faith duty to facilitate Securiforce's performance.

In contrast, plaintiff's November 16, 2012 claim to the contracting officer set forth several different reasons and theories to support its allegation that "DLA Energy's actions in partially terminating the Contract for convenience was a material breach of Contract," including that DLA Energy breached the contract by repudiating its obligation to provide security escorts, that defendant's justification for the termination was pretextual, and that defendant unilaterally changed the contract in applying the TAA requirements after the contract was awarded.  Each of these theories are independently asserted as grounds to support plaintiff's claim that the termination for convenience was a material breach of the contract between DLA Energy and Securiforce. In K-Con Building Systems, Inc. v. United States, the Federal Circuit explained that asserting "breach of contract for not constructing a building on time versus breach of contract for constructing with the wrong materials" creates two different claims because each breach of contract allegation is based on a separate, materially different factual or legal theory. K-Con Bldg. Sys., Inc. v. United States, 778 F.3d at 1006. Similarly, in this case, setting aside the fact that plaintiff's initial complaint does not even specifically allege that the termination for convenience was a material breach of contract, plaintiff's initial complaint alleges that the termination for convenience was improper because DLA Energy did not seek a waiver and thus breached its duty to perform in good faith.  Plaintiff's November 16, 2012 claim to the contracting officer asserts various other theories to support its allegation that the termination for convenience was improper, including, for example, that the justification for the termination was pretextual.  Because plaintiff's initial complaint sets forth a different factual and legal theory than plaintiff's claim to the contracting officer, and assuming, for the sake of argument only, that the allegation in plaintiff's initial complaint may even be considered a claim, the claims are different.  Accordingly, the contracting officer did not lose her authority to decide plaintiff's November 16, 2012 claim seeking, as non-monetary relief, a declaration that the termination for convenience was improper and thus a material breach of contract.

Accordingly, having determined that plaintiff's November 16, 2012 letter constituted a valid claim to the contracting officer for non-monetary relief, that the contracting officer issued a final decision denying plaintiff's claim or, alternatively, that plaintiff's claim can be deemed denied, and that the contracting officer had authority to consider the claim and issue a final decision, this court may exercise jurisdiction over plaintiff's termination for convenience claim.

In addition to its motion to partially dismiss plaintiff's complaint with regard to the September 11, 2011, termination for convenience, defendant also asserts that this court lacks jurisdiction to entertain Securiforce's material breach allegations contained in Counts I-V of the complaint, including that the termination for convenience was improper,

because plaintiff did not satisfy the CDA prerequisites for these claims before filing its original complaint in this court. Furthermore, defendant argues that, by putting those claims into litigation before obtaining a contracting officer's final decision, plaintiff removed the claims from the contracting officer's decision-making authority. This decision has already addressed defendant's jurisdictional arguments regarding plaintiff's termination for convenience claim. In Counts I-V of its complaint, plaintiff alleges that DLA Energy materially breached the contract prior to the termination for default when: (I) DLA Energy unilaterally repudiated its obligation to provide security escorts, (II) DLA Energy did not place orders for the government's actual requirements and procured requirements from other sources, (III) DLA Energy did not intend to perform the contract  as agreed to by the parties at the time of award, (IV) DLA Energy breached its duty to facilitate Securiforce's performance and to act in good faith, and, (V) even if each of these allegations are not considered independent material breaches, all of DLA Energy's actions and inactions cumulatively amount to a material breach.  Defendant contends that Counts I-V of the complaint "contain separate, affirmative claims" that are distinct from plaintiff's termination for cause claim, and plaintiff did not submit these separate claims to the contracting officer for a final decision before filing its complaint in this court. Defendant argues that "[w]hen Securiforce filed its original Complaint, the only valid final decision that gave rise to this Court's jurisdiction was DLA Energy's November 15, 2011 termination for cause decision," which "did not relieve Securiforce of its obligations to present its affirmative claims for contractual breach to the contracting officer before this court could exercise jurisdiction."  Defendant argues that the material breach allegations in Counts I-V of plaintiff's complaint must have been presented to the contracting officer as defenses to the termination for cause before they would be proper grounds for a suit in this court, citing <u>M. Maropakis Carpentry, Inc. v. United States</u>, 609 F.3d 1323, and <u>Raytheon Co. v. United States</u>, 747 F.3d 1341 (Fed. Cir. 2014). In reply, plaintiff argues that there are only two claims involved in this case, (1) the government's termination for cause claim, and (2) plaintiff's claim that the termination for convenience was improper and a material breach of the contract. Plaintiff contends that the material breaches alleged in its complaint are defenses to DLA's termination for cause claim and not separate, affirmative claims that would require submission to the contracting officer for a final decision, as defendant asserts.  Plaintiff argues that it listed its defenses as separate counts in its complaint in accordance with Rule 10(b) of the Rules of the United States Court of Federal Claims (RCFC) (2015): "The prior material breaches were set out as defenses to the propriety of the default termination, as Rule 10(b) requires, rather than as claims themselves."  In the alternative, plaintiff asserts that, even if its defenses could be construed as separate CDA claims, its letter on November 8, 2011 requesting rescission of the default termination satisfied the CDA requirements. According to plaintiff, in its letters dated November 8, 2011 and November 18, 2011, Securiforce addressed each of the material breach defenses, and their supporting facts, asserted in the initial complaint, and the amended complaint, filed in this court.

To defend against an agency's termination for cause decision, a contractor may

assert that the government committed a material breach of contract prior to the termination.  See Stone Forest Indus., v. United States, 973 F.2d 1548, 1550 (Fed. Cir. 1992), reh'g denied (Fed. Cir. 1993); Malone v. United States, 849 F.2d 1441, 1445 (Fed. Cir. 1988), modified, 857 F.2d 787 (Fed. Cir. 1988); Internat'l Verbatim Reporters, Inc. v. United States, 9 Cl. Ct. 710 (1986)) see also Lake Charles XXV, LLC v. United States, 118 Fed. Cl. 717 (2014); Precision Pine & Timber, Inc. v. United States, 62 Fed. Cl. 635, 647 (2004); Airport Indus. Park, Inc. v. United States, 59 Fed. Cl. 332, 338 (2004); Morganti Nat'l, Inc. v. United States, 49 Fed. Cl. 110, 141 (2001), aff'd, 36 F. App'x 452 (Fed. Cir. 2002).  When the government commits a material breach of contract, a subsequent termination for cause against a contractor may be deemed improper. See Morganti Nat'l, Inc. v. United States, 49 Fed. Cl. at 141. "A contractor's failure to perform may be excused and a termination for default converted to a termination for the convenience of the government if the contractor can establish that the government materially breached the contract."  Morganti Nat'l, Inc. v. United States, 49 Fed. Cl. at 141. Moreover, a breach of contract defense to a termination for default is not necessarily a CDA claim for breach of contract.  See Roxco, Ltd. v. United States, 60 Fed. Cl. at 43-44 (explaining that a contractor may waive its ability to allege  breach of contract as an affirmative defense to a termination for default without waiving its ability to submit a CDA claim based on the same breach of contract in the future); but see Armour of Am. v. United States, 69 Fed. Cl. at 590 (holding that when breach of contract claims present different factual and legal issues than a claim for improper default termination those claims must be separately presented and certified to a contracting officer under the CDA). Accordingly, a contractor can appeal a contracting officer's termination for cause decision in this court and assert breach of contract as a defense to that termination without first submitting a breach of contract claim to a contracting officer and receiving a final decision.  See Malone v. United States, 849 F.2d at 1445; see also Roxco, Ltd. v. United States, 60 Fed. Cl. at 43-44.

In the above-captioned case, plaintiff asserts that its breach of contract allegations contained in Counts I-V of its complaint are defenses to DLA Energy's decision to terminate plaintiff's contract for cause and not CDA claims, which would require submission to the contracting officer and a contracting officer's final decision. Counts I-V of plaintiff's complaint each assert a "Prior Material Breach of Contract" and plaintiff requests as relief that, based on these prior material breaches, this court award it "a declaration that the default was invalid and was itself a material breach of contract." Plaintiff does not seek an award of money damages in its complaint.

To support its assertion that the breach of contract allegations are claims and that plaintiff has not satisfied the CDA prerequisites that are necessary for this court to exercise subject matter jurisdiction, defendant relies on M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, and Raytheon Co. v. United States, 747 F.3d 1341, which are distinguishable from the above-captioned case. In M. Maropakis Carpentry v. United States, the plaintiff attempted to assert an affirmative claim for contract modification as a

defense to the government's counterclaim, and the plaintiff argued that the CDA requirements did not apply. See M. Maropakis Carpentry, Inc. v. United States, 609 F.3d at 1329–30. The Federal Circuit held that "a contractor seeking an adjustment of contract terms must meet the jurisdictional requirements and procedural prerequisites of the CDA, whether asserting the claim as an affirmative claim or as a defense to a government action." M. Maropakis Carpentry, Inc. v. United States, 609 F.3d at 1331. Unlike in M. Maropakis Carpentry, in the above-captioned case, plaintiff is not seeking a modification of the contract terms, instead, plaintiff is seeking a declaratory judgment that defendant's terminations were improper based on the government's prior material contract breaches. In Raytheon Co. v. United States, 747 F.3d 1341, the government attempted to assert a counterclaim for an equitable adjustment, but the Federal Circuit found that the trial court lacked jurisdiction to consider the government's counterclaim because it was never the subject of a contracting officer's final decision. Unlike in Raytheon Co. v. United States, in the above-captioned case, plaintiff is not seeking to recover costs or modify the terms of the contract. Rather, the breach allegations against the government are a basis for plaintiff's assertion that the termination for cause was improper. Plaintiff's breach allegations are asserted in defense against the government's termination for cause claim. As defendant explains, the "parties do not dispute that the Government's termination for cause is an affirmative claim made by the Government and that this Court possesses jurisdiction to entertain this claim through Count VI of Securiforce's complaint." Defendant does not dispute that the termination for cause constitutes a final decision, which plaintiff did not need to challenge before the contracting officer before challenging the decision in this court. Defendant argues, however, that raising the alleged, prior material breaches of the contract as defenses to the termination for cause is jurisdictionally improper until the claims presented in Counts I-V are first presented to the contracting officer.

Defendant further argues that, because plaintiff did not submit its material breach claims to the contracting officer before filing its complaint in the above-captioned case in this court, plaintiff's subsequent attempts in its November 16, 2012 to submit its claims to the contracting officer after the initial complaint was filed are unhelpful in establishing this court's subject matter jurisdiction. Similar to the discussion above, defendant argues that, because plaintiff put its material breach allegations into litigation in its initial complaint, "this Court lacks jurisdiction over those claims as presented to the contracting officer after the complaint was filed because the contracting officer no longer held the authority to issue a final decision." Citing K-Con Building Systems, Inc. v. United States, 778 F.3d at 1005, defendant argues that when a contract claim is pleaded in a complaint in a federal court, the contracting officer is deprived of the authority to issue a final decision. As explained above, in K-Con Building Systems, Inc. v. United States, the Federal Circuit affirmed the rule that "once a claim is in litigation, the contracting officer may not rule on it—even if the claim is not properly in litigation because it was not properly submitted to and denied by the contracting officer before it was placed in litigation." K-Con Bldg. Sys., Inc. v. United States, 778 F.3d at 1005. In its decision, the Federal Circuit explained that

requests should be treated as "involving separate claims if they *either* request different remedies (whether monetary or non-monetary) *or* assert grounds that are materially different from each other factually or legally." Id.

Defendant in the above-captioned case argues that by asserting its material breach allegations in Counts I-V, for the first time, in its original complaint filed in this court, Securiforce deprived the contracting officer of the authority to issue a final decision on plaintiff's breach of contract claims asserted in Securiforce's November 16, 2012 claim. Plaintiff, again, contends that its material breach allegations are defenses, not claims.   Plaintiff's initial complaint in the above-captioned case seeks "declaratory relief that its default by the Defense Logistics Agency Energy. . . was improper because DLA Energy committed multiple, material breaches of its commercial-item, requirements contract." The initial complaint put forth several alleged prior material breaches intended to support plaintiff's appeal of the termination for cause.  As discussed above, in an appeal of a contracting officer's termination for cause, a contractor may assert a prior material breach as a defense to a termination for cause, without first submitting a breach of contract claim to a contracting officer for a final decision, when the relief sought is a declaration that the termination for cause was improper. See Malone v. United States, 849 F.2d at 1445.  In this case, neither the initial complaint nor the amended complaint sought relief other than a declaratory judgment that the termination for cause was improper because of the government's prior material breaches. Plaintiff has not raised a separate affirmative claim for breach of contract or requested an award of monetary relief for breach damages. Also, as defendant correctly indicates, this court would not have jurisdiction to award plaintiff breach of contract monetary damages because plaintiff has not submitted a claim for breach of contract damages. See Armour of Am. v. United States, 69 Fed. Cl. at 592. Although plaintiff organized its amended complaint in a confusing manner, Counts I-V of the amended complaint are defenses and each part and parcel to plaintiff's challenge to the termination for cause.   Therefore, plaintiff was not required to submit these allegations to the contracting officer before filing its complaint in this court.   Accordingly, this court has jurisdiction to consider plaintiff's breach of contract allegations in Counts I-V of its complaint.

In the alternative, even if the court was to hold that, under M. Maropakis Carpentry, plaintiff's defenses had to be presented to the contracting officer, both the spirit and letter of M. Maropakis Carpentry are satisfied. In M. Maropakis Carpentry, the court explains that the purpose of requiring a claim to be filed with the contracting officer "is to encourage the resolution of disagreements at the contracting officer level thereby saving both parties the expense of litigation." M. Maropakis Carpentry, Inc. v. United States, 609 F.3d at 1331. In the above-captioned case, it is clear that plaintiff made efforts to resolve the issue at the contractor level, and the contracting officer cannot claim the element of surprise. On November 4, 2011, Ms. Shepherd issued a show cause notice to Securiforce, which stated: "the Government is considering terminating the contract under the provisions for default of this contract. . . .The Government has not received Delivery Orders 0001 and

0002 . . . ." The contracting officer offered plaintiff the opportunity to present explanations in writing, which plaintiff did by responding with a letter dated November 8, 2011. In its November 8, 2011 letter, Securiforce argued that it was not late, citing the ordering clause in the contract and stating that the clause does not provide a timeframe under which Securiforce was required to deliver. Securiforce explained that it had raised this issue previously with DLA Energy. Securiforce asserted that neither party expected delivery by October 24, 2011. Securiforce also argued that it had submitted a detailed Concept of Operations, Logistical Procedures, and Quality Control Plan, which the government had accepted, but, nonetheless, the government repeatedly asked Securiforce to change its procedures to comply with continually changing government policy for operations in the war zone. Securiforce also argued that the orders were not placed until October 20, 2011, when they were assigned order numbers, and the orders were not entered into PORTS, as required under the contract. In the November 8, 2011 letter, plaintiff alleges specifically that a number of actions hindered its ability to perform, including:

- loss of the majority of CLINs immediately after award of the contract [Mod 0001], and the uncertainty of resolution,
- request for a Proof of Principle (POP) to Taji, Besamaya and Umm Qasr, outside of the contract requirements as no POP is mentioned [in the Contract],
- cancellation of orders,
- orders verbally given with no assigned order numbers,
- continued changes in direction from DLA regarding performance;
- shortly after executing Mod. 2 [providing security], DLA's e-mail informing Securiforce that security escorts were not available to numerous locations.

Securiforce also alleges in its November 8, 2011 letter that the government's actions caused plaintiff to "cancel the KPC [Kuwait Petroleum Company] account and stand down the subcontractor twice, which led to a great deal of turmoil between all parties and resulting [sic] in a substantial amount of additional work and expense for Securiforce IA." Securiforce concludes in the November 8, 2011 letter that:

The Government's actions and indecision have created many barriers to cross and hoops to jump through to set this service up since award of this contract, which has attracted difficulties that were not foreseen or expected. Under the terms of our Contract, Securiforce IA is not late. Furthermore, for the reasons discussed above, the delays are attributable to the Government's actions, which does qualify Securiforce IA to relief under the Excusable Delays clause.

Approximately one week later, on November 15, 2011, the government, through the contracting officer, issued Mod 0003, the termination for cause. In the letter explaining

the termination for cause, the contracting officer explained that Securiforce was obligated to deliver once an order was placed, and Securiforce's failure to deliver Orders 0001 and 0002 was considered to be a breach of contract. The contracting officer, Ms. Shepherd, stated that the security discussions "should not have precluded Securiforce from obtaining their supplier and financial commitments" and those discussions were resolved by Mod 0002, which was issued on October 13, 2011, prior to any orders being placed. Ms. Shepherd also explained that in plaintiff's response to the show cause letter, Securiforce failed to provide evidence that its failure to perform was caused by excusable delay, and it did not give a firm date by which Securiforce would deliver orders 0001 and 0002. The contracting officer concluded:

> As of today, November 15, Securiforce has had 30 days to perform the two deliveries. However, no fuel has been delivered and Securiforce is in breach of its contract. The Government can no longer allow further delays due to the mission critical nature of this requirement. I have reviewed your response to the show cause notice and I do not find that your nonperformance was excused. Therefore, I am terminating for cause this contract in its entirety, effective November 15, 2011.

She then provided information regarding Securiforce's appeal rights, stating that her letter was a final decision by a contracting officer for the termination for cause.

Securiforce, through its counsel, replied to the government's November 15, 2011 termination for cause with a letter dated November 18, 2011. In this letter, Securiforce's attorney alleged that DLA Energy's decision to terminate the contract for cause was unfounded and asked the government to rescind the termination. Securiforce, through counsel, argued in its letter:

> *First*, the Government repudiated its contractual obligation to provide security. *Second*, the delays in delivery were due to Government-caused delay, and DLA Energy failed to fully consider Securiforce IA's response to the cure notice. *Third*, DLA Energy has waived its right to terminate for untimely delivery.

(emphasis in original). Plaintiff also explained in the letter the circumstances under which it believed a termination for cause was and was not appropriate and then reiterated its arguments:

> Given that (1) DLA breached the Contract by repudiating its obligation to provide security prior to the termination, (2) DLA's cancellation of prior orders caused the delay, and (3) DLA expressly waived the purported delivery dates and instead continued to let Securiforce IA perform, it is clear that forfeiture is inappropriate here.

(emphasis added). Plaintiff asserted that "DLA Energy unilaterally repudiated the Government's contractual commitments set forth in Mod. 2 [to provide security]." Plaintiff also claimed that the government was responsible for causing Securiforce's delay by cancelling an order for a shipment of fuel to one of its sites, Umm Qasar, which caused turmoil with Securiforce's contractors. Further, Securiforce alleged that the government violated its obligation not to interfere with the contractor's actions. Plaintiff also argued that DLA Energy waived its right to terminate Securiforce for failure to deliver by the alleged deadlines because it did not act promptly after the deadlines passed to terminate plaintiff, and it is now too late. Finally, plaintiff claimed that given the small value of Orders 0001 and 0002 relative to the expected value of the contract, terminating the entire contract was inappropriate. Securiforce also noted that there are additional reasons not discussed in its letter to support its argument that termination is unwarranted. The allegations in Securiforce's November 18, 2011 letter foreshadow those in its subsequent complaints filed in this court. Plaintiff's attorney concludes the letter by noting that plaintiff intends to pursue litigation if the termination is not rescinded.

DLA Energy responded to plaintiff's letter on December 6, 2011, asserting that the contract was properly terminated. Ms. Shepherd addressed Securiforce's arguments that the contract should not have been terminated for cause in her response letter. First, she explained why she believed that "the Government did not repudiate its obligation to provide security." Second, she argued that the cancellation of "an order under a contract simply cannot be construed as interfering with Securiforce's supply arrangements," and she refuted Securiforce's claims that the government was responsible for the delay by claiming Securiforce failed to put into place the components necessary to perform. Third, she took issue with the contention that the government had waived its right to terminate the contract because it waited until November 15, 2011 to terminate. Finally, she stated:

> It is disingenuous for Securiforce to argue that it did not know that time was of the essence to deliver fuel to Iraq to support the DoS mission. The gasoline and diesel fuels under the Contract were to support DoS vehicles and generators for electricity. These locations cannot be permitted to run out of fuel. DLA Energy was covering for Securiforce's failure to deliver by trucking fuel from Department of Defense stocks in Kuwait. The Securiforce Contract was awarded to allow the transition from DoD assets to contracts supporting only DoS missions. The Contract required Securiforce to deliver fuel from the date of Contract award and Securiforce should have been ready to perform from the date the Contract was awarded. However, as of the November 3, 2011 email, there were problems with supply arrangements and financing with an estimated delivery date of November 20, 2011. In its November 8, 2011 response to the show cause notice, Securiforce provided no additional information about a delivery date to DLA Energy.

Ms. Shepherd concluded that Securiforce had not provided a basis to rescind the termination for cause. She closed her response with a disclaimer that her letter "does not impact the rights and remedies available to Securiforce as set forth in the termination for cause."

Securiforce's November 18, 2011 letter asking DLA Energy to reconsider the termination for cause independently, and in conjunction with plaintiff's November 8, 2011 response to the show cause notice, informed the contracting officer of the basis for Securiforce's breach of contract allegations against the government and provided the contracting officer with the opportunity to respond and potentially resolve the dispute. It is well settled that:

> [t]he CDA requires a contractor to submit a written claim against the federal government to the contracting officer for decision. 41 U.S.C. § 7104. A claim is defined as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract."

Williams v. United States, 118 Fed. Cl. at 538 (quoting FAR § 2.101). The basis for Securiforce's allegations that the termination for cause was improper and Securiforce, therefore, was entitled to relief relating to the contract, was communicated to the contracting officer through its letters.  Although this court finds that plaintiff can assert its breach of contract allegations as defenses against DLA Energy's termination for cause, and that plaintiff is not required to first submit these defenses to the contracting officer, the correspondence from plaintiff in the record satisfies the requirements of the CDA and M. Maropakis Carpentry.

For the reasons explained above, defendant's partial motion to dismiss, for lack of jurisdiction under RCFC 12(b)(1), the claims in plaintiff's amended complaint that are related to the September 2011 partial termination for convenience of Securiforce's contract is, therefore, **DENIED**.

Securiforce's CDA Claims

Having denied defendant's partial motion to dismiss, we turn to the merits of plaintiff's complaint. Plaintiff claims that both the termination for convenience and the termination for cause were improper. Plaintiff "seeks a declaratory judgment that the partial termination for convenience and, subsequently, its default by [DLA Energy] was improper because DLA Energy committed multiple, material breaches of its commercial-item, three-year, requirements contract with Securiforce for fuel deliveries to eight locations in Iraq." Thus, this court is asked to review both terminations.  While the allegedly improper termination for convenience is one of several grounds that plaintiff puts

forth to support its argument that the termination for cause was invalid, it is a separate, independent claim for this court to consider. Furthermore, although plaintiff's complaint can be considered an appeal of the contracting officer's deemed or actual denial of Securiforce's claim regarding the termination for convenience, and, separately, an appeal of the government's termination for cause decision, the complaint blurs the factual and legal theories intended to support these two claims.  Specifically, although raised in the complaint, the complaint does not carefully discuss in detail the grounds that support the appeal of its November 16, 2012 claim to the contracting officer seeking a declaration that the termination for convenience was a material breach of contract.  As a result, in order to best address plaintiff's allegation that the termination for convenience was invalid, the court also considers the grounds set forth in the November 16, 2012 claim to the contracting officer. The court considers plaintiff's allegations surrounding the termination for convenience first.

Termination for Convenience

The parties do not dispute that on or about September 26, 2011, DLA Energy issued Modification P0001 to the contract with Securiforce, which terminated for the government's convenience three of Securiforce's CLINs, specifically, the CLINs for the Embassy and Prosperity DoS sites. The contract included a term contemplating a termination for convenience:

> **TERMINATION FOR THE GOVERNMENT'S CONVENIENCE.** The Government reserves the right to terminate this contract, or any part thereof, for its sole convenience. In the event of such termination, the Contractor shall immediately stop all work hereunder and shall immediately cause any and all of its suppliers and subcontractors to cease work. Subject to the terms and conditions of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination. The Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose. This paragraph does not give the Government any right to audit the Contractor's records. The Contractor shall not be paid for any work performed or costs incurred which reasonably could have been avoided.

(capitalization and emphasis in original).

A contract may be terminated for convenience by the government any time it determines that to do so is in its best interests, so long as it does not abuse its discretion or act in bad faith. See Krygoski Constr. Co. v. United States, 94 F.3d 1537, 1541 (Fed.

Cir. 1996); <u>Northrop Grumman Corp. v. United States</u>, 46 Fed. Cl. at 627; <u>see also</u> 48 C.F.R. § 52.249–2 (2016). The phrase "termination for the convenience of the government" makes clear that a contractual relationship can been halted by the government simply because it no longer desires to continue it. 48 C.F.R. § 52.249–2. "[A] proper termination for convenience does not constitute a breach of contract" and "limits the monetary recovery" a contractor can collect. <u>TigerSwan, Inc. v. United States</u>, 110 Fed. Cl. 336, 344 (2013). A contractor "may not recover anticipatory or consequential damages following a termination for convenience," but, instead, the government is liable only for the contractor's partial performance up to the time of the termination for convenience "and certain costs delineated by law or by the contract's termination clause." <u>Id.</u> A contractor may successfully allege that a termination for convenience rises to a breach of contract when "the agency (1) terminates the contract in bad faith or (2) abuses its discretion in its decision to terminate the contract." <u>Id.</u>; <u>see also</u> <u>T & M Distribs., Inc. v. United States</u>, 185 F.3d 1279, 1282 (Fed. Cir. 1999). "In the absence of bad faith or clear abuse of discretion, the contracting officer's election to terminate for the government's convenience is conclusive." <u>T & M Distribs., Inc. v. United States</u>, 185 F.3d at 1282.

A Judge of the United States Court of Federal Claims has summarized the standard as follows:

> The United States Court of Appeals for the Federal Circuit has held that a termination for convenience will be upheld unless the contractor can establish bad faith or clear abuse of discretion. <u>See</u> <u>T & M Distribs., Inc. v. United States</u>, 185 F.3d 1279, 1283 (Fed. Cir. 1999) ("In the absence of bad faith or clear abuse of discretion, the contracting officer's election to terminate for the government's convenience is conclusive."); <u>see also</u> <u>Krygoski Constr. Co., Inc. v. United States</u>, 94 F.3d 1537, 1541 (Fed. Cir. 1996) ("When tainted by bad faith or an abuse of contracting discretion, a termination for convenience causes a contract breach.")[, <u>cert. denied</u> 520 U.S. 1210 (1997)]. In <u>Am–Pro Protective Agency, Inc. v. United States</u>, 281 F.3d 1234 (Fed. Cir. 2002), the United States Court of Appeals for the Federal Circuit held that the presumption that Government officials act in good faith may only be overcome by clear and convincing evidence. <u>Id.</u> at 1239 ("[W]e believe that clear and convincing most appropriately describes the burden of proof applicable to the presumption of the government's good faith."). In addition, the plaintiff must show "specific intent to injure" the plaintiff. <u>Id.</u> at 1241.

<u>NCLN20, Inc. v. United States</u>, 99 Fed. Cl. 734, 758-59 (2011), <u>appeal</u> <u>dismissed</u>, 462 F. App'x 966 (Fed. Cir.), <u>and</u> <u>aff'd</u>, 495 F. App'x 94 (Fed. Cir. 2012); <u>see also</u> <u>Custom Printing Co. v. United States</u>, 51 Fed. Cl. 729, 733-34 (2002) ("This Court employs a highly deferential standard when reviewing the Government's decision to terminate for

convenience.  While the Government's right to terminate a contract for convenience is not unlimited, the case law clearly provides that the Government is entitled to considerable latitude in making such a decision to terminate." (citations omitted)).  Moreover, it has been observed that: "'if the contract contains a termination for convenience clause and the contracting officer could have invoked the clause instead of terminating, rescinding or repudiating the contract on some other invalid basis, the court will constructively invoke the clause to retroactively justify the government's actions, avoid breach, and limit liability.'"  Praecomm, Inc. v. United States, 78 Fed. Cl. 5, 11 (2007) (quoting Best Foam Fabricators, Inc. v. United States, 38 Fed. Cl. 627, 638 (1997)), aff'd, 296 F. App'x 929 (Fed. Cir. 2008). In addition, because of the broad discretion vested in the contracting officer, plaintiff has a high burden of proof to show that a determination was an abuse of discretion.  See Caldwell & Santmyer, Inc. v. Glickman, 55 F.3d 1578, 1581 (Fed. Cir. 1995); Salsbury Indus. v. United States, 905 F.2d 1518, 1521 (Fed. Cir.), reh'g denied (Fed. Cir.), and suggestion for reh'g in banc denied (Fed. Cir. 1990), cert. denied, 498 U.S. 1024 (1991); Cont'l Bus. Enters., Inc. v. United States, 196 Ct. Cl. 627, 637, 452 F.2d 1016, 1021 (1971).

The considerable latitude the government is entitled to in terminating for convenience, however, is not unlimited.  See IMS Eng'rs-Architects, P.C. v. United States, 92 Fed. Cl. 52, 72 (2010) (citing Torncello v. United States, 231 Ct. Cl. 20, 47, 681 F.2d 756, 772 (1982); Nat'l Factors, Inc. v. United States, 204 Ct. Cl. 98, 103, 492 F.2d 1383, 1385 (1974)) (noting the Torncello court rejected, "in context of requirements contract, unfettered use of termination for convenience and stating that the 'government may not use the standard termination for convenience clause to dishonor, with impunity, its contractual obligations'"), aff'd, 418 F. App'x 920 (Fed. Cir.), and reh'g and reh'g en banc denied (Fed. Cir. 2011).

Proof that a termination for convenience was an abuse of discretion renders a contract breached.  See Krygoski Constr. Co. v. United States, 94 F.3d at 1541 (citations omitted); see also NCLN20, Inc. v. United States, 99 Fed. Cl. at 758.  To prove an abuse of discretion, plaintiff must show that the contracting officer's decision to terminate was arbitrary and capricious.  See U.S. Fid. & Guar. Co. v. United States, 230 Ct. Cl. 355, 368, 676 F.2d 622, 630 (1982).  The applicable burden of proof under the abuse of discretion standard is clear and convincing evidence.  See, e.g., NCLN20, Inc. v. United States, 99 Fed. Cl. at 758 ("The United States Court of Appeals for the Federal Circuit has held that a termination for convenience will be upheld unless the contractor can establish bad faith or clear abuse of discretion."  (citing T & M Distribs., Inc. v. United States, 185 F.3d at 1283 ("In the absence of bad faith or clear abuse of discretion, the contracting officer's election to terminate for the government's convenience is conclusive."))); see also Caldwell & Santmyer, Inc. v. Glickman, 55 F.3d at 1581 ("We have stated that '[i]t is not the province of the courts to decide de novo whether termination was the best course. In the absence of bad faith or clear abuse of discretion the contracting officer's election to terminate is conclusive.'"  (bracket in original) (quoting

Salsbury Indus. v. United States, 905 F.2d at 1521 (quoting John Reiner & Co. v. United States, 163 Ct. Cl. 381, 390, 325 F.2d 438, 442 (1963)))).

Pursuant to 48 C.F.R. § 12.403(b), the contracting officer can terminate contracts under the following guidance:

Policy. The contracting officer should exercise the Government's right to terminate a contract for commercial items either for convenience or for cause only when such a termination would be in the best interests of the Government. The contracting officer should consult with counsel prior to terminating for cause.

48 C.F.R. § 12.403(b) (2016). The FAR requires only that a termination for convenience be in the best interests of the government. See 48 C.F.R. § 49.101 (2016).

A contracting officer, however, may not terminate a contract in bad faith, such as "simply to acquire a better bargain from another source." Krygoski Constr. Co. v. United States, 94 F.3d at 1541 (citing Torncello v. United States, 231 Ct. Cl. at 48, 681 F.2d at 772). Similarly, the government is not permitted to enter into a contract without any intention of upholding it. See Caldwell & Santmyer, Inc. v. Glickman, 55 F.3d at 1582. However, "[t]he mere fact that a contracting officer awards a contract to another company after terminating the plaintiff's contract is insufficient to show bad faith." Kalvar Corp. v. United States, 211 Ct. Cl. 192, 199, 543 F.2d 1298, 1302 (1976), cert. denied, 434 U.S. 830 (1977).

Moreover, as noted by the United States Court of Appeals for the Federal Circuit, agency personnel are presumed to act in good faith, and a claimant must present significant proof of bad faith to overcome that presumption. See T & M Distribs., Inc. v. United States, 185 F.3d at 1285; see also Sickels v. Shinseki, 643 F.3d 1362, 1366 (Fed. Cir.) ("'"The presumption of regularity provides that, in the absence of clear evidence to the contrary, the court will presume that public officers have properly discharged their official duties."'" (internal quotation marks omitted) (quoting Rizzo v. Shinseki, 580 F.3d 1288, 1292 (Fed. Cir. 2009) (quoting Miley v. Principi, 366 F.3d 1343, 1347 (Fed. Cir. 2004)))), reh'g and reh'g en banc denied (Fed. Cir. 2011). Accordingly, in order to prove that the termination for convenience was a breach of contract, plaintiff, Securiforce, must prove that the agency either terminated the contract in bad faith or abused its discretion in deciding to terminate the contract for the government's convenience.

In plaintiff's November 16, 2012 claim to the contracting officer, it alleged that "DLA Energy's actions in partially terminating the Contract for convenience was a material breach of the Contract, for several reasons." These reasons include, as discussed above, that "the government breached the Contract by unilaterally repudiating its obligation to provide security escorts"; DLA Energy invoked the termination "as a means to avoid its

obligations under the Contract"; DLA Energy's justification for the termination was a pretext; "DLA Energy breached its express and implied duties of good faith and fair dealing"; the application of the TAA after the contract award was a unilateral change to the contract; and DLA Energy was negligent in preparing its solicitation.

First, the court considers whether the termination for convenience was issued in bad faith.  While plaintiff's complaint does not directly assert that the termination for convenience was exercised in bad faith, plaintiff did assert that defendant breached its duty of good faith and fair dealing because "DLA breached its duty to facilitate, not frustrate, Securiforce's performance of the awarded Embassy and Prosperity CLINs." Specifically, plaintiff argues that "DLA had a duty, once the Contract was formed, to attempt to obtain the waiver through the Defense Procurement and Acquisition Policy Office ("DPAP')," but, instead, DLA processed a waiver for six sites and terminated the CLINs associated with two other sites and rewarded those CLINs to plaintiff's competitors. Judges on this court have held that a breach of contract allegation based on a breach of the implied duty of good faith and fair dealing "is distinct from a claim for breach of contract based on an improper termination for convenience."  TigerSwan, Inc. v. United States, 110 Fed. Cl. at 345; see also E & ER Enter. Glob., Inc. v. United States, 120 Fed. Cl. 165, 173 (2015) (explaining that an allegation of lack of good faith and fair dealing and an allegation of bad faith are "distinct in terms of burdens of proof"); D'Andrea Bros. LLC v. United States, 96 Fed. Cl. 205, 222 n.24 (2010) (explaining that "the standard for showing a breach of the covenant of good faith and fair dealing is different from that for showing that the government has acted in bad faith"). Stated differently, an allegation that the government breached its duty of good faith and fair dealing is not equal to an allegation of bad faith.  See Rivera Agredano v. United States, 70 Fed. Cl. 564, 574 n.8 (2006) ("a claim that the government breached the covenant of good faith and fair dealing is not the same as a claim that the government acted in bad faith").  In fact, proof of bad faith is not always required to show a breach of the implied duty of good faith and fair dealing. See TigerSwan, Inc. v. United States, 110 Fed. Cl. at 346.  "Parties can show a breach of the implied duty of good faith and fair dealing by proving lack of diligence, negligence, or failure to cooperate." Id. at 345.

As explained above, in order for plaintiff to prove bad faith on the part of the government, plaintiff must overcome the presumption that government officials act in good faith in the discharge of their duties. See ManTech Comm. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 74 n. 26 (2001), aff'd, 30 F. App'x 995 (Fed. Cir. 2002). To overcome this presumption, the plaintiff must produce "clear and convincing" evidence of bad faith on the part of the government. Am-Pro Protective Agency v. United States, 281 F.3d at 1239. "[A] challenger seeking to prove that a government official acted in bad faith in the discharge of his or her duties must show a 'specific intent to injure the plaintiff' by clear and convincing evidence." Road & Highway Builders, LLC v. United States, 702 F.3d 1365, 1369 (Fed. Cir. 2012) (quoting Am-Pro Protective Agency v. United States, 281 F.3d at 1239-40).  In this regard, the trial record does not reflect that any government

official acted with the specific intent to injure the plaintiff or to prevent performance of its contract. Certainly, frustration on the part of the government officials was evident in their testimony. The government officials expressed the urgency to ensure fuel deliveries were available for the DoS sites in a conflict zone, given the critical nature of the requirements. As discussed above, plaintiff did not point to any specific evidence to demonstrate defendant's bad faith.  There is no evidence in the record that defendant's actions were motivated by ill will against the plaintiff. Moreover, plaintiff merely indirectly alleged bad faith in its complaint. The record does not reflect the requisite malice or specific intent to injure.

Notwithstanding plaintiff's reasons in support of its allegation that the termination for convenience rises to a breach of contract, plaintiff did not put forth any evidence of defendant's bad faith in exercising its discretion to terminate the contract, falling well short of the evidentiary bar of clear and convincing evidence of "intent to injure,'" which is necessary for overcoming the presumption of good faith afforded to government employees. TigerSwan, Inc. v. United States, 110 Fed. Cl. at 345 (quoting Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239-40 (Fed. Cir. 2002). Because plaintiff has not directly alleged bad faith against the government with regard to the termination for convenience, and it has not presented any evidence of bad faith, this court does not find that the termination for cause was a material breach of contract because DLA Energy acted in bad faith. Thus, only if there is evidence in the trial record of defendant's abuse of discretion, may this court find that the termination for convenience rises to a breach of contract.

Plaintiff's second mechanism to prove the termination for convenience was a breach of contract is to demonstrate an abuse of discretion by the government. As explained above, to prove an abuse of discretion, plaintiff must show that the contracting officer's decision to terminate was arbitrary and capricious.  See U.S. Fid. & Guar. Co. v. United States, 676 F.2d at 630.  The applicable burden of proof under the abuse of discretion standard is clear and convincing evidence. See, e.g., NCLN20, Inc. v. United States, 99 Fed. Cl. at 758.

> Without question, a contracting officer is granted a great deal of discretion in determining whether it is in the government's best interest to terminate a contract for convenience. However, while a contracting officer is afforded wide discretion, he [or she] is still responsible for making an independent decision with regard to a contract.

TigerSwan, Inc. v. United States, 118 Fed. Cl. 447, 453 (2014) (citing FAR §§ 49.101(a)–(b) (stating that the contracting officer has the authority to terminate contracts)); see also N. Star Alaska Hous. Corp. v. United States, 76 Fed. Cl. 158, 209 (2007) (citing CEMS, Inc. v. United States, 65 Fed. Cl. 473, 479–80 (2005)) ("[A] contracting officer may not forsake his duties, but rather must ensure that his decisions are the product of his

personal and independent judgment."). As explained by the Federal Circuit, the contracting officer must ultimately "'put his own mind to the problems and render his own decisions.'" Pac. Architects & Eng'rs, Inc. v. United States, 203 Ct. Cl. 499, 517, 491 F.2d 734, 744 (Ct. Cl. 1974) (quoting New York Shipbuilding Co. v. United States, 180 Ct. Cl. 446, 460, 385 F.2d 427, 435, (Ct. Cl. 1967)). Although the contracting officer's failure to exercise independent judgment does not automatically require a finding that there was an abuse of discretion, "the contracting officer's failure to make an independent decision weighs in favor of finding an abuse of discretion." TigerSwan, Inc. v. United States, 118 Fed. Cl. at 453 (citing Keco Indus., Inc. v. United States, 492 F.2d 1200, 1204 (Ct. Cl. 1974)). Such a failure also means that "the contracting officer's reasons for termination are not entitled to the deference typically afforded to contracting officer decisions." Id. (citing Pac. Architects & Eng'rs, Inc. v. United States, 491 F.2d at 744)); see also Krygoski Constr. Co. v. United States, 94 F.3d at 1541. When a contracting officer abdicates her responsibility to exercise her own independent business judgment in deciding whether to terminate a contract for the government's convenience, the court may "inquire into the objective facts to determine whether the justifications for the decision are supported." TigerSwan, Inc. v. United States, 118 Fed. Cl. at 453.

In this case, at trial, the contracting officer testified that she failed to exercise independent judgment in executing the partial termination for convenience. When asked: "Did you decide it was in the government's best interest to partially terminate the contract for convenience?", contracting officer Phyllis Watson surprisingly replied: "No, my supervisor." She was then asked: "Did you reach an independent conclusion or determination that it was in the government's best interest, or did you do what Ms. Shepherd just asked you to do?". Ms. Watson replied: "I did not have an independent decision." She also did not recall what documents she had reviewed or the content of any discussions that were held prior to the termination. Given this testimony, the law clearly removes any deference this court would otherwise afford to the contracting officer's decision to terminate the CLINs for the government's convenience. As a result, this court reviews the government's termination for convenience decision, without any deference, to determine whether it was an abuse of discretion.

Defendant argues the termination for convenience was not improper and that, because the initial award to Securiforce was improper and unauthorized, "the contracting officer was, in effect, compelled to either terminate or rescind the award of the Embassy and Prosperity CLINs to Securiforce." Defendant argues that when "DLA Energy learned shortly after awarding a contract to Securiforce that it did not have the authority to waive the Trade Agreements Act prohibition on source fuel from Kuwait, the contracting officer was, in effect, required to terminate those CLINs in Securiforce's contract that did not supply fuel to 'U.S. forces overseas.'" Plaintiff asserts in its post-trial brief that "DLA Contracting didn't intend to have Securiforce service Embassy and Prosperity, and so it just terminated those CLINs – its duty to facilitate Securiforce's Contract by seeking a waiver or by allowing it to switch courses. . . be damned."

45

The evidence in the record indicates that DLA Energy needed a waiver of the TAA in order to contract with Securiforce for fuel delivery services because Securiforce intended to procure fuel from Kuwait in order to perform under the contract. According to the record, the director of DLA Energy understood that he only possessed authority to sign a waiver for goods utilized by the Department of Defense, but the sites awarded to Securiforce were being operated by the Department of State. Subsequently, DLA Energy came to understand that the Office of Security Cooperation-Iraq, which is part of the DoD, was present at six of Securiforce's eight assigned locations. Because DoD had a presence at six of the eight locations, DLA Energy believed that it could execute a TAA waiver for those six sites through internal business processes, without having to pursue a waiver from the United States Trade Representative. The record establishes that, for the remaining two sites where DoD was not present, DLA Energy could pursue a waiver from the United States Trade Representative through the Defense Procurement Acquisitions Policy process to allow Securiforce to provide fuel from Kuwait.  Ms. Fantasia testified that she understood that DLA Energy could pursue a waiver from the United States Trade Representative for the DoS sites so that Securiforce would be able to provide fuel from Kuwait to those sites. The record reflects that defendant knew Securiforce wanted DLA Energy to pursue a waiver, but that DLA Energy was concerned about the uncertainty and time involved in the waiver process and made the decision not to pursue such a waiver. Mr. Reeves testified: "Ms. Fantasia said the reason they couldn't get it was because it would take four to six weeks. That was -- that was the reason given for not issuing the TAA waiver." Ms. Fantasia testified:

> we made an internal business decision that the strategic goal was to have a southern ground line of communication. We had that without Embassy and Prosperity, with the other line items that Securiforce was awarded. So, as a business practice, not even as a business practice, it was a business decision that we would terminate those line items, maintain our southern ground line of communication and re-award them rather than pursue the waiver.

Although defendant argues that the termination for convenience was proper because the contracting officer acted without authority and in violation of the TAA when she awarded the contract to Securiforce, the record demonstrates that DLA Energy could have pursued a TAA waiver from the United States Trade Representative through the DPAP process in order to allow Securiforce to provide fuel from Kuwait to the two DoS sites, but chose not to do so. Without exercising her own independent business judgment or putting her mind to the problem and independently reaching a decision, the contracting officer partially terminated the contract for the government's convenience. Defendant cannot successfully claw back or attempt to mitigate this significant error in the decision-making process. Because the contracting officer abdicated her duty to exercise her own independent business judgment, the court concludes that the partial termination for convenience was an improper abuse of discretion. The contracting officer has a duty to

exercise independent judgment in terminating the contract for convenience, and her failure to do so was a breach of this obligation.  See 48 C.F.R. § 49.101(a)-(b).[9]

Having concluded that the termination for convenience was a breach of contract, the court considers plaintiff's allegation that, because the termination for convenience was improper, the subsequent termination for cause should be rendered improper. Although the manner in which the termination for convenience was exercised constituted an abuse of discretion, the termination for convenience did not prevent Securiforce from performing the remaining portion of its contract, and it does not invalidate the subsequent termination for cause. Plaintiff argued that the termination for convenience damaged its relationships with Al Nakhla and KPC, which made it more difficult to obtain fuel for delivery. Mr. Reeves testified that after the termination for convenience "there was a reduction in the trust or that there was something fishy going on. He [Shaikh Aziz] just had an air of distrust about him when we discussed that." In response to being asked whether the termination for convenience effected Securiforce's relationship with Al Nakhla, Mr. Reeves testified:

> I know Mr. Brierley had had to renegotiate the partnership agreement that had already been signed with the CEO of Al Nakhla, because I was the one overwriting it. . . . There was an original partnership agreement in place from the start. I had that document, and I was overwriting it as they were negotiating -- renegotiating, because that's a massive amount lost from

---

[9] Plaintiff also asserted that the termination for convenience was a breach of contract under Torncello v. United States, 231 Ct. Cl. 20, because DLA Energy "awarded CLINs it later terminated, and allowed them to become effective, even though it already planned to terminate them for the perceived lack of ability to provide a TAA waiver for the two [DoS] sites." Under Torncello v. United States, "when the government contracts with a party knowing full well that it will not honor the contract, it cannot avoid a breach claim by adverting to the convenience termination clause."  Salsbury Indus. v. United States, 905 F.3d 1518, 1521 (Fed. Cir. 1990), cert. denied, 498 U.S. 1024 (1991) (explaining the Federal Circuit's holding in Torncello v. United States, 231 Ct. Cl. 20).  In this case, although the record indicates that DLA Energy was aware of the TAA waiver issue with regard to the two DoS sites by September 8, 2011, it is also clear that defendant had not reached a conclusion on how it would resolve the issue before both parties executed the contract on September 9, 2011. According to Ms. Fantasia's testimony, as of September 12, 2011, DLA Energy still was discussing whether to terminate the DoS CLINs on Securiforce's contract or pursue a TAA waiver from the United Stated Trade Representative. Because the record does not prove that DLA Energy had decided to partially terminate the DoS CLINs before the contract was awarded to Securiforce, plaintiff has failed to prove that defendant contracted with Securiforce knowing that it would not honor the contract with regard to the CLINs associated with the two DoS sites.

> what was previously awarded a few weeks before, a few -- well, a few -- ten days before, and these guys are -- you know, they're -- this doesn't happen on a DLA contract. You've just lost 66 percent of your contract. They -- there -- there's a lot of questions being raised, you know, is this real? Have we won this?

No admissible evidence is before the court, however, to support the conclusion that it was the partial termination for convenience that single-handedly damaged Securiforce's relationships, such that it was the cause of Securiforce's inability to perform in a timely fashion. Furthermore, Mr. Reeves also testified: "They [Al Nakhla] had been working with Securiforce for the last few years on government contracts, so there was no problem with continuing to work together." There is a missing link in the causal chain to argue that the termination for convenience negatively impacted plaintiff's ability to perform in such a way that it was the cause for plaintiff's failure to perform, or that the termination for cause was invalid as a result of the termination for convenience. The testimony on the subject only came from interested plaintiff's witnesses. Plaintiff offered no witnesses from Al Nakhla or KPC to testify at trial, nor does the correspondence in the record establish a direct nexus as to the cause of plaintiff's failure to deliver fuel. Plaintiff has failed to prove that the improperly executed termination for convenience led to plaintiff's failure to perform under the contract. Rather, there is evidence in the record that suggests plaintiff's inability to perform, as discussed below, was not the result of the termination for convenience, but related to business management issues, including Securiforce's difficulties in obtaining the fuel necessary to perform under the contract.

<u>Termination for Cause</u>

Plaintiff asserts several additional breach of contract allegations in Counts I-V of its complaint in its effort to prove that the termination for cause issued on November 15, 2011 was invalid. Defendant does not dispute jurisdiction in this court over plaintiff's appeal of the termination for cause. Defendant argues, however, that:

> The Government's decision to terminate Securiforce's contract for cause was appropriate given that Securiforce proved that it lacked the capability to timely deliver fuel, it could not guarantee the Department of State would have a reliable source of a very critical resource one the military withdrew from Iraq, and it did not have the ability to obtain fuel until two months after it was required to be able to meet all of the needs of its awarded sites.

Defendant argues that "[d]espite Securiforce's allegations, its failure to perform was not justified by any excusable delay and the orders placed by DLA Energy were valid orders with clear delivery dates."

"The decision of a contracting officer to terminate a contract for default is reviewed de novo by the Court of Federal Claims." Pinckney v. United States, 88 Fed. Cl. 490, 505 (2009) (citing 41 U.S.C. § 7104(b)(4) (2006)). In reviewing an agency's default termination, "a court must review the evidence and circumstances surrounding the termination, and that assessment involves a consideration of factual and evidentiary issues." McDonnell Douglas Corp. v. United States, 323 F.3d 1006, 1014 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003). A default termination is a drastic sanction that should be imposed "only for good grounds and on solid evidence." J.D. Hedin Constr., Co. v. United States, 408 F.2d 424 (Fed. Cir. 1969). Nonetheless, the contracting officer has broad discretion to determine whether to terminate a contract for cause and a court should only overturn that decision if it is arbitrary, capricious or constitutes an abuse of discretion. Consol. Indus., Inc. v. United States, 195 F.3d 1341, 1343–44 (Fed. Cir. 1999). When a contractor challenges a default termination, "the government bears the initial burden of proof to show that the contractor was in default at the time of termination." Morganti Nat'l, Inc. v. United States, 49 Fed. Cl. at 129 (citing Lisbon Contractors, Inc. v. United States, 828 F.2d 759, 765 (1987); see also Gen. Injectables & Vaccines, Inc. v. United States, 519 F.3d 1360, 1363 (Fed. Cir.), reh'g denied, 527 F.3d 1375 (2008). "In deciding whether to terminate a contract for default, the contracting officer is required to exercise his discretion, to make sure that termination is in the best interests of the Government." Nuclear Research Corp. v. United States, 814 F.2d 647, 649 (Fed. Cir. 1987); FAR § 12.403(b) ("The contracting officer should exercise the Government's right to terminate a contract for commercial items either for convenience or for cause only when such a termination would be in the best interests of the Government."). "A nexus between the government's decision to terminate for default and the contractor's performance is required, and the government may not use default as a pretext for terminating a contract for reasons unrelated to contract performance." Keeter Trading Co., Inc. v. United States, 79 Fed. Cl. 243, 252 (2007). As the United States Court of Appeals for the Federal Circuit has held:

> Properly understood, then, Schlesinger [v. United States, 182 Ct. Cl. 571, 390 F.2d 702 (1968)] and its progeny merely stand for the proposition that a termination for default that is unrelated to contract performance is arbitrary and capricious, and thus an abuse of the contracting officer's discretion. This proposition itself is but a part of the well established law governing abuse of discretion by a contracting official.

McDonnell Douglas Corp. v. United States, 182 F.3d 1319, 1326 (Fed. Cir. 1999), cert. denied, 529 U.S. 1097 (2000).

"A clear violation of contract terms by the contractor supports a finding that a reasonable, contract-related basis for the termination exists." Keeter Trading Co., Inc. v. United States, 79 Fed. Cl. at 252. A contractor's "[f]ailure to meet contract specifications and inability to meet the contract delivery schedule are of course relevant considerations

to whether a contractor is in default." <u>McDonnell Douglas Corp. v. United States</u>, 182 F.3d at 1328. Moreover, the <u>McDonnell Douglas</u> court wrote that:

> The cost to complete a contract—more particularly, the inability of a contractor to perform a contract at the specified contract price—and the ability to meet a contract schedule are both fundamental elements of government contracts and are related to contract performance; as such, they are highly relevant to the question of default.

<u>Id.</u> "To summarize, the government may not use default as a pretext for terminating a contract for reasons unrelated to performance; instead, there must be a nexus between the government's decision to terminate for default and the contractor's performance." <u>Id.</u> at 1329. The same review standards are applicable to the termination for cause provision of FAR 52.212–4(m), which is identical to the termination for cause provision in the contract.

"If the government meets its burden of proving that a termination for default was justified, the burden shifts to the contractor to show that the non-performance was excused." <u>Pinckney v. United States</u>, 88 Fed. Cl. at 506. A contractor can satisfy its burden "by showing that improper government actions were the primary or controlling cause of the default and rendered the contractor financially unable to perform." <u>Keeter Trading Co., Inc. v. United States</u>, 79 Fed. Cl. at 252. Additionally, although a complete failure to perform under a contract is generally equivalent to a repudiation of contract terms that would justify a default termination, "a contractor's failure to perform in the presence of a material breach of contract by the government does not constitute a repudiation." <u>Id.</u> After a material breach of contract, the non-breaching party has a right to discontinue contract performance. <u>Id.</u> In other words, a contractor can prove that a default termination for non-performance was unjustified if its refusal to perform was caused by a breach of contract by the government.

In the case currently before the court, defendant asserts that the government "has met its burden to prove a *prima facie* case for termination for cause because it is indisputable that Securiforce did not deliver fuel by the date set in Delivery Orders 1 and 2, by the alternative date proposed by Ms. Fantasia, or by the date Securiforce stated it could deliver." Additionally, defendant argues that plaintiff did not provide "any adequate assurances that it would be able to meet its proposed November 20, 2011 delivery date." Plaintiff argues that "orders" 0001 and 0002 were unauthorized "Proof of Principle" orders which did not reflect the government's actual fuel requirements. Plaintiff claims that it was not in default because "Delivery Orders 0001 and 0002" were not valid written orders under the contract and, even if those orders were valid, "the parties knew an October 24 delivery was infeasible." Plaintiff also argues that prior to the November 4, 2011 show cause letter, DLA Energy never asserted that Securiforce was late in delivering Orders

0001 and 0002, the parties never agreed to a delivery date for Orders 0001 and 0002, and DLA Energy never established deadlines for the delivery of Orders 0001 and 0002.

The parties do not dispute that Securiforce did not complete Orders 0001 and 0002 on or before October 24, 2011. The contract states:

> **TERMINATION FOR CAUSE.** The Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance. In the event of termination for cause, the Government shall not be liable to the Contractor for any amount for supplies or services not accepted, and the Contractor shall be liable to the Government for any and all rights and remedies provided by law. If it is determined that the Government improperly terminated this contract for default, such termination shall be deemed a termination for convenience.

(capitalization and emphasis in original). The termination for cause provision in the contract is identical to the standard FAR clause regarding termination for cause of a contract involving commercial items. FAR § 52.212-4(m).

In the above-captioned case, the contractor failed to comply with the terms of the contract when it failed to deliver Orders 0001 and 0002 by the date established by the government, October 24, 2011. Securiforce was supposed to be ready to perform 30 days after contract award, the government only was required to set a delivery date at least 48 hours after the date on which the order was submitted to the contractor, and the contractor was not given input in setting the unilateral delivery date. Mr. Cannon testified for the government:

**Q. Did you ever see anything in the contract to suggest that Securiforce had to, in fact, agree to the delivery date of any order?**

A. No.

**Q. Would that -- would them having to agree to the delivery date of an order be consistent with your understanding of what a requirements contract is?**

A. No.

**Q. And why not?**

A. For that reason, that when the delivery date is placed on the order, that is now the delivery date, and it's not a -- at that point, we're in a unilateral

51

> situation. They've -- the contractor's already entered into the contract, he's aware of this, and we are not in a bilateral negotiation when an order is placed.

(emphasis in original). When the government issued a show cause notice to the plaintiff on November 4, 2011, Securiforce also failed to provide adequate assurances of future performance. Multiple government witnesses testified to the fact that, given the history of delays, they had no confidence Securiforce would be able to perform. In the termination letter, contracting officer Shepherd states: "Although you advised me today by phone call that you could start performance within 3 days, I have no confidence that you will be able to perform under this contract." Mr. Cannon testified:

> Yes, my impression, absolutely, was that the senior leadership was concerned about performance on this contract, seriously concerned, because we are so far past the -- the time of even loading fuel, and we are now looking into late to early November, and we are still -- we are still -- we still only get the word "confidence," and we still haven't even had the actual transfer of funds, still haven't started the mechanism of really calling up a truck, having it load -- be able to go to the refinery and load a drop of fuel.

> This isn't a delay of any normal commodity here, and -- and the delivery of -- of fuel is of the highest priority to any U.S. Government installation in Iraq. Food and fuel, it's the top priority. So, when we're talking delays like this, it's receiving concern at the highest levels.

Ms. Fantasia testified:

> **Q. And just to be clear, did you have any confidence at this point, on November 3rd, that the Taji and Besamaya orders would actually happen on the 20th of November?**

> A. No, I did not.

> **Q. You did not what?**

> A. Have any confidence that those orders would be delivered.

(emphasis in original). Colonel Rush also testified:

> I had an overall lack of confidence in Securiforce. I don't recall the dates of a three-day -- I don't recall that, but I just, I shared an overall lack of confidence in Securiforce.

> **Q. And again, can you explain why?**

A. As I've indicated, numerous times, as each time we had made an accommodation to meet a requirement that they had something new had come up and it had been pushed to the right. So, for a period I guess it's been five or six weeks now when we needed them to deliver fuel, they were unable to do so, we were unable to confirm their ability to do so. It was always at a future date.

As we were trying to synchronize this transition of missions in Iraq, it was becoming extremely difficult to continue to find ways to support these sites when the military presence was diminishing. So, I was extremely concerned we were going to reach a fail-safe point where we could no longer support sites and they would run out of fall [sic] and there would be mission failure.

(emphasis in original).

The documents in the record and testimony presented at trial offer different explanations regarding Securiforce's failure to perform in a timely manner. Despite its best efforts, and through no fault of DLA Energy, Securiforce experienced delays in formalizing its relationships with its subcontractors, including its fuel suppliers. At trial, Securiforce representative Mr. Reeves was asked: "As of October 13th, Securiforce did not have its contract in place with [its subcontractor] Al Nakhla. Isn't that correct?" He replied: "It wasn't signed and stamped, no." Perhaps, as plaintiff suggests, relationships between Securiforce and its subcontractors became increasingly strained, including following the partial termination for convenience, but the termination for convenience was clearly not the only issue impeding Securiforce's ability to perform. Securiforce failed to finalize its arrangements with Al Nakhla and KPC within the timeframe required for delivery under the contract. Mr. Reeves testified: "The Arabs weren't performing as quickly as I would like them to perform, but they were still working -- working through those issues, and I was on top of them with a big stick." Also, badging of drivers, which was necessary for the drivers to cross the border from Kuwait into Iraq, was delayed because Securiforce did not have enough drivers confirmed to operate the contract. Mr. Reeves was asked: "So, the real reason you didn't have the driver data is because the drivers you had originally planned to use were now committed to other contracts. Isn't that correct?" He responded: "Well, the transport market in Kuwait is obviously a business. There had been so many changes and delays so far through this that they were picking up other contracts, Al Mada [a subcontractor]. So, that didn't impact on what we were doing. They were recruiting new drivers." Procuring fuel was also delayed because the bank account was not set up to transfer money to KPC. Lieutenant Colonel Musgrove testified:

My belief was that setting up an account with KPC to be able to transfer funds and do all that stuff is stuff that should have been done once the contract was awarded, that they shouldn't have been all the way until the

1st of November for them to be able to perform those actions to be able to order fuel from KPC. This should have all been handled during their prep work in the first 30 days of award until contract execution.

Mr. Reeves also testified regarding the status of the bank account:

**Q. As to this missing the transfer of funds window, you knew full well that the banks would be closed during Eid. Isn't that correct?**

A. That's correct.

**Q. And it was Al Nakhla's responsibility to transfer the funds to KPC from their joint bank account. Isn't that correct?**

A. Well, the joint bank account wasn't set up, so the alternate action was Al-Rashed Development Group bank account, but they can't transfer if the banks are shut. And, again, if -- it's all of the delays from the commencement of this contract that's now left us in a position where we're at Eid.

We had already planned and we had a contingency plan for Eid to fill delivery locations or push out an email to DLA Middle East to get orders in from DoS to cover the Eid period, but with not being able to perform from the start of it because we haven't had the assistance and all the relevant processes and procedures in place from the start.

**Q. What prevented you -- Securiforce or Al Nakhla or Al-Rashed -- from transferring money from a bank account in Kuwait to KPC?**

A. Well, in this case, the bank was shut, but you -- we can't -- we can't provide credit to -- to KPC. The orders are procured on an order receipt as that occurs. As we receive orders, we then procure the fuel for those orders.

**Q. Did Securiforce or Al Nakhla not have the funding?**

A. The funding was there.

**Q. Where? You say the funding was there. Where was the funding?**

A. Well, in the bank, I presume.

**Q. You have no knowledge of whether it was actually in the bank. Is that correct?**

> A. I didn't see bank statements or anything like that, no, but we had the Al-Rashed account, the joint account was going to be set up for the profit share or however it was going to work, and so the Al-Rashed Development Group bank account was there as the alternative.

(emphasis in original).

Plaintiff argues that the subcontract with Al Nakhla was delayed because Securiforce was uncertain of the security arrangements and the future of its contract following the partial termination for convenience, and Securiforce, therefore, hesitated to move forward after award and the partial termination for convenience. In minutes from a November 4, 2011 meeting, Mr. Reeves explained that contract progress had been delayed following the partial termination for convenience. Writing in the third person:

> Mr. Reeves explained that we couldn't commit to a contract that we had won but thought might be terminated after the 3 CLINs had been removed unilaterally, where the modification was not signed by us and legal council was taken, so we were unsure that we even had a contract at that stage.

These delays, however, do not demonstrate good cause or excusable delay for plaintiff's failure to perform under the contract.

Additionally, the disputes clause of plaintiff's contract states:

> **DISPUTES.** This contract is subject to the Contract Disputes Act of 1978, as amended (41 U.S.C. 601-613). Failure of the parties to this contract to reach agreement on any request for equitable adjustment, claim, appeal or action arising under or relating to this contract shall be a dispute to be resolved in accordance with the clause at FAR 52.233-1, DISPUTES, which is incorporated herein by reference. The Contractor shall proceed diligently with performance of this contract, pending final resolution of any dispute arising under the contract.

(capitalization and emphasis in original). Securiforce was obligated under the disputes clause to continue performing, despite any ongoing disputes. Mr. Reeves stated: "Well, the initial termination for convenience was a bit of a shock. We just wondered what was going to happen next, because as -- as I said, there was no real explanation for the removal of those CLINs." He also testified:

> **Q. Again, to the second half of that sentence, "we couldn't financially commit to a contract that seemed to be hanging in the balance so progress was put on hold."**

**Isn't it true that progress was put on hold because you were advised by counsel not to perform until you got the security modification you eventually got on the 13th of October?**

A. Well, progress was put on hold because of the lack of cooperation and assistance we were getting from DLA regarding some of the items, processes, procedures, and information I'd requested throughout the whole of the contract.

**Q. In fact, you never financially committed to this because you were unable to transfer the funds to purchase the fuel. Isn't that correct?**

A. Because of U.S. Government delays, it took us to the Eid holidays when the banks were shut.

**Q. The funds were never actually transferred from KP -- the Kuwait bank account to KPC. Isn't that correct?**

A. That's correct.

(emphasis in original).

Despite preexisting informal arrangements with its subcontractors, as of the middle of November 2011 Securiforce was not yet able to procure and provide fuel. Regardless of any of actions plaintiff alleges the government did or did not take, which allegedly delayed Securiforce's ability to perform, including the failure to set up PORTS, help with driving badging, or facilitate the acquisition of CACs (common access cards), plaintiff's inability to deliver fuel was a product of its own making. Given the lack of formal, operational arrangements with its subcontractors, it is hard to see how the government can be held responsible for plaintiff's inability to deliver fuel to the DoS sites.

Defendant also explained the consequences of a DoS location not receiving the fuel it had requested on time. Ms. Austin-Ferguson, Executive Assistant to the Under Secretary of Management at the Department of State, testified as follows:

So, we have generators who -- you know, which run, which provide all of the electricity, which is, you know, sort of the normal things, the lights, the heat, the cooling, which is most particularly important in Iraq. It provides the -- the electricity for our computers, for the opening and shutting of doors, for the cameras -- security cameras around the compound. It provides the electricity to the water well.

When asked what would happen if there was a fuel shortage at a DoS site, she added:

We would have been shutting down life, which is to say without the generators running, we could not have provided electricity to the office buildings, so we could not have had computers, cooling, even the doors. Some of the doors are magnetic, so you've got to have the ability to push that -- click that button and get people in and out.

People would -- it would have been unsustainable in the summertime, that's for sure, because the temperature gets up to 126 degrees there. So, with no cooling, you know, we simply would have been in a position -- we would have had no food. We would not have been able to process water.

In essence, we would have had to draw down personnel to either a very small group of people and sustain them almost as if you were camping, if you will, and eating MREs, meals ready to eat, or draw down completely, altogether, which means we would have been leaving Iraq and walking away from a bilateral relationship, which was not something we could do. We were at the start of that bilateral relationship, of the -- of that being the centerpiece of our relationship with the Government of Iraq.

Ms. Fantasia also testified: "These were fuels that were being delivered to bases that were for life support, to fuel their vehicles, generators." Further, Colonel Rush testified:

So, for us managing those deliveries, it was very critical that things operated on a timeline so that either the trucks didn't arrive when there was not enough fuel or not enough empty space in the bags to take delivery and the trucks would have to wait, or the trucks got there too late and there wouldn't be any fuel left and generators would stop, air conditioners would stop, communications would stop, the whole site would have to shut down because they didn't have any power.

The record supports defendant's conclusions that the delivery of fuel was critical and time sensitive and that plaintiff's failure to perform in a timely manner, or even to promise a time certain for performance, was the basis for DLA Energy's decision to terminate the contract for cause.

Defendant presented sufficient evidence to support and justify its termination for cause such that the burden of proof shifted to plaintiff to demonstrate that its non-performance was excusable and the termination for cause was improper.  As the trial record discussed above demonstrates, plaintiff failed to meet this burden. Notwithstanding that plaintiff failed to demonstrate that its non-performance was the result of excusable delay, plaintiff argues that the default termination was improper because DLA Energy committed multiple material breaches of contract, which plaintiff did not waive, and that, as a result, the termination for cause was improper. As stated above, a

contractor can prove that a default termination for non-performance was unjustified if its refusal to perform was caused by a breach of contract by the government. See Keeter Trading Co., Inc. v. United States, 79 Fed. Cl. at 252. Thus, the court considers plaintiff's allegations that DLA Energy breached its contract with Securiforce.

In Count I of its complaint, plaintiff alleges that DLA Energy unilaterally repudiated its obligation to provide Securiforce with security, materially breaching its obligations under the contract. Plaintiff alleges that the contract required DLA Energy to provide security escorts through December 31, 2011, and changes were only allowed to be made by written agreement of the parties. Nonetheless, plaintiff states it received an e-mail on September 13, 2011 announcing that the government would not provide escorts after September 15, 2011. DLA Energy executed Mod 0002 on October 13, 2011, which guaranteed security would be provided for Securiforce, at least until the end of 2011, by stating: "ADD 'U.S. Government provided escorts required' to each location on the schedule," listing plaintiff's six DoS locations on the schedule, and noting that the provision will expire on December 31, 2011. Plaintiff states, however, that DLA Energy again repudiated its obligation to provide security escorts by e-mail dated October 24, 2011. In the October 24, 2011 e-mail from contracting officer Shepherd to Mr. Reeves and Mr. Brierley, the contracting officer stated:

> Military provided security to the DoS locations beyond Cedar will no longer be provided.  Only locations for military provided security through the K-Crossing will be Basrah and Umm Qasar.  For the DoS locations north of Cedar under your contract, Besamaya, Sather, Shield, and Taji, DLA Energy is working towards a solution to line Securiforce with a DoS task order for security but this has not been finalized as of the writing of the e-mail.

Securiforce alleges that it repeatedly objected to performing without security escorts and never waived the government's material breach.

The record indicates that the issue of security was a constant source of dispute between Securiforce and DLA Energy, beginning before the contract was awarded and lasting until after the contract was terminated. Mr. Reeves, Securiforce's project manager, testified as to his understanding that "The U.S. Government would be providing security." He stated that under the contract, he understood the government to be responsible for providing security escorts to all of its DoS sites for the duration of the contract. Mr. Reeves also testified that Securiforce was asked to remove security prices from its bid for the DoS CLINs and stated, "we understood and they mentioned that all escorts would be provided by the U.S. Government, for Amendment 5 CLINs."

In contrast, the government witnesses repeatedly reiterated that the DoS's intent was for there to be no security escorts for deliveries to the DoS sites and Securiforce's

contract did not provide for security escorts.  For example, Mr. Cannon stated, "Their [the Department of State] intent was clearly, when I was there, to operate without security and government-provided escorts and that the Department of State did not want to -- to pay to provide those escorts, and that was always their consistent and clear guidance." Lieutenant Colonel Musgrove testified: "It was briefed and talked about a couple times, that the -- and depending -- in September, that according to the contract, Securiforce was not to have security and that they were supposed to go unescorted into Iraq." He also stated: "As far as Securiforce was concerned and their contract, they weren't supposed to be going with armed security, and when I say anything in here about security, that's what I mean, is they can't have armed security going into Iraq." Colonel Rush testified: "I became aware some time, and I believe it was before the performance period started, but I cannot exactly recall, that security -- or Securiforce was expecting security to be provided, but that it was not specified in the contract." DLA Energy contracting officer Shepherd testified that the Department of State CLINs did not mention escort required in Iraq "[b]ecause the Department of State did not want their fuel deliveries to be escorted within Iraq." Ms. Shepherd further testified that she knew of no provision in Securiforce's contract that required the government to provide security.

Ms. Shepherd stated that although Securiforce was not entitled to security under its contract, the government attempted to accommodate Securiforce's request for security "[b]ecause they were -- they were constantly bringing up the fact that they thought they had security under their contract, and -- and I believe at one point their issue was possibly their subcontractor may not perform without security." She also stated:

> We were -- we were trying to -- we as a team, DLA Energy, was trying to work with the contractor to perform. We were in a war zone, we understood that there's the possibility that things can change, in a war zone, and that we wanted them to perform because it was beneficial for DLA Energy to have them perform from the south, to have that line of communication open, along with the north. So, we wanted to work with them in order to perform the contract.

Therefore, the government issued Mod 0002, which provided security to Securiforce until December 31, 2011. Plaintiff contends that DLA Energy subsequently revoked its commitment under Mod 0002 to provide security when it sent an October 24, 2011 e-mail stating that there would not be military escorts to sites north of Cedar. Ms. Fantasia testified, however that:

> What we told Securiforce on October 24th is there's no military escorts. That said, the government is still obligated to provide security [after enacting Mod 0002], and we would have done so in accordance with the mod that we signed with Securiforce. Ms. Shepherd states, we're working to line them up with Department of State. My interpretation of that is that, yes, there was

security, and we had now to work out the details with the Rock Island contract for security.

Although Securiforce believed it was entitled to security, the contract prior to Mod 0002 did not explicitly provide for security for Securiforce. The inferences which are required in order to conclude that the government was obligated to provide security to Securiforce prior to issuing Mod 0002 are not supported in the record. Amendment 0003, which updated some of the DoD CLINs and answered questions contractors asked regarding the initial solicitation and government-provided security, predated Amendment 0005, which added the DoS CLINs. Although Amendment 0003 stated that the government would provide escorts, that statement was an answer that responded to a question regarding language from the original DoD CLINs, "escort required while in Iraq," which was not present in the Amendment 0005 DoS CLINs. It cannot be assumed that the answer for the DoD sites also applies to the Amendment 0005 DoS CLINs regarding the DoS sites, when those DoS CLINs had not been issued at the time Amendment 0003 was drafted and they did not include the language to which Amendment 0003 was responding.

Under Mod 0002 to the contract, the government was required to provide security escorts to each location until December 31, 2011. In her e-mail on October 24, 2011, Ms. Shepherd explained to Securiforce that military-provided security would no longer be available to the DoS locations north of Cedar.  She specifically stated, however, that DLA Energy was working to provide Securiforce with nonmilitary-provided security for these sites. Despite plaintiff's argument that this e-mail should be considered a repudiation by defendant, the plain text of the e-mail explains that DLA Energy intended to arrange security escorts for Securiforce.  The e-mail explained that the military-provided security would end, but that other security alternatives were available. The e-mail, therefore, should not be considered a repudiation by DLA Energy.

The testimony at trial indicates that the parties had starkly different views of the security situation. Plaintiff, however, has not proven that a failure to provide security occurred so as to constitute a breach of a duty under the contract. Moreover, given that Securiforce never even attempted to deliver fuel to one of the DoS sites, the failure to provide security, as alleged by plaintiff, never actually occurred.

Plaintiff next contends that DLA Energy breached the contract because it failed to place orders with Securiforce for the government's actual requirements, and, instead, the government procured fuel from other sources while requiring plaintiff to deliver unauthorized PoP orders. Securiforce states that it never waived the material breaches the government committed when it failed to order the amount of fuel the DoS sites actually required and supplied those sites by other means. The contract states: "Except as this contract otherwise provides, the Government shall order from the Contractor all the supplies or services specified in the Schedule that are required to be purchased by the

Government activity or activities specified in the Schedule." Additionally, the contract provides:

> If the Government urgently requires delivery of any quantity of an item before the earliest date that delivery may be specified under this contract, and if the Contractor will not accept an order providing for the accelerated delivery, the Government may acquire the urgently required goods or services from another source.

Plaintiff contends that the government had estimated over 2.3 million gallons of fuel would be required each month, but throughout the life of the contract, the government never placed orders for its actual requirements. Plaintiff argues that "orders" 0001 and 0002 were unauthorized "Proof of Principle" orders which did not reflect the government's actual fuel requirements. The testimony in the above-captioned case seems to support that the PoP orders were for actual requirements. Mr. Cannon stated:

> Well, definitely -- the military can call it a proof of principle all they want, but contractually, it turns into a -- it becomes an order, and we don't use the term "proof of principle," but when we sent out a notice like this, it -- things become an order, and if it's followed up -- if a verbal order is followed up by a written order, it becomes an order.

Mr. Cannon was asked: "So, is there any difference between an order that's termed a 'proof of principle' and an order that's termed an 'order' -- . . . -- in your mind?" He responded: "No, because it's just -- it's something not -- somebody not using the accurate contract terms. And somebody from the operations office, I wouldn't expect them to use contracting terms, per se, versus a contracting officer." Ms. Fantasia was asked: "And what is a proof of principle?" She replied: "Contractually, there's -- it has no relevance to the contract, but military tend to use that, especially in Afghanistan and Iraq, as we want to make sure they can actually do what they say they're going to do. So that first order to the military proves that the contractor can do what they say they're going to do." Lieutenant Colonel Musgrove was asked: "What do you recall about the idea of a proof of principle to Taji in late September 2011?" He explained:

> A.  For every new contract that we had, we used a very small first shipment to -- what we called a proof of principle.  So, basically it's a requirement that we get from the customer saying, yes, I can take fuel, we can do it at this location, and we give it to the contractor to see if they can perform in accordance with their SOPs [standard operating procedures] or how they said that they can perform their contract, just to test it to make sure all the bugs and everything is worked out, because no plan survives first contact.

61

So, we let them do at least one small one that doesn't affect the operations on the other end for the customer, so that it's not fuel that is in dire need, an emergency-type case.  It's a smaller quantity, there's enough room to receive it, and if they get it successfully, then we give them a second larger shipment.  If that one goes off in the exact same manner, then we go full bore with the contract.

**Q.  You used the word "requirement" there.  Is this proof of principle to Taji based on actual requirements of fuel needed by --**

A.  It was fuel that was requested by the State Department, that they said that they could take and they wanted, because we don't place fuel orders for a customer without them asking for it.

(emphasis in original).

Additionally, the testimony indicates that the government only filled additional requirements from other sources after Securiforce clearly had indicated that it could not deliver sooner than early November 2011 and while the government waited for Securiforce to be able to perform. Lieutenant Colonel Musgrove testified: "We had moved all orders except for the diesel first two orders from Securiforce over to filling them with the Jassim Trucking contract since Jassim or since Securiforce was not going to be able to deliver until the beginning of November." He also stated, with respect to deliveries that occurred on October 25, 2011, "This was during the window where Securiforce wasn't projected to be able to meet any of their orders, so that's why these orders were placed with Jassim Trucking Company." Colonel Rush wrote in an e-mail dated October 18, 2011: "Securiforce to be ready NET [no earlier than] 4 Nov so we will fill first order (Besmaya and Taji) with Jassim assets to fill the bags. Subsequent orders will be through Securiforce." Although DLA Energy had an obligation to place orders for its requirements from Securiforce, the contract also provides that the government was permitted to acquire fuel from another source if the contractor was unable to provide the necessary fuel by the required date. Plaintiff has not proven that the government was obligated to place fuel orders with Securiforce for requirements that needed to be filled prior to the earliest possible date Securiforce had indicated it could deliver. This case involved a critical, war zone situation in which fuel deliveries were life sustaining and delivery dates generally were not flexible. When Securiforce was unable to meet the government's immediate needs for fuel at DoS sites, DLA Energy was authorized under the contract terms to fill those needs from other sources.

The testimony in the above-captioned case suggests there was some miscommunication and misunderstanding on plaintiff's part as to the nature of fuel deliveries that would be needed under the contract. Plaintiff appears to have envisioned relatively infrequent, large amounts of fuel to be delivered by sizeable convoys while

defendant appears to have contemplated that for certain sites frequent, small deliveries of fuel could be required. Mr. Cannon testified:

> Well, again, the requirement was so much less, so you'd have singleton trucks running versus convoys. If you looked at the requirements for Umm Qasar and Basrah, where -- locations where maybe they're just filling up generators and there's very small motor pools, to put a single truck on the road, it's -- in many cases, that was already being done, fuel trucks driving openly on the road in Iraq.

In Count III of its complaint, plaintiff also alleges that numerous unilateral changes DLA Energy made shortly after awarding the contract changed the parties' bargain for plaintiff to deliver fuel to DoS sites and constituted material breaches of the contract. Under this umbrella, plaintiff reiterates some of its earlier allegations, including that DLA Energy twice repudiated its obligation to provide security and that DLA Energy required PoP deliveries, fundamentally changing the bargain of the contract. This decision already has addressed those allegations. Plaintiff also alleges that the evidence shows a pretextual, knowing misuse of the Termination for Cause clause and that Ms. Fantasia and the DLA Contracting Office issued the default termination "just so the agency no long ha[d] to deal with [the] contractor." These allegations are unsupported by the record. The evidence supports a conclusion that the government had a strong interest in Securiforce performing successfully, not the other way around. After a comprehensive trial, the record does not suggest that the government would benefit from Securiforce's failure to perform; certainly no support for this has been presented. The contract was a high priority for the government, given the importance of fuel deliveries for the DoS sites and the transition taking place in Iraq at the time in question when the military was withdrawing and DoS was establishing its diplomatic presence in the country.

Plaintiff also claims that the multiple changes made shortly after award demonstrate the government had no intention of allowing plaintiff to perform the contract as awarded, or if the government was not aware before award of the changes it would make shortly thereafter, that it was negligent in preparing the solicitation. Plaintiff contends that the fact that there were numerous alleged changes quickly after the contract was awarded shows that the solicitation did not accurately reflect the government's requirements. Whether there were, in fact, numerous changes is disputed by defendant. What plaintiff describes as changes to the contract might be equally well explained as misunderstandings and a failure between the parties to communicate effectively. It is not clear that the bargain changed, as opposed to Securiforce simply having a different understanding of the bargain, at that time and now, than the understanding possessed by the government. Although plaintiff includes this allegation in its complaint, plaintiff failed to offer specific or sufficient evidence at trial directed at this claim.

Count V contends that even if the allegations of Counts I through IV do not individually constitute material breaches, collectively, they are a material breach of the contract. Securiforce also reiterates that it has not waived any of the government's breaches. It is unclear, however, as discussed above, if there was not a duty, nor breaches of that duty, nor damages caused by said breaches for any of the independent government actions, how collectively a material breach of the contract would exist, and plaintiff provides no case law to support this theory.

Although plaintiff alleged that DLA Energy breached the contract for fuel delivery on multiple occasions, the record does not support plaintiff's breach of contract allegations.  Accordingly, plaintiff was not excused from performing under the contract due to any alleged prior material breaches by the government.

Finally, plaintiff argues that DLA Energy's improper termination for cause "qualifies as a bad faith termination." Plaintiff alleges that the "cascading of actions motivated by the personal interests of DLA individuals" and the disconnect within DLA Energy indicate that Securiforce's contract was terminated in bad faith. Specifically, plaintiff points to the troubled working relationship in the record between Colonel Rush and Ms. Fantasia as evidence of Ms. Fantasia's personal interest in terminating the contract for cause. As plaintiff correctly notes, this court "will not uphold a default termination where the agency has acted in bad faith in administering the contract." Keeter Trading Co. v. United States, 79 Fed. Cl. at 252; see also Libertatia Assocs., Inc. v. United States, 46 Fed. Cl. at 708. As explained above, however, agency personnel are presumed to act in good faith, and a claimant must present significant proof of bad faith to overcome that presumption. See T & M Distribs., Inc. v. United States, 185 F.3d at 1285.  In fact, in order to prove that the termination for cause was done in bad faith, plaintiff is required to put forth clear and convincing evidence that agency personnel acted with a specific intent to injure Securiforce.  See Road & Highway Builders, LLC v. United States, 702 F.3d at 1369. Although the record demonstrates a certain amount of dysfunction and confusion within DLA Energy, plaintiff has not presented clear and convincing evidence of bad faith on the part of any agency personnel.  While there may have been frustration on the agency's part because Securiforce was not moving forward to meet it contractual obligations to delivery necessary fuel, the trial and exhibits do not demonstrate bad faith by the agency. The court carefully listened to each of the government witnesses to judge their credibility and to assess the possibility of bad faith on their part during contract performance. Although some of the witnesses were more sympathetic and appeared more competent than others, bad faith motivations did not appear to the court to be present.

The government, therefore, was within its right, under the contract, to terminate the contract for cause. Defendant did not commit a prior material breach, which would have eliminated its authority to terminate plaintiff's contract for cause. In this case, the contracting officer appeared to have properly exercised independent business judgment when issuing the termination for cause. Defendant properly provided plaintiff with an

opportunity to explain why its contract should not be terminated and persuade the government that it was ready and able to perform. Plaintiff failed to provide an explanation of excusable delay for its failure to perform and it failed to convince the government that it was capable of delivering fuel within the timeframe the government required. Because the court has found that the termination for cause was not improper, plaintiff's relief in this regard, and its request for alternative relief, is **DENIED**.

## CONCLUSION

Although the government's actions with respect to the contract were not a model of organized and efficient behavior, especially with regard to Ms. Watson's lack of independent judgment when issuing the termination for convenience, they do not, independently or collectively, evidence an improper termination for cause. The government acted within its authority in issuing the termination for cause. With regard to the termination for convenience, plaintiff's amended complaint survives with regard to the request for declaratory relief, but, with regard to the termination for cause, plaintiff's complaint is **DISMISSED**.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**