# In the United States Court of Federal Claims

**No. 12-759C**
**Filed: July 12, 2016**

\* \* \* \* \* \* \* \* \* \* \* \* \* \*   \*

SECURIFORCE INTERNATIONAL   \*
AMERICA, LLC,   \*
  \*
        **Plaintiff,**   \*
  \*
     **v.**   \*
  \*
UNITED STATES,   \*
  \*
       **Defendant.**   \*
  \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \*   \*

**RCFC 37; Motion to Compel Discovery and for Payment of Expenses; Motion for Sanctions; Adequacy of 30(b)(6) Witness.**

**Frederick W. Claybrook, Jr.**, Crowell & Moring LLP, Washington, D.C., for plaintiff. With him were **Gordon N. Griffin**, Crowell & Moring LLP, and **Robert J. Wagman, Jr.**, Kaye Scholer LLP, Washington, D.C.

**Russell J. Upton,** Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington D.C., for defendant. With him were **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Benjamin C. Mizer**, Principal Deputy Assistant Attorney General, Civil Division, Department of Justice, Washington, D.C. Of counsel were **Jeffrey M. Lowry**, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington D.C., **Kay Bushman**, Senior Counsel, DLA Counsel-Energy, and **Jill Rodriguez**, Assistant Counsel, DLA Counsel-Energy, Ft. Belvoir, Va.

## O P I N I O N

<u>**HORN, J.**</u>

## FINDINGS OF FACT

Plaintiff, Securiforce International America, LLC (Securiforce), filed two separate motions under Rule 37 of the Rules of the United States Court of Federal Claims (RCFC) (2015)[1] during the extended and difficult discovery in this case. Plaintiff filed a motion to

---

[1] In reviewing plaintiff's two motions brought under RCFC 37, the court reviewed the language of the applicable Rules at the time each motion was filed, May 31, 2013 and October 31, 2014, respectively. The court found no substantive, relevant differences between the applicable Rules in May 2013, October 2014, and the current version.

compel discovery and for payment of expenses under RCFC 37(a) on May 31, 2013, after defendant did not produce to plaintiff, in response to plaintiff's document production requests, contract documents pertaining to contractors other than Securiforce that were awarded contracts under the same solicitation as plaintiff. Defendant asserted that the requested contract documents were not relevant to plaintiff's case, and, therefore, defendant should not be obligated to produce them. The court held multiple, frequently contentious, conferences with the parties regarding discovery and other disputed issues in this case in an effort to resolve the differences between the parties and to move forward towards trial. Plaintiff also filed another motion for sanctions on October 31, 2014, on issues separate and distinct from the previous motion to compel, alleging that defendant had failed adequately to investigate certain of plaintiff's discovery requests and that defendant had produced a RCFC 30(b)(6) witness "who had insufficient knowledge of, and was unprepared to answer specific questions about, the narrow list of topics Securiforce propounded."

A brief summary of the background of this case, including plaintiff's claims against defendant, provides necessary context for considering plaintiff's two motions. Plaintiff filed an initial complaint in this court, followed by an amended complaint, which alleged that the Department of Defense Logistics Agency Energy (DLA Energy) had awarded plaintiff a requirements contract for fuel delivery to specific sites in Iraq, that DLA Energy had committed multiple breaches of the contract, and that DLA Energy had improperly issued a partial termination for convenience of the contract, followed by an improper termination for cause. The Department of State fuel delivery sites in Iraq that were specified in the contract awarded to Securiforce were Basrah, Umm Qasar, Embassy Baghdad, Besamaya, Sather, Shield, Taji, and Prosperity. In its complaint, plaintiff did not seek money damages, but, instead, sought a declaratory judgment that DLA Energy's partial termination for convenience and subsequent termination for cause of Securiforce's contract was improper because "DLA Energy committed multiple, material breaches of its commercial-item, three-year, requirements contract with Securiforce for fuel deliveries to eight locations in Iraq." In addition to other alleged contractual breach claims that are not relevant to the disposition of plaintiff's two RCFC 37 motions, plaintiff alleged that the government materially breached the contract by (1) repudiating its contractual obligation to provide plaintiff with security escorts; (2) ordering "Proof of Principle" fuel shipments that allegedly did not reflect the government's actual fuel requirements; and (3) failing to place orders with plaintiff for the government's actual fuel requirements and, instead, procuring fuel from other sources in order to satisfy the government's requirements. Following a trial on the merits, during which multiple witnesses testified, this court issued its opinion on March 21, 2016, which adjudicated all the claims included in plaintiff's complaint in the above-captioned case. See Securiforce Int'l Am., LLC v. United States, 125 Fed. Cl. 749 (2016). In the decision, the court found that defendant had not committed the various breaches of contract asserted by plaintiff, but that defendant had improperly issued a partial termination for convenience of plaintiff's contract because the contracting officer admitted that she did not exercise her independent business judgment when issuing the termination. The court also found that defendant had issued a proper termination for cause of plaintiff's contract because plaintiff could not timely deliver fuel to the various sites specified in the contract that had been ordered by DLA Energy in accordance with the terms of the contract.

I.    **Securiforce's May 31, 2013 Motion to Compel Discovery and for Payment of Expenses**

Plaintiff moved to compel the production of certain contract documents pursuant to RCFC 26(b) (2015) and RCFC 37(a)(1) after the government, in response to plaintiff's discovery requests, did not produce requested documents asserting that the documents were not relevant. Specifically, plaintiff moved to compel the production of contract documents related to (1) security escorts for other contractors that were awarded contracts under the same solicitation as Securiforce; and (2) "Proof of Principle" orders placed with other contractors that were awarded contracts under the same solicitation as Securiforce. Plaintiff seeks costs related to the filing of its motion, as well as attorney's fees, for a total amount of $219,194.00.

During discovery in the above-captioned case, plaintiff served document requests upon defendant that were apparently designed to support its breach of contract claims, including that defendant allegedly had repudiated its contractual obligation to provide plaintiff with security escorts and had improperly ordered "Proof of Principle" fuel shipments that allegedly did not reflect the government's actual fuel requirements for the Department of State sites designated in plaintiff's requirements contract. Plaintiff's motion to compel specifically identifies document requests 11 and 12 as the requests at issue:

> 11. All documents, including but not limited to contract modifications, notices, and correspondence, related to security for other contractors awarded contracts under the Solicitation.

> 12. All documents related to notices issued to other contractors awarded contracts under the Solicitation requesting contractors to conduct a Proof of Principle.

In response to plaintiff's document requests 11 and 12, defendant objected, as follows:

> The Government objected to these requests, principally on the grounds that they are overly broad and unduly burdensome, and because they call for the production of documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible information.

Subsequently, defendant sent a letter to plaintiff on May 15, 2013, further clarifying its objections to plaintiff's document production requests 11 and 12. In the letter, defendant maintained its objection and explained that, "[t]o the extent Securiforce seeks documents relating to different contractors performing under different contracts for deliveries to different sites maintained by a different Government agency, the Department of Defense, we stand by our objections." According to defendant, however, in order "[t]o ensure Securiforce receive[d] all documents to which it is reasonably entitled" and "to avoid burdening the Court with an unnecessary discovery dispute," defendant offered to produce "responsive documents relating to other contractors performing under the contract originally awarded Securiforce. . . which provided for deliveries of fuel to various Department of State sites in Iraq." Approximately two weeks later, on May 31, 2013,

plaintiff filed its motion to compel discovery and for reimbursement of expenses incurred in filing its motion to compel in the amount of $219,194.00.

After a status conference was held with the parties on June 25, 2013 to discuss plaintiff's motion to compel, the court ordered plaintiff to file a motion in limine addressing "whether the contract at issue in the above-captioned case required defendant to provide security for plaintiff's fuel deliveries, as well as whether the contract permitted defendant to request that plaintiff make 'proof of principle' deliveries," with an opportunity for defendant to submit a reply brief. Thereafter, plaintiff filed a motion in limine and for partial summary judgment and the parties conducted briefing on the motion. After another status conference with the parties on December 4, 2013, the court issued an Order stating that "Plaintiff's May 31, 2013 Motion to Compel Discovery and for Payment of Expenses, July 23, 2013 Motion in Limine and for Partial Summary Judgment, and November 8, 2013 Motion to Amend the Court's October 30, 2013, Order are **DENIED** at this time." (capitalization and emphasis in original). The court indicated to the parties during multiple status conferences that the legal and factual issues briefed in the various motions, including plaintiff's motion to compel and for payment of expenses, would be deferred until after the trial testimony had been taken and the court had the opportunity to hear the witnesses' testimony and review the record, which the court considered necessary to resolve plaintiff's motions.

In its post-trial briefing, plaintiff asked the court to revisit plaintiff's May 31, 2013 motion to compel discovery and for payment of expenses. According to plaintiff, evidence presented at trial reinforces the relevance of the documents sought by Securiforce in its document production requests 11 and 12 and warrants the court's further consideration of plaintiff's motion for costs. Plaintiff points out, with regard to document production request 11, concerning security, that, during the trial, plaintiff was permitted to admit into evidence, as plaintiff's exhibit 1025 in the trial record, an e-mail discussing a contract for fuel delivery that was issued under the same solicitation as Securiforce's contract, but held by a different contractor, "Ram," over defendant's objection. Also, with regard to document production request 12, which sought documents pertaining to proof of principle orders placed with other contractors, included in Colonel Nicholas Musgrove's testimony at trial was a discussion of proof of principle orders placed with other contractors. According to plaintiff "the whole record now makes clear that both Request 11 and Request 12 were relevant and its Motion to Compel Discovery should have been granted in whole." As a result, plaintiff now seeks "its costs in connection with the Motion to Compel Discovery" and "costs associated with filing its Motion in Limine and for Partial Summary Judgment, as that motion was filed at the direction of the court." As explained to the parties, the court found the motion in limine helpful to further the court's understanding of plaintiff's claims heading into the trial, and for the final disposition of the case regardless of any possible relationship to plaintiff's document requests, although the court deferred a decision on the issues raised in plaintiff's motion in limine and plaintiff's motion for partial summary judgment until after the trial.

## II.  Securiforce's October 31, 2014 Motion for Sanctions

Plaintiff filed a motion for sanctions under RCFC 37 on October 31, 2014 arising out of issues separate and distinct from plaintiff's earlier May 31, 2013 motion to compel and for payment of expenses. As indicated above, one of Securiforce's alleged breaches of contract was that the government relied on contractors other than Securiforce to fulfill its fuel requirements for the Department of State sites specifically designated in Securiforce's contract, including the Basrah, Umm Qasar, Besamaya, Sather, Shield, and Taji delivery sites, allegedly in violation of the requirements contract between DLA Energy and Securiforce. In its October 31, 2014 motion for sanctions, plaintiff alleges that, during more than a year of discovery in the above-captioned case, defendant made inaccurate representations as to whether Securiforce's designated sites received fuel from any sources other than Securiforce during the life of the contract, including the period of time between the date of contract award, September 7, 2011, and the first delivery deadline, October 24, 2011. According to plaintiff, only after conducting an RCFC 30(b)(6) (2015) deposition on September 5, 2014, for which plaintiff alleges the government produced an inadequate witness, did defendant conduct a more thorough investigation into plaintiff's questions about fuel deliveries prior to October 24, 2011, admit that defendant's initial discovery responses were inaccurate, and submit revised discovery responses in October 2014. Plaintiff asserts that defendant's investigation following the RCFC 30(b)(6) deposition occurred more than one year after plaintiff first propounded discovery requests seeking admissions from defendant that the government had received fuel at the sites specified in Securiforce's contract between September 7, 2011 and October 24, 2011. Defendant explained that it learned new information during the September 2014 RCFC 30(b)(6) deposition that "brought to light the need for further investigation," which it undertook promptly following the RCFC 30(b)(6) deposition, after which defendant promptly modified its responses to plaintiff's discovery requests.

During discovery in the above-captioned case, plaintiff propounded interrogatories, document requests, and requests for admissions to defendant to support its claim that, during the pendency of the contract, the government had improperly received fuel from sources other than Securiforce in violation of plaintiff's requirements contract. The contract documents sought in plaintiff's discovery requests related to fuel deliveries to United States Department of State locations in Iraq from September 2011 to March 2013 during a time of conflict. The relevant documents appear to have been located at DLA Energy sites both in the United States and in Iraq at on-site offices. In March 2013, plaintiff served document production requests upon defendant, including a request for:

> All documents related to actual orders and/or delivery of diesel fuel and motor gasoline at the eight sites awarded under the Contract from the date of Contract award until the present, including, but not limited to, deliveries made to the eight sites awarded under the Contract by trucking fuel from Department of Defense Stocks in Kuwait.

In response to this document request, in July 2013, defendant produced two spreadsheets which purported to show all diesel fuel and motor gasoline deliveries to the eight Department of State sites covered by plaintiff's contract between September 7,

2011, the date of contract award, and March 12, 2013, the date of plaintiff's discovery request, with no deliveries occurring prior to October 25, 2011, the day after Securiforce first failed to deliver fuel in accordance with the terms of the contract. Plaintiff's first delivery deadline under the contract was October 24, 2011, and plaintiff failed to deliver fuel in accordance with that deadline. In an e-mail sent on November 5, 2013, plaintiff's counsel inquired as to whether the spreadsheets were accurate and captured all of the fuel delivery orders, electronic and hard copy, that had been placed between September and October 2011. Defendant responded by letter on November 6, 2013, and explained that "as reflected in the data produced, the Government placed no orders, electronic or otherwise, in the month of September 2011. The very first orders it placed under the contract were with Securiforce, as required, and issued verbally on October 14, 2011," and these were "the only deliveries requested through the October 24, 2011 delivery deadline." During discovery defendant explained:

> [T]he Department of State urgently required fuel that Securiforce admittedly could not deliver. So, as authorized by the contract, the Government "covered" Securiforce's breach, procuring a limited quantity of fuel from elsewhere. To the best of our current knowledge, covering orders were accomplished electronically. Based on your request, however, we have asked agency personnel to search for any hardcopy orders associated with these deliveries, which are accurately reflected on the delivery spreadsheet about which you inquired. In terms of source data, it is our understanding that DLA's fuel database is designed to function exclusively or almost exclusively by electronic means, with data input, collected, and recorded to accurately detail the agency's global logistics efforts.

In addition to the document production requests, plaintiff propounded multiple requests for admissions. Plaintiff propounded its first request for admissions to defendant on April 16, 2013, in which "Securiforce sought admissions that the government had received deliveries of diesel fuel and motor gasoline" at Department of State locations, including Basrah, Umm Qasar, Besamaya, Sather AB, Shield, and Taji between the date of contract award, September 7, 2011, and the November 15, 2011 termination for cause. In its response on June 7, 2013, defendant stated that fuel had been delivered to some of these sites (Basrah, Besamaya, Shield, Taji), but only after plaintiff was unable to timely deliver the fuel ordered under the contract and had defaulted on the contract, thus, not in violation of Securiforce's requirements contract.

On November 20, 2013, plaintiff sent defendant a second request for admissions, this time specifically asking about an e-mail, dated October 4, 2011, sent by Colonel William Rush, which stated, in part:

> we've tagged our KO [contracting officer] for the Jassim contract to make mods to allow us to make deliveries to [Securiforce's] sites with their assets to get DoS [Department of State] and OSC-1 their initial operational stocks IAW [in accordance with] MG Richardson's guidance.

. . .

6

> Through Jassim I think I can support Taji, Prosperity, Embassy, Besmaya
> [sic] Shield and Umm Qasar with the orders slated for later this week.

Plaintiff alleges this e-mail indicated that, as of October 2011, DLA Energy had submitted fuel orders to sources other than plaintiff for deliveries to the sites covered by Securiforce's contract. In its December 23, 2013 response to plaintiff's request for admissions regarding the October 4, 2011 Colonel Rush e-mail, defendant denied plaintiff's request for admissions and stated that the e-mail did not state or indicate that as of October 4, 2011 DLA Energy had decided to use another contractor to deliver fuel to Securiforce's sites. Defendant asserted that the e-mail "reflects Col. Rush's concern that Securiforce, misunderstanding its contractual obligations, had refused to make timely deliveries" as of October 4, 2011. This e-mail also was the subject of a line of questioning during the deposition of Colonel Rush, which occurred on January 16, 2014. When plaintiff's counsel asked Colonel Rush: "Were there orders slated for later that week?" Colonel Rush stated: "I don't recall." Colonel Rush further indicated that he believed his e-mail to be accurate, but that "I just don't remember the specific details of the orders." During his deposition, Colonel Rush also stated:

> As I'm sure we'll discuss later, they weren't able to meet that time line, so I still had customers that needed fuel. And as I recall, we had to come up with other ways to get them fuel while waiting for SecuriForce to be able to bring fuel into Iraq from Kuwait. And that proof of principle I believe was bringing DOD-procured fuel that was already in Iraq, positioned in an intermediate terminal, forward to another site by KBR [Kellogg Brown & Root], an Army contractor.

In May 2014, plaintiff propounded an additional interrogatory, identified as interrogatory 16, regarding the spreadsheets that defendant had produced in July 2013, "seeking information about who had prepared the spreadsheets, the sources of the data contained therein, and whether the government contended that the spreadsheets captured all fuel deliveries to Securiforce's sites" from September 7, 2011 through November 15, 2011. Interrogatory 16 asked:

> For the spreadsheets produced by the government at DLA4929 and DLA4930, identify (a) the individual(s) that prepared those spreadsheets; (b) the source(s) of data and other sources of information relied upon by the individual(s) that prepared those spreadsheets; and (c) whether the government contends that these spreadsheets capture all fuel deliveries (including delivery of government-owned fuel) to Securiforce's sites from September 7, 2011, through the date of Securiforce' s First Set of Document Production Requests (March 12, 2013).

Defendant responded:

> Defendant objects to interrogatory 16 to the extent it violates Rule 33(a) because it includes multiple discreet [sic] subparts. Subject to, and without waiving its objections, the defendant responds as follows: For the

spreadsheets produced by the government at DLA4929 and DLA4930, the individuals who prepared those spreadsheets were, in alphabetical order: (a) Kellie Allison; (b) Thomas Cooch; (c) Kathleen Drohan; (d) Steven Hurwitz; and (e) Al Morgan. The referenced spreadsheets compiled data from the DLA Energy's Fuels Enterprise Server, DLA Energy's Defense Fuel Automated Management System, and DLA Energy's Automated Voucher Examination and Disbursing System. The referenced spreadsheets capture all fuel deliveries (including delivery of government-owned fuel) to Securiforce's sites from September 7, 2011, through the date of Securiforce's First Set of Document Production Requests (March 12, 2013).

Still questioning the completeness and accuracy of defendant's continued representations and discovery responses regarding fuel deliveries to Securiforce's sites, in July 2014, plaintiff notified defendant of its intent to conduct a deposition pursuant to RCFC 30(b)(6) on the following topics:

The information contained in the government's response to interrogatory No. 16.

Deliveries of diesel fuel and motor gasoline, including government-owned fuel, to the sites under Securiforce's Contract from the date of Contract award until the date of Securiforce's First Set of Document Requests.

The basis for government's representations that no diesel fuel or motor gasoline was delivered to Securiforce's sites prior to October 24, 2011. (See Responses to Request for Admissions Nos. 71, 72, 81, 82, 90, 91, 98, 99, 106, 107, 115, 116, 213, 215, 216, 217, 218, 219, 220)

The sources (i.e., country of origin) of diesel fuel and motor gasoline being delivered to Securiforce's sites.

Defendant designated a DLA Energy inventory program manager, Jack Whitaker, as the RCFC 30(b)(6) witness, and Mr. Whitaker was deposed by plaintiff's counsel on September 5, 2014. During his deposition, Mr. Whitaker identified himself as an inventory program manager for DLA Energy and stated that he had been working for DLA Energy in the Middle East since approximately 2005. Mr. Whitaker explained that his job duties as a DLA Energy inventory program manager included overseeing aspects of inventory, accounting, and invoicing for fuel in the Middle East. In response to plaintiff's counsel's question: "if somebody needs fuel in Iraq, what's the process?"; Mr. Whitaker provided testimony about DLA Energy's processes for ordering, delivering, and paying for fuel for sites in Iraq. Mr. Whitaker also was asked about the spreadsheets that defendant had previously produced during discovery that purportedly captured all of the fuel deliveries to Securiforce's sites during the life of Securiforce's contract. Mr. Whitaker stated that he was familiar with the various databases listed on the spreadsheets, including "DLA Energy's fuels enterprise server, DLA Energy's defense fuel, automated management system, and DLA Energy's automated voucher examination and dispersing system" and was able to explain the systems to plaintiff's counsel when asked. Mr. Whitaker testified,

however, that he had not spoken with any of the individuals who had prepared the spreadsheets containing the fuel delivery information, nor had he spoken with individuals at the sites covered in Securiforce's contract at the relevant time period, many of whom had no doubt moved on, as to whether fuel was received between September 7, 2011, the contract award date, and November 15, 2011, the contract termination date. Plaintiff's counsel asked Mr. Whitaker if he had done "anything to go back and verify the accuracy of the information" in the spreadsheets, and Mr. Whitaker responded: "No, I did not," but he stated that he had reviewed the spreadsheets and knew how the process worked, and he explained, "[s]o on that basis, I think they're accurate." When asked more questions about the data contained in the spreadsheets, Mr. Whitaker's deposition testimony indicated his understanding of the material captured in the spreadsheets, the coding language used, how it was organized, and what the spreadsheet entries represented. Although Mr. Whitaker could not define every code used in the spreadsheets, or explain every entry, he was able to define multiple codes used and explain the context of the information contained in the spreadsheets. For example, when asked to explain an entry in the spreadsheets, Mr. Whitaker responded: "That's a DoDAAC. It's like the billing code for a base that delivers fuel -- delivers or receives fuel. This column is for the receipt. There's also a DoDAAC on the other side that's for the delivering."

Mr. Whitaker was asked whether he reviewed the contract between DLA Energy and Securiforce prior to his deposition, to which he replied "I've seen it. No, I didn't, like, dig into it and review it like I would a -- you know, when a contract's awarded, does it meet mission requirements, et cetera. I didn't look at it. Just kind of breezed through it." Mr. Whitaker also indicated that he had seen plaintiff's list of topics for the deposition only the day before, and that, in order to familiarize himself with the topics, he looked at each one of the admissions and the spreadsheets produced by defendant in discovery. Plaintiff's counsel asked Mr. Whitaker "is it your understanding between September 7 and October 24, no fuel was delivered to any of the eight sites awarded to SecuriForce under their contract?" Mr. Whitaker replied: "Yeah, I'm not sure. I didn't look these up. I mean--." When asked whether it was his understanding that the Securiforce sites went without fuel between September 7, 2011 and October 24, 2011, Mr. Whitaker stated:

> I don't -- I don't know that they didn't have any deliveries. I mean, if they were operating -- and as I said before, I'm not sure if there were people -- if those sites were occupied during that time. But I imagine if people were there, they had to have generators running, they needed fuel. You know, there was a bunch of big bases that we closed during that period. There could have been leftover fuel that was used that the Army moved to those destinations that was excess that -- when they were leaving. I'm just speculating. I don't know.

Following Mr. Whitaker's deposition on September 5, 2014, the government conducted a "follow on investigation," and, as represented in defendant's response to plaintiff's motion for sanctions,

> it became clear that, although DLA Energy was the primary supplier of fuel for the military and the Department of State in Iraq, the Army or its

contractor, Kellogg Brown & Root (KBR), would redistribute fuel it purchased from DLA Energy to its forward operating bases, including to the military located at Securiforce sites.

Defendant stated that it "immediately informed counsel for Securiforce of this new information" during a telephone call on September 18, 2014. Approximately one month later, on October 14, 2014, defendant served its amended discovery responses on plaintiff in which it admitted that some DLA Energy-owned fuel was delivered to at least four sites designated in Securiforce's requirements contract, including Taji, Shield, Embassy Baghdad, and Basrah, between September 7, 2011 and October 24, 2011. With regard to Umm Qasar, Besamaya, and Sather AB, defendant indicated that there were fuel deliveries,

> to the extent that DLA Energy-owned fuel from Kuwait was delivered to various DLA Energy-owned stock points in Iraq. Some of that fuel was subsequently transferred to the Army. The Army then redistributed that fuel under a LOGCAP contract with KBR to military customers at various sites in Iraq, including the sites under the Securiforce contract. Furthermore, during the transition, DLA Energy turned over various fuel stocks that it held in Iraq to the Army in Iraq. The Army in turn had a policy to provide USF-I owned fuel to the Department of State for USM-I at enduring locations.

Although defendant conceded that some fuel was received at four of Securiforce's designated sites, and that it is possible fuel was transferred from the Army to the Department of State at Securiforce's other sites, the government indicated it "was unable to locate any records documenting fuel transfer from the Army to the Department of State."

Based on the deposition testimony that Mr. Whitaker offered at the RCFC 30(b)(6) deposition, plaintiff alleges that "[t]he government did next to nothing to prepare Mr. Whitaker to testify on its behalf." According to plaintiff, Mr. Whitaker was an inadequate RCFC 30(b)(6) witness. Approximately one week after Mr. Whitaker's deposition, plaintiff's counsel notified defendant that Securiforce believed Mr. Whitaker was an inadequate RCFC 30(b)(6) witness and that plaintiff intended to move for sanctions under RCFC 37. Plaintiff also asked if defendant would be willing to produce another 30(b)(6) witness for deposition. On September 17, 2014, defendant notified plaintiff's counsel that it was "willing to produce another 30(b)(6) witness, perhaps the person who ran the reports, but remain[ed] concerned that person will still not be able to answer all of your questions." Defendant included a list of specific individuals "who would be able to answer additional questions regarding the delivery of fuel to Securiforce's sites and the source of that fuel." Notwithstanding defendant's willingness to produce one or more additional RCFC 30(b)(6) witnesses, and that defendant had identified other possible individuals who might have additional information, plaintiff chose to file a motion for sanctions on October 31, 2014, rather than pursue additional information through deposing other RCFC 30(b)(6) witnesses. Therefore, no additional RCFC 30(b)(6) witnesses were deposed prior to trial.

Even after the trial and plaintiff's decision not to depose additional witnesses, plaintiff continues to press this court to impose sanctions on defendant for allegedly providing inaccurate discovery responses for more than a year while "repeatedly and unequivocally represent[ing] that its discovery responses were accurate." According to Securiforce, it was forced to continue investigating the responses in order to prove their inaccuracy and to conduct an unnecessary deposition of an unprepared RCFC 30(b)(6) witness. In its motion for sanctions, plaintiff alleges that this court must award costs "under Rule 37(c)(1),(c)(2), and (d)(3) for the government's numerous inaccurate discovery responses necessitating [a] 30(b)(6) deposition in the first instance; and (b) under Rule 37(b)(2)(C) for producing an unprepared witness who could not testify to matters clearly within the government's knowledge."[2] Plaintiff's motion for sanctions seeks $110,833.55 in costs.

## D I S C U S S I O N

Plaintiff filed its motions for costs and sanctions pursuant to RCFC 37, which provides various forms of relief for discovery failures and uncooperative conduct, including sanctions in the form of a party's reasonable expenses and attorney's fees. See RCFC 37. "The decision whether to impose discovery sanctions rests within the sound discretion of the trial court." AG-Innovations, Inc. v. United States, 82 Fed. Cl. 69, 79 (2008) (quoting Ingalls Shipbuilding, Inc. v. United States, 857 F.2d 1448, 1450 (Fed. Cir. 1988)). In determining whether sanctions are appropriate, the court may consider the conduct of the violating party. See Goodeagle v. United States, 124 Fed. Cl. 43, 46 (2015) (declining to impose a severe sanction that would exclude evidence "where there is no indication that the Government acted with willful neglect or bad faith"); see also Dairyland Power Co-op v. United States, 79 Fed. Cl. 709, 716 (2007) ("A trial court must find that the violating party acted willfully and in bad faith"). In the above-captioned case, plaintiff argues that "demonstrating bad faith is not a prerequisite to the Court's awarding any Rule 37 sanctions short of dismissal or default judgment." (emphasis in original). See United Med. Supply Co. Inc., v. United States, 77 Fed. Cl. 257, 268 (2007) (holding that a finding of bad faith is not required to impose spoliation sanctions). The language of RCFC 37 does not direct a party moving for sanctions to prove bad faith, however, the United States Court of Appeals for the Federal Circuit has held that the "harsh remedy of de facto dismissal is appropriate where the failure to comply with a pretrial discovery order is due to 'willfulness, bad faith, or. . . fault' on the part of a litigant." Ingalls Shipbuilding, Inc. v. United States, 857 F.2d at 1451 (quoting Societe Int'l Pour Participants Industrielles Et Commerciales, S.A. v. Rogers, 357 U.S. 197, 1095 (1958)).

---

[2] In its motion for sanctions filed on October 31, 2014, plaintiff also sought "'an order that it be taken as established that the government fulfilled its requirements for motor gasoline and diesel fuel at Securiforce's awarded sites from sources other than Securiforce during the entire term of the Contract," an exaggeration in any event. In a joint status report filed on November 21, 2014, however, plaintiff stated that it believed its request for this order "is now moot," and retracted that request.

I.      **Plaintiff's May 31, 2013 Motion to Compel and for Payment of Expenses**

Plaintiff filed its May 31, 2013 motion to compel and for payment of expenses seeking $219,914.00 pursuant to RCFC 26 and RCFC 37(a)(1). RCFC 26(b)(1) provides that a "party may obtain discovery, including documents, "regarding any nonprivileged matter that is relevant to any party's claim or defense." RCFC 26(b)(1). RCFC 37(a)(1) provides that "a party may move for an order compelling disclosure or discovery." RCFC 37(a)(1). Under RCFC 37(a)(5)(A), if a party's motion compelling disclosure or discovery is granted, then "the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." RCFC 37(a)(5)(A). RCFC 37(a)(5)(A) explains further that the court shall not order payment of expenses if certain exceptions apply, including "(i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action; (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or (iii) other circumstances make an award of expenses unjust." RCFC 37(a)(5)(A)(i)-(iii). Alternatively, if a motion to compel is denied, the court "must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party or deponent who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees." RCFC 37(a)(5)(B). The court shall not order this payment "if the motion [to compel] was substantially justified or other circumstances make an award of expenses unjust." Id.

Plaintiff seeks to recover under RCFC 37(a)(5)(A) on the theory that its motion to compel discovery and for payment of expenses should have been granted and "requests that the Court reconsider the provisional denial of Securiforce's request for fees relating to its Motion to Compel Discovery." As discussed above, during discovery in the above-captioned case, plaintiff propounded document requests to defendant apparently designed to support its breach of contract claims, including, among other allegations, that (1) defendant had repudiated its contractual obligation to provide plaintiff with security escorts, and (2) had ordered "Proof of Principle" fuel shipments that allegedly did not reflect the government's actual fuel requirements. Specifically, plaintiff requested:

> 11. All documents, including but not limited to contract modifications, notices, and correspondence, related to security for other contractors awarded contracts under the Solicitation.
>
> 12. All documents related to notices issued to other contractors awarded contracts under the Solicitation requesting contractors to conduct a Proof of Principle.

Defendant "objected to these requests, principally on the grounds that they are overly broad and unduly burdensome, and because they call for the production of documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible information." In an effort "to avoid burdening the Court with an unnecessary discovery dispute," however, defendant offered to "produce responsive documents

relating to other contractors performing under the contract originally awarded Securiforce through Amendment 5 to the Solicitation." Unsatisfied with defendant's response, plaintiff moved to compel the production of additional documents that it believed defendant should have produced in response to plaintiff's document requests. In a December 4, 2013 Order, the court held that "Plaintiff's May 31, 2013 Motion to Compel Discovery and for Payment of Expenses, July 23, 2012 Motion in Limine and for Partial Summary Judgment, and November 8, 2013 Motion to Amend the Court's October 30, 2013, Order are **DENIED** at this time." (capitalization and emphasis in original). The court ordered that the parties work together to "pursue the discovery plan discussed at that conference in order to attempt to resolve any discovery disputes." The court indicated that it was deferring plaintiff's motions until it could hear the witnesses at trial, given the difficulty at the time to determine relevancy and the need to more fully understand the facts surrounding the termination for convenience and the termination for cause which formed the basis of plaintiff's complaint.

In its post-trial brief, plaintiff argues that "evidence presented at trial reinforces the relevance of the documents sought by Securiforce and warrants the Court's reconsideration of Securiforce's motion for costs." According to plaintiff, although its motion compelling certain document discovery was provisionally denied before trial, the record developed at trial demonstrates that the motion should have been granted initially. Plaintiff, however, did not argue that any additional evidence should have been introduced into the trial record or that any such evidence would have changed the result of the trial.

Although plaintiff's complaint was framed as a request for declaratory relief and to void the terminations for the government's convenience and for cause, plaintiff sought a finding from this court that the terminations were breaches of plaintiff's contract with DLA Energy. In reviewing a breach of contract claim, the court shall look to the language of the written agreement between the parties. See Bell/Heery v. United States, 739 F.3d 1324, 1331 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); Sterling, Winchester & Long, L.L.C. v. United States, 83 Fed. Cl. 179, 183 (2008), aff'd, 326 F. App'x 568 (Fed. Cir. 2009). Where there is ambiguity in the language of a contract evidence of conduct under other, similar contracts may be admissible to prove breach. See Miller Elevator Co., Inc. v. United States, 30 Fed. Cl. 662, 689 (1994) (explaining that the previous conduct between parties to an agreement can establish "a common basis of understanding for interpreting their expressions and other conduct"). This court's predecessor held in Troise v. United States, 21 Ct. Cl. 48, 61 (1990), that a court may consider as evidence prior contracts between parties involved in a contract dispute if the prior contract and the current contract are sufficiently similar. Additionally, in certain circumstances, this court may consider the course of dealing between parties to resolve an ambiguous contract term. See Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004); see also Miller Elevator Co., Inc. v. United States, 30 Fed. Cl. at 689. In the motion to compel, plaintiff argues that other contracts are relevant to its breach of contract claims, however, plaintiff has not established that the contract between Securiforce and DLA Energy was ambiguous.

Plaintiff has argued that its document discovery requests 11 and 12 were part of its effort to prove that DLA Energy had breached its contract with Securiforce by

repudiating its obligation to provide security escorts and improperly ordering proof of principle shipments. With regard to document request 11, which requested contract documents related to government-provided security for other contractors, plaintiff points to three different examples in the trial record to prove that the documents requested were relevant and, thus, the motion to compel should have been granted. First, plaintiff argues that "[t]estimony from various witnesses and trial exhibits established that other contractors, including Ram and Jassim, refused to make fuel deliveries without government-provided security." As discussed further below, however, neither the conduct of other contractors, nor the terms of other contracts between different contractors and defendant are relevant when considering this plaintiff's breach of contract claim. The trial record, including the testimony of several witnesses, emphasized that the particular contract between Securiforce and defendant governed plaintiff's relationship with the government and that the contract did not, initially, provide for security. The trial record also did not establish the relevancy of other contractors' agreements with the government in relation to the contract specifications contained in Securiforce's contract. As such, even discussion at trial of other contractors' conduct cannot establish that plaintiff's document production request sought relevant information.

Second, plaintiff points to Contracting Officer Shepherd's trial testimony regarding discussions about security that were conducted with other offerors prior to contract award. Contracting Officer Shepherd explained at trial, however, that these discussions only concerned the contracts for Department of Defense sites, and did not address contracts issued to provide fuel to Department of State sites, such as plaintiff's contract. Therefore, plaintiff has failed to prove the relevance of discussions between the government and other contractors with regard to plaintiff's specific contract with the government. The fact that different contractors in the same war zone were operating under different contractual agreements with defendant does not change, or effect in any way, the terms of plaintiff's contract with the United States.

Third, plaintiff relies on the fact that, at trial, the court admitted into evidence, over defendant's relevancy objection, an e-mail discussing a contract between DLA Energy and another contractor, Ram, which had been awarded under the same solicitation as plaintiff's contract. Plaintiff moved to admit the e-mail into evidence during its trial examination of Kathryn Fantasia, in order, according to plaintiff, to demonstrate "what a requirements contract required and what would be a breach." In this regard, the court allowed plaintiff latitude to offer the evidence for general definition purposes. Although the court allowed this e-mail to be entered into evidence as an exhibit, plaintiff asked only a few questions about the e-mail discussing the Ram contract and did not draw a comparison between the Ram contract and plaintiff's contract regarding government-provided security. Moreover, in a bench trial, the court is in the position to sift through the evidence presented and to consider only the information relevant to the disposition of a case when arriving at and issuing a decision. In the March 21, 2016 opinion, the court did not utilize or refer to the e-mail discussing the Ram contract. As plaintiff itself explained at trial, the e-mail was admitted as a general example of a requirements contract, it was not admitted to prove whether security was required under plaintiff's contract with DLA Energy. Indeed, the e-mail discussing the Ram contract could not have been used to prove or interpret the terms of plaintiff's contract with defendant.

Although plaintiff tries to rely upon these three occurrences to advance its argument that the mere mention at trial of another contract or contractor connected to the same solicitation as plaintiff's contract necessarily should lead to the conclusion that all of the contract documents related to security for other contractors awarded contracts under the same solicitation as Securiforce's contract are relevant to the above-captioned case, the court issued its opinion without coming to a similar conclusion. The contract documents requested by plaintiff were not relevant to plaintiff's claim that DLA Energy breached the contract with Securiforce by allegedly repudiating its obligation to provide security escorts, and the instances at trial that plaintiff points to in support of its position do not prove the relevancy of those contract documents.

Similarly, with regard to document request 12, which asked for contract documents related to proof of principle orders placed with other contractors, plaintiff argues that defendant's "conduct with respect to requiring POP [proof of principle] deliveries from other awardees under the same Solicitation is relevant to this matter." Plaintiff points to Colonel Musgrove's trial testimony acknowledging that DLA Energy did not place any proof of principle orders with any of the other contractors that were awarded a contract under the same solicitation as Securiforce. Colonel Musgrove's trial testimony regarding proof of principle orders placed with other contractors was during Securiforce's own examination of Colonel Musgrove and came in response to the question: "Can you with certainty identify a single order. . . to a vendor, other than Securiforce, that was a proof of principle order?" Simply because plaintiff's counsel asked whether other contractors received proof of principle orders, however, does not establish that all "documents related to notices issued to other contractors awarded contracts under the Solicitation requesting contractors to conduct a Proof of Principle" are relevant to the above-captioned case. Also, Colonel Musgrove's testimony does not establish that defendant's actions in relation to other contractors operating under different contracts is relevant to plaintiff's contract with the government.

Plaintiff Securiforce moved to compel defendant to produce contract documents pertaining to contracts to which it was not a party. Plaintiff's requests were overly broad and not likely to produce evidence relevant to interpreting plaintiff's contract with the government. Plaintiff was not a party, nor has it alleged it was a party, to any of the contract documents requested in document requests 11 or 12. Plaintiff's document requests and submissions to the court indicate that plaintiff wished to receive contract documents held by other contractors in order to draw a comparison between contract performance under Securiforce's contract and performance under contracts held by other contractors issued under the same solicitation as Securiforce's contract, at least in part, to support plaintiff's breach of contract allegations. Such comparisons, however, would not have been helpful to plaintiff's case because the terms of the contracts held by other contractors and the performance obligations thereunder could not be imposed onto plaintiff's contract with DLA Energy.  The terms and conditions between DLA Energy and other contractors would not have served to aid in resolving the issues of whether defendant was obligated to provide security escorts or permitted to place proof or principle orders with plaintiff under the terms of the contract between Securiforce and DLA Energy. In the above-captioned case, in order to succeed on its breach of contract claims regarding security escorts and proof of principle orders, plaintiff would have had to

demonstrate that DLA Energy breached a duty on these issues arising out of the terms of the particular contract between Securiforce and DLA Energy, which was the only contract relevant to plaintiff's claims. See Carlos Irr. & Drainage Dist. v. United States, 877 F.2d at 959.

As stated above, evidence of other contracts may be relevant in cases in which the language in a contract is ambiguous. In the above-captioned case, plaintiff argues that contract documents pertaining to different contracts held by different contractors are relevant to proving plaintiff's breach of contract allegations, however, plaintiff does not appear to argue that the contract between Securiforce and DLA Energy was ambiguous, such that extrinsic evidence, including these other contract documents, would be appropriate as evidence. With regard to whether the government was required under the contract to provide security, plaintiff argues that the contract unambiguously required the government to provide armed security. Also, in its March 21, 2016 opinion in the above-captioned case, the court did not find that plaintiff's contract with DLA Energy was ambiguous with regard to either security escorts or proof of principle orders. The court acknowledged that, although "the contract prior to Mod 0002 did not explicitly provide for security for Securiforce," "[u]nder Mod 0002 to the contract, the government was required to provide security escorts to each location until December 31, 2011." Securiforce Int'l Am., LLC v. United States, 125 Fed. Cl. at 795. Notwithstanding plaintiff's argument that DLA Energy breached the contract by repudiating its obligation to provide security, in its previous opinion in the above-captioned case, the court determined that DLA Energy did not repudiate its obligation under the contract to provide security. See id. The court explained that, "given that Securiforce never even attempted to deliver fuel to one of the DoS sites, the failure to provide security, as alleged by plaintiff, never actually occurred." Id. at 796. With regard to the proof of principle orders, the March 21, 2016 opinion of this court explained that the trial "testimony in the above-captioned case seems to support that the PoP orders were for actual requirements," notwithstanding plaintiff's argument that the proof of principle orders did not reflect the government's fuel requirements. Id.

As previously stated, RCFC 26(b)(1) defines the scope of discovery as "any nonprivileged matter that is relevant to any party's claim or defense." RCFC 26(b)(1). This court generally has afforded a liberal treatment to the rules of discovery, however, it has recognized that discovery has "'ultimate and necessary boundaries.'" See New Orleans Reg'l Physician Hosp. Org., Inc. v. United States, 122 Fed. Cl. 807, 815, recons. denied, 123 Fed. Cl. 40 (2015) (quoting Hickman v. Taylor, 329 U.S. 495, 507 (1947)). Similar to its May 31, 2013 motion to compel and for payment of expenses, plaintiff's post-trial brief continues to espouse the same, overly broad theory that "[d]ocuments related to security for other contractors awarded contracts under the same Solicitation [as Securiforce] and under the same terms and conditions are relevant to Securiforce's claims," and that "[t]he government's conduct with respect to requiring POP deliveries from other awardees under the same Solicitation is relevant to this matter." Plaintiff in the above-captioned case has failed to explain, however, how the terms and conditions of other contracts, held by different contractors, and applicable to different fuel delivery sites would be relevant to Securiforce's breach of contract claims. Moreover, Securiforce's contract was terminated for cause because plaintiff ultimately failed to provide timely delivery of fuel in accordance with the terms of its contract.

Based on the above discussion, plaintiff's May 13, 2013 motion to compel is **DENIED**. Discovery in this case was protracted, contentious, and difficult. The circumstances of discovery in this case, and the actions of all parties, including DLA Energy, lead the court to conclude that both sides should bear the costs of their own discovery. As is further discussed below, the difficulties during discovery in this case do not warrant reward to either party.

## II.   Plaintiff's October 31, 2014 Motion for Sanctions

In its motion on October 31, 2014, plaintiff moved for sanctions against defendant based on defendant's allegedly inadequate discovery responses and for producing an allegedly unprepared RCFC 30(b)(6) deposition witness. Plaintiff's motion for sanctions revolves around its claim that the government relied on contractors other than Securiforce to fulfill its fuel requirements in violation of the requirements contract between DLA Energy and Securiforce. According to plaintiff, under the terms of the requirements contract, only Securiforce could deliver diesel fuel and motor gasoline to the specific eight Department of State sites in Iraq listed in Securiforce's contract. During discovery, plaintiff sought admissions from defendant that, during the life of Securiforce's requirements contract, the government had received fuel from sources other than Securiforce at the eight sites designated in Securiforce's requirements contract. Plaintiff alleges that during discovery on this issue defendant incorrectly denied this allegation and gave inaccurate responses for more than one year, and only produced corrected responses, admitting that some fuel deliveries had occurred, after plaintiff had conducted a deposition of a RCFC 30(b)(6) government witness. Plaintiff further alleges that, in its effort to prove that the government improperly received fuel from other sources at Securiforce's designated sites in Iraq, plaintiff had to conduct an unnecessary deposition of an RCFC 30(b)(6) witness and that the RCFC 30(b)(6) witness the government produced was unprepared. In its motion for sanctions, plaintiff asserts that this court must award costs "under Rule 37(c)(1),(c)(2), and (d)(3) for the government's numerous inaccurate discovery responses necessitating [a] 30(b)(6) deposition in the first instance; and (b) under Rule 37(b)(2)(C) for producing an unprepared witness who could not testify to matters clearly within the government's knowledge." Plaintiff seeks the award of Securiforce's reasonable costs, including attorney's fees, in the amount of $110,833.55, in connection with the RCFC 30(b)(6) deposition and the filing of its motion for sanctions in this regard.

In response to plaintiff's motion for sanctions, defendant argues that "Securiforce is not entitled to its fees under Rule 37(c)(2) when the Government's responses to Securiforce's requests for admission were based on a reasonable understanding of the only evidence the Government believed available." According to defendant, "sanctions are unwarranted when the Government had a reasonable belief that its answers represented the best available evidence and amended its answers once it learned from newly discovered information that its admissions did not tell the complete story." Additionally, defendant asserts that "[b]ecause the Government produced a qualified and knowledgeable Rule 30(b)(6) witness who answered some, but admittedly not all, of Securiforce's questions, and because Securiforce has declined the Government's repeated offer of additional Rule 30(b)(6) witnesses, Securiforce's motion should be denied."

a.  Defendant's Responses to Plaintiff's Discovery Requests from June 2013 to October 2014

As explained above, during discovery in the above-captioned case, plaintiff propounded interrogatories, document requests, and requests for admissions to defendant from March 2013 to May 2014 designed to support its claim that, during the life of the contract, the government improperly received fuel from sources other than Securiforce in violation of plaintiff's requirements contract. In defendant's discovery responses beginning in June 2013, defendant stated that fuel had been delivered to some of Securiforce's designated sites (Basrah, Besamaya, Shield, Taji), but only after plaintiff defaulted on the contract and, thus, the deliveries were not in violation of Securiforce's requirements contract. In July 2013, in response to plaintiff's document requests on March 12, 2013, defendant produced spreadsheets that purportedly captured all diesel fuel and motor gasoline deliveries to the eight sites under the contract between September 7, 2011 (the date of contract award) and March 12, 2013 (the date of plaintiff's first discovery request). The spreadsheets indicated that there were no deliveries of fuel to Securiforce's eight sites before October 24, 2011, the date on which Securiforce failed to deliver fuel ordered by DLA Energy in accordance with the terms of the requirements contract. Approximately one year after producing the spreadsheets, defendant confirmed that the spreadsheets "capture[d] all fuel deliveries (including delivery of government-owned fuel) to Securiforce's sites from September 7, 2011, through the date of Securiforce's First Set of Document Production Requests (March 12, 2013)." Thereafter, plaintiff conducted a RCFC 30(b)(6) deposition of Mr. Whitaker, the government employee produced by defendant for the RCFC 30(b)(6) deposition. During his deposition, Mr. Whitaker indicated that the government may have received some government-owned fuel for Securiforce's designated sites from sources other than Securiforce prior to October 24, 2011, specifically, from the United States Army. Following plaintiff's deposition of the government's RCFC 30(b)(6) witness in September 2014, defendant initiated a follow on investigation and, as noted above, partially modified its discovery responses.

In October 2014, defendant produced revised discovery responses which stated that fuel apparently had been received at four of the sites designated in Securiforce's requirements contract, including Taji, Shield, Embassy Baghdad, and Basrah prior to October 24, 2011. Defendant also admitted that fuel may have been delivered to Umm Qasar, Besamaya, and Sather AB,

> to the extent that DLA Energy-owned fuel from Kuwait was delivered to various DLA Energy-owned stock points in Iraq. Some of that fuel was subsequently transferred to the Army. The Army then redistributed that fuel under a LOGCAP contract with KBR to military customers at various sites in Iraq, including the sites under the Securiforce contract. . . . Furthermore, during the transition, DLA Energy turned over various fuel stocks that it held in Iraq to the Army in Iraq. The Army in turn had a policy to provide USF-I owned fuel to the Department of State for USM-I at enduring locations.

Plaintiff now moves to sanction defendant for its inaccurate discovery responses and recover its costs under RCFC 37(c)(1), (c)(2) and (d)(3) for conducting the RCFC 30(b)(6) deposition, which plaintiff characterizes as unnecessary, as well as to recover the costs incurred in filing its motion for sanctions.

### 1. *RCFC 37(c)(1)*

RCFC 26(e)(1)(A) requires a party which has responded to an interrogatory to "supplement or correct its. . . response. . . in a timely manner if the party learns that in some material respect the. . . response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." RCFC 26(e)(1)(A).  Under RCFC 37(c)(1), if a party fails to supplement its discovery responses in accordance with RCFC 26(e), including the party's previous responses to requests for admissions and interrogatories, the court may order that party to pay the reasonable expenses, including attorney's fees, caused by the failure. See RCFC 37(c)(1) (when a party "fails to provide information or identify a witness as required by RCFC 26(a) or (e) . . . the court, on motion and after giving an opportunity to be heard . . . may order payment of the reasonable expenses, including attorney's fees, caused by the failure."); see also Deseret Mgmt. Corp. v. United States, 97 Fed. Cl. 272, 275 (2011) (explaining that under RCFC 37(c)(1), the court may order payment of reasonable expenses in lieu of excluding evidence prior to a trial). A party's duty to supplement its responses under RCFC 26(e) applies to interrogatories, requests for production, and requests for admission. See RCFC 26(e)(2); see also Zoltek Corp. v. United States, 71 Fed. Cl. 160, 163 (2006). "The duty to supplement is a continuing duty, and no additional interrogatories by the requesting party are required to obtain the supplemental information—rather, the other party has an affirmative duty to amend a prior response if it is materially incomplete or incorrect." Zoltek Corp. v. United States, 71 Fed. Cl. at 164. In determining whether the government failed in its duty to amend a discovery response pursuant to RCFC 26(e), the court must consider: "(1) whether there was a prior response; (2) whether the response became materially incorrect or incomplete; (3) whether the government knew that the response was incomplete; and (4) whether the corrective information was otherwise made known to Plaintiff through the discovery process or in writing." Zoltek Corp. v. United States, 71 Fed. Cl. at 164. "Monetary sanctions may be imposed against a governmental party for violating the duty to supplement." Id. at 171.

In the above-captioned case, it is undisputed that defendant produced discovery responses in June 2013, October 2013, and June 2014 that were subsequently found to be, in part, incomplete or inaccurate. Defendant admits that in September 2014, upon realizing that its earlier discovery responses were not entirely accurate, it "immediately informed counsel for Securiforce" of the new information defendant had obtained. The parties do not dispute that, after conducting a follow on investigation in September 2014, following the RCFC 30(b)(6) deposition of Mr. Whitaker, defendant amended its discovery responses and produced corrected information to plaintiff in October 2014.

Plaintiff argues, therefore, that its deposition of Mr. Whitaker proved that defendant's prior discovery responses were inaccurate and seeks to recover the costs

incurred in conducting the deposition. Plaintiff argues that, pursuant to RCFC 37(c)(1), "the government is responsible for Securiforce's costs incurred in the 30(b)(6) exercise, because the government had no good reason for its prolonged misrepresentations that required Securiforce to incur this additional deposition expense." Plaintiff argues that defendant was essentially on notice of the Army's possible involvement in deliveries to Securiforce's designated sites as early as Colonel Rush's deposition in January 2014, nine months before Mr. Whitaker's deposition. At Colonel Rush's deposition in January 2014, he mentioned that the United States Army was used to deliver fuel to Securiforce's sites. Colonel Rush stated:

> As I'm sure we'll discuss later, they [Securiforce] weren't able to meet that time line, so I still had customers that needed fuel. And as I recall, we had to come up with other ways to get them fuel while waiting for SecuriForce to be able to bring fuel into Iraq from Kuwait. And that proof of principle I believe was bringing DOD-procured fuel that was already in Iraq, positioned in an intermediate terminal, forward to another site by KBR, an Army contractor.
>
> . . .
>
> KBR is Kellogg Brown & Root. It just means using -- the Army used Kellogg Brown & Root to deliver fuel. We would deliver fuel, DOD procured fuel, we own it, buy it in Kuwait, move it through Jassim by our transportation contractor.

When asked whether it was his understanding that the Securiforce sites went without fuel between September 7, 2011 and October 24, 2011, Mr. Whitaker stated at his deposition, nine months later:

> I don't -- I don't know that they didn't have any deliveries. I mean, if they were operating -- and as I said before, I'm not sure if there were people -- if those sites were occupied during that time. But I imagine if people were there, they had to have generators running, they needed fuel. You know, there was a bunch of big bases that we closed during that period. There could have been leftover fuel that was used that the Army moved to those destinations that was excess that -- when they were leaving. I'm just speculating. I don't know.

Plaintiff argues that Mr. Whitaker's deposition testimony corroborated other evidence that the government's discovery responses were inaccurate. In its submissions to the court, defendant does not specifically address the nine month period between Colonel Rush's deposition in January 2014 and Mr. Whitaker's deposition in September 2014, and argues that "it was Mr. Whitaker's testimony that made clear the potential existence of [the] informal support system [between the Army and the Department of State] and that DLA's records would not reflect any such fuel transfers." The information that defendant originally produced during discovery appears to have been based on DLA's records, as DLA was the party with which plaintiff entered into the contract and

with which plaintiff interacted during contract performance. Defendant argues that "the Government's denial that fuel was delivered to Securiforce's contract sites prior to October 25, 2011 was based on the only information available to it in response to a reasonable inquiry into DLA Energy's fuel delivery records." Defendant argues also that plaintiff "should have recognized that the Department of States' [sic] presence at the various sites Securiforce was contracted to supply was negligible at first and would materialize only after the sites transitioned fully from military control to the Department of State" in January 2012.

Notwithstanding plaintiff's argument that it is entitled to recover costs pursuant to RCFC 37(c)(1), the record in the above-captioned case indicates that defendant promptly, after conducting a follow on investigation and learning that its prior responses were not entirely accurate or complete, in accordance with RCFC 26(e), amended its discovery responses. Once Mr. Whitaker suggested at his deposition that during the military withdrawal from Iraq the Army had distributed excess government-owned fuel from military base closures to remaining Department of State sites, defendant investigated Mr. Whitaker's statements. Defendant subsequently learned: "[A]lthough DLA Energy was the primary supplier of fuel for the military and the Department of State in Iraq, the Army or its contractor, Kellogg Brown & Root (KBR), would redistribute fuel it purchased from DLA Energy to its forward operating bases, including to the military at Securiforce sites."

While defendant was able to learn this information from its investigation, it was "unable to locate any records documenting fuel transfer from the Army to the Department of State." Thus, given the information gained from Mr. Whitaker's deposition testimony and defendant's follow on investigation, it does not appear that defendant was disingenuous when it previously responded to and denied plaintiff's requests for admission based on its earlier reasonable search of DLA Energy's records in response to plaintiff's discovery requests.

Although plaintiff argues that defendant should have been on notice of the fuel deliveries to Securiforce's sites prior to October 24, 2011 based on the deposition testimony of Colonel Rush in 2014, in his testimony, Colonel Rush described the government's efforts as occurring only after Securiforce indicated that it could not comply with the delivery timeline of October 24, 2011, which was plaintiff's first delivery deadline. It is not clear that Colonel Rush was discussing the possibility of fuel transfers prior to October 24, 2011, and his testimony was not definitive. In the excerpt of Colonel Rush's deposition that plaintiff submitted in support of its motion for sanctions, Colonel Rush discussed how the government devised other ways to get fuel to Securiforce's sites after Securiforce indicated it would not be able to meet its October 24, 2011 delivery deadline. Colonel Rush specifically indicated that he was describing the government's delivery of fuel "while waiting for SecuriForce to be able to bring fuel into Iraq from Kuwait" because Securiforce had indicated that it could not deliver fuel before October 24, 2011: "[T]hey weren't able to meet that time line, so I still had customers that needed fuel." In contrast, Mr. Whitaker's deposition testimony specifically discussed fuel delivery to Securiforce's sites in September 2011, prior to October 24, 2011. Mr. Whitaker was directly asked whether it was his "understanding that these sites went

without any fuel from September 7 through October 24?" Mr. Whitaker answered that it was possible the sites were receiving government-owned fuel in September 2011. As discussed previously, based on Mr. Whitaker's response, defendant conducted a follow on investigation concerning fuel deliveries before October 24, 2011. Plaintiff's argument that Colonel Rush's deposition testimony, which discussed fuel delivery after October 24, 2011, should have triggered further investigation into deliveries to Securiforce's designated sites before October 24, 2011, as Mr. Whitaker's deposition prompted, is not sufficient to cause this court to impose sanctions on defendant. Discovery in this case was protracted and adversarial, and the contract records were created during an international conflict, dispersed, and stored in multiple locations, and, apparently, not easily retrievable if available at all. The record demonstrates that defendant made a good faith effort to comply with plaintiff's discovery requests and further investigated Mr. Whitaker's statements promptly following his deposition in September 2014. Defendant also promptly produced supplemental discovery responses approximately five weeks later. Moreover, although defendant produced its supplemental discovery responses in October 2014, plaintiff received the corrected responses at least four months before trial, with time for plaintiff to conduct any follow up discovery, had it chosen to request to do so.

Based on the record in the above-captioned case, defendant initially supplied information based on a reasonable review of what was identified by the agency as the available records. Defendant also met its obligation under RCFC 26(e) to supplement or correct its discovery responses in a timely manner upon learning that its prior responses were incomplete or inaccurate. Accordingly, plaintiff is not entitled to recover costs under RCFC 37(c)(1).

   *2.  RCFC 37(c)(2)*

The court must impose sanctions against a party that fails to admit what is requested in a discovery request for admissions if the party that initially propounded the request for admissions later proves the matter to be true and no exceptions under RCFC 37(c)(2) apply. See RCFC 37(c)(2). These exceptions include: (1) the request was held objectionable; (2) the admission sought was of no substantial importance; (3) the party failing to admit had a reasonable ground to believe that it might prevail on the matter; or (4) there was other good reason for the failure to admit. See RCFC 37(c)(2)(A)-(D). The party moving for sanctions may request "that the party who failed to admit pay the reasonable expenses, including attorney's fees," incurred in proving the truth of the previously denied matter. RCFC 37(c)(2); see also JZ Buckingham Investments LLC v. United States, 77 Fed. Cl. 37, 46-47 (2007) ("If, at trial, the propounding party subsequently succeeds in proving the matter set forth in the request for admission and the court determines that the responding party was not justified in refusing to admit the matter, the court may award monetary sanctions to the propounding party equivalent to the cost of proving the matter at trial."); Centex Corp v. United States, 71 Fed. Cl. 40, 53 (2006) ("Rule 37(c)(2) is thus directed at failures to respond properly to requests for admission."); Universal Life Church, Inc. v. United States, 14 Cl. Ct. 343, 348 (1988) (explaining that RCFC 37(c)(2) "requires that the court award expenses for failure to admit unless it makes the stipulated findings favorable to the non-movant").

In considering the imposition of sanctions pursuant to RCFC 37(c)(2), the court looks to whether the party against which sanctions are sought failed to make "full and frank disclosures" that "resulted in expense, waste, and delay." Universal Life Church, Inc. v. United States, 14 Cl. Ct. at 349 (sanctioning party pursuant to the requirements of RCFC 37(c)(2) after the party failed to make admissions that were later proved by uncontroverted evidence on summary judgment). Although the United States Court of Appeals for the Federal Circuit has explained that "[a]s a practical matter, it will often be necessary to complete a proceeding before it can be said that a requester has 'proved' the truth of the matter for which an admission has been requested," it is not clear that sanctions under RCFC 37(c)(2) are appropriate only after a requesting party has proved the truth of a matter at trial, as opposed to another type of proceeding. See Chemical Eng'g Corp. v. Essef Indus., Inc., 795 F.2d 1565, 1574 (Fed. Cir. 1986). In Universal Life Church, Inc. v. United States, another judge on this court imposed sanctions under RCFC 37(c)(2) after the matter was resolved on summary judgment because the sanctioned party's failure to make full disclosures resulted in "expense, waste, and delay." Universal Life Church, Inc. v. United States, 14 Cl. Ct. at 349.

In the above-captioned case, plaintiff argues that, under RCFC 37(c)(2), it is entitled to recover its expenses and attorney's fees incurred in preparing for and conducting the RCFC 30(b)(6) deposition of Mr. Whitaker. According to plaintiff, RCFC 37(c)(2) "mandates that Securiforce be awarded its costs associated with the 30(b)(6) deposition and its Motion for Sanctions" because "[t]he government has now admitted the falsity of its prior responses by retracting them, and it has acknowledged the truth of Securiforce's RFAs [requests for admissions] by admitting them in substance." Plaintiff argues that Mr. Whitaker's deposition testimony "undermined the government's position that no fuel deliveries had been made to Securiforce's sites from Contract award to October 24, 2011," which "led the government to recant its earlier denials and admit that it had made such fuel deliveries, as Securiforce had contended throughout" discovery. Defendant argues that sanctions under RCFC 37(c)(2) are not warranted because "Securiforce did not 'prove' through Mr. Whitaker's deposition that the Government failed to make an admission." Defendant contends that, at the time of Mr. Whitaker's deposition, there was an absence "of any information available to the Government. . . that these sites even received fuel before October 25, 2011." According to defendant:

> Mr. Whitaker's deposition raised the possibility that the Army was a source of fuel for the Department of State. Following the deposition, the Government conducted a follow-on investigation and amended its admissions to reflect that, although there was no supporting documentation, it was likely the Army supplied the Department of State without the involvement of DLA Energy.

(citations omitted). Defendant argues further that "the Government's denial that fuel was delivered to Securiforce's contract sites prior to October 25, 2011 was based on the only information available to it in response to a reasonable inquiry into DLA Energy's fuel delivery records." Defendant explains that "DLA Energy maintained the Government's stock of fuel for Iraq and was solely responsible for the contracts for direct delivery of fuel to Department of State locations in Iraq," thus, "there were reasonable grounds to believe

that its denial would prove true at trial," as it was based on the records maintained by DLA Energy.

As discussed above, defendant supplemented its discovery responses in October 2014 in order to provide more accurate and more complete discovery responses after it conducted a follow on investigation to the September 2014 RCFC 30(b)(6) deposition of Mr. Whitaker. After conducting this follow on investigation, defendant admitted what it had previously denied in its earlier discovery responses, that fuel not supplied by Securiforce was delivered to at least four of the sites designated in Securiforce's requirements contract prior to October 24, 2011, including Taji, Shield, Embassy Baghdad, and Basrah, albeit that fuel was "DLA Energy-owned fuel" and not, alternatively, privately sourced fuel. With regard to Securiforce's other sites, including Umm Qasar, Besamaya, and Sather AB, defendant admitted that Army-controlled fuel may have been redistributed to those sites,

> to the extent that DLA Energy-owned fuel from Kuwait was delivered to various DLA Energy-owned stock points in Iraq. Some of that fuel was subsequently transferred to the Army. The Army then redistributed that fuel under a LOGCAP contract with KBR to military customers at various sites in Iraq, including the sites under the Securiforce contract. . . . Furthermore, during the transition, DLA Energy turned over various fuel stocks that it held in Iraq to the Army in Iraq. The Army in turn had a policy to provide USF-I owned fuel to the Department of State for USM-I at enduring locations.

Plaintiff points to defendant's October 2014 admissions and Mr. Whitaker's deposition testimony to assert that it, Securiforce, was the party that proved fuel deliveries were made to Securiforce's sites between the contract award date, September 7, 2011, and October 24, 2011, notwithstanding defendant's denials throughout discovery. According to Securiforce, because plaintiff proved that such deliveries took place, it is thereby entitled to recover the cost of proving the truth of such deliveries pursuant to RCFC 37(c)(2). Plaintiff identifies the costs incurred in conducting the RCFC 30(b)(6) deposition of Mr. Whitaker as the costs of proving that the deliveries occurred. According to plaintiff, "the cost of the 30(b)(6) deposition qualifies under Rule 37(c)(2) as Securiforce's 'reasonable expenses, including attorney's fees,'" incurred in proving that the government's responses were untrue.

Notwithstanding plaintiff's argument, it is clear from the record in this case that the RCFC 30(b)(6) deposition of Mr. Whitaker did not "prove" that Securiforce's sites had received fuel prior to October 24, 2011. As defendant asserts, it was not until defendant's further, self-initiated investigation following Mr. Whitaker's deposition testimony that information regarding fuel deliveries to Securiforce's sites prior to October 24, 2011 was discovered.  Mr. Whitaker's deposition, by itself, did not prove that fuel was delivered to Securiforce's sites between September 7, 2011 and October 24, 2011. The deposition prompted defendant to conduct further investigations into the delivery of fuel to Securiforce's designated sites. That investigation led to an indication that the government had delivered what appears to have been DLA Energy-owned fuel to some of Securiforce's sites and that the Army also may have redistributed government-owned fuel

to other Securiforce sites. It was defendant's voluntary further investigation, albeit prompted by Mr. Whitaker's deposition testimony, that proved some Securiforce sites had received government-owned fuel between the contract award date and October 24, 2011. Although a party seeking sanctions may not always be required to show bad faith by the other party, sanctions are punitive in nature and intended to reprove a party for engaging in bad behavior during discovery. See Goodeagle v. United States, 124 Fed. Cl. at 46. Although DLA's conduct during discovery, including its discovery responses, in the above-captioned case was not exemplary, the record indicates a Department of Justice supervised and self-initiated investigation by the government into Mr. Whitaker's statements and the quick sharing of information with plaintiff upon learning new information. This investigation prompted defendant to produce additional responses, which, however, still did not demonstrate that DLA had contracted to purchase fuel from other contractors in order to meet the requirements for which defendant had contracted with plaintiff. With respect to the discovery responses, the record does not indicate a willful intent to deceive or other egregious conduct worthy of sanctions.

Additionally, to the extent that plaintiff's discovery requests asked for information about the delivery of government-owned fuel to Securiforce's sites in Iraq, those requests, likely, would be irrelevant to plaintiff's claim that the government breached its contract. The requirements contract between plaintiff and DLA Energy included the FAR 52.216-21 requirements term, which explains that "the Government shall order from the Contractor all the supplies or services specified in the Schedule that are required to be purchased by the Government activity or activities specified in the Schedule." Because the government presumably did not have to purchase fuel that was already owned by the government, even if it was later delivered to Securiforce's sites, the delivery of such government-owned fuel would be insufficient to prove that defendant breached the requirements contract it had entered into with Securiforce.   Furthermore, this court's opinion on March 21, 2016, upheld defendant's termination for cause based on plaintiff's inability to timely provide any fuel to defendant in accordance with the contract terms.

Notwithstanding plaintiff's allegations, it was not plaintiff that proved fuel was delivered to the sites identified in Securiforce's requirements contract. Instead, it was the result of defendant's follow on investigation after Mr. Whitaker's tentative testimony at his deposition, which suggested to defendant that it should further review the issue due to the responses provided to plaintiff. Mr. Whitaker stated:

> I don't -- I don't know that they didn't have any deliveries. I mean, if they were operating -- and as I said before, I'm not sure if there were people -- if those sites were occupied during that time. But I imagine if people were there, they had to have generators running, they needed fuel. You know, there was a bunch of big bases that we closed during that period. There could have been leftover fuel that was used that the Army moved to those destinations that was excess that -- when they were leaving. I'm just speculating. I don't know.

(emphasis added). Accordingly, because defendant's Department of Justice counsel promptly initiated a follow on inquiry after Mr. Whitaker's deposition, and then promptly

supplemented its discovery responses, defendant met its discovery obligations. Based on the record before the court, defendant's conduct during discovery does not warrant sanctions and plaintiff is not entitled to recover its expenses.

    b.  <u>RCFC 30(b)(6) Deposition of Jack Whitaker</u>

Plaintiff also moves for sanctions against defendant pursuant to RCFC 37(b)(2)(C) on the basis that the government "produced a wholly unprepared witness to testify." Plaintiff seeks to recover its expenses and attorney's fees incurred in preparing for and conducting the 30(b)(6) deposition of Jack Whitaker because, according to plaintiff, Mr. Whitaker effectively was a "No-show" witness. Plaintiff alleges that the government's RCFC 30(b)(6) witness was unprepared to answer specific questions about what plaintiff identifies as the narrow list of topics that Securiforce propounded when it notified defendant of its intent to conduct a RCFC 30(b)(6) deposition. Defendant argues that plaintiff's motion for sanctions should be denied because "the Government produced a qualified and knowledgeable Rule 30(b)(6) witness who answered some, but admittedly not all, of Securiforce's questions." According to defendant, in response to plaintiff's RCFC 30(b)(6) deposition notice,

> the Government identified Jack Whitaker, DLA Energy inventory program manager, as the witness most likely to have knowledge about the fuel inventory process and any possible transfer of fuel to Department of State sites during the transition to a commercial supply based fuel system from a system based on delivery of Government-owned fuel.

Defendant argues that "Mr. Whitaker's extensive involvement in DLA Energy's fuel inventory management for the Middle East made him the best witness available to the Government at the time to explain how Department of State sites in Iraq received fuel when Securiforce failed to provide any." While defendant acknowledges that Mr. Whitaker could not answer every question posed by Securiforce, defendant argues that "Securiforce is not entitled to a single, all-knowing Rule 30(b)(6) witness."

RCFC 30(b)(6) provides that, in a notice of deposition, "a party may name as the deponent. . . a governmental agency. . . and must describe with reasonable particularity the matters for examination." RCFC 30(b)(6). "The named organization must then designate one or more officers, directors, or managing agents. . . . The persons designated must testify about information known or reasonably available to the organization." <u>Id.</u>; <u>see also</u> <u>Dairyland Power Co-op v. United States</u>, 79 Fed. Cl. at 714 ("RCFC 30(b)(6) requires that when a party seeking to depose a governmental agency announces the subject matter of the proposed deposition, the agency must produce someone familiar with that subject."). To satisfy its obligations under RCFC 30(b)(6), a government agency has an affirmative duty to make available individuals who will be able to give complete, knowledgeable, and binding answers on behalf of the government. <u>See</u> <u>Dairyland Power Co-op v. United States</u>, 79 Fed. Cl. at 714. When the deponent is a government entity, "a deponent's failure to thoroughly investigate available records to identify an appropriate witness can be tantamount to failure to testify under RCFC 37(b)." <u>Dairyland Power Co-op v. United States</u>, 79 Fed. Cl. at 715. "If an RCFC 30(b)(6)

deponent produces a witness who has insufficient knowledge concerning the areas of inquiry, essentially defeating the purpose of the discovery process, then RCFC 37(b)(2) allows courts to impose various sanctions." <u>Dairyland Power Co-op v. United States</u>, 79 Fed. Cl. at 714-15; <u>see</u> <u>also</u> <u>Goodeagle v. United States</u>, 124 Fed. Cl. at 46 (plaintiff sought sanctions after the government allegedly failed to produce a proper RCFC 30(b)(6) witness). Pursuant to RCFC 37(b)(2)(A), if a witness designated under RCFC 30(b)(6) "fails to obey an order to provide or permit discovery," then the court must order "the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." RCFC 37(b)(2)(C).

In the above-captioned case, plaintiff identified the following broad topics for the RCFC 30(b)(6) deposition in an e-mail to defendant from plaintiff's attorney, Robert Wagman, dated July 15, 2014:

The information contained in the government's response to interrogatory No. 16.

Deliveries of diesel fuel and motor gasoline, including government-owned fuel, to the sites under Securiforce's Contract from the date of Contract award until the date of Securiforce's First Set of Document Requests.

The basis for government's representations that no diesel fuel or motor gasoline was delivered to Securiforce's sites prior to October 24, 2011. (See Responses to Request for Admissions Nos. 71, 72, 81, 82, 90, 91, 98, 99, 106, 107, 115, 116, 213, 215, 216, 217, 218, 219, 220)

The sources (i.e., country of origin) of diesel fuel and motor gasoline being delivered to Securiforce's sites.

Plaintiff alleges that Mr. Whitaker was not prepared for his RCFC 30(b)(6) deposition. When asked to explain how he had prepared for the RCFC 30(b)(6) deposition, Mr. Whitaker stated that he had seen the list of plaintiff's RCFC 30(b)(6) deposition topics only the day before his deposition, and that, in order to familiarize himself with the topics, he looked at each one of the admissions and the spreadsheets produced by defendant in discovery. Mr. Whitaker also testified that he had not thoroughly reviewed the contract between Securiforce and DLA Energy before his deposition.

Plaintiff points to different statements made by Mr. Whitaker during his RCFC 30(b)(6) deposition to demonstrate that the "government's designated witness, Mr. Whitaker, had no firsthand knowledge concerning the specified topics and had undertaken no investigation as to what was 'reasonably known to the organization.'" Specifically, Mr. Whitaker testified that he had no personal knowledge as to whether fuel was delivered to any of Securiforce's sites between September 7, 2011 and October 24, 2011, and that his knowledge regarding specific fuel deliveries was based on the information contained in the spreadsheets that were produced to plaintiff in July 2013.

When asked about the process for ordering and delivering fuel in Iraq, however, Mr. Whitaker articulated a developed understanding of this process and its nuances, including how the process could be different based on the source of the fuel. Furthermore, Mr. Whitaker was able to testify to the information contained in defendant's response to interrogatory 16, including the data systems used to compile the spreadsheets.

The transcript of Mr. Whitaker's deposition demonstrates that he offered a thorough knowledge of the spreadsheets prepared by DLA and previously turned over to plaintiff. The spreadsheets purportedly captured the fuel deliveries to the Securiforce Department of State sites in Iraq during the relevant time period according to defendant's information when the spreadsheets were prepared. Mr. Whitaker stated that he was familiar with the various databases listed on the spreadsheets, including "DLA Energy's fuels enterprise server, DLA Energy's defense fuel, automated management system, and DLA Energy's automated voucher examination and dispersing system" and was able to explain the systems to plaintiff's counsel when asked. The dialogue contained in the deposition transcript indicates that Mr. Whitaker could speak intelligently about the information contained in the spreadsheets. Mr. Whitaker answered many questions posed by plaintiff's counsel about specific, detailed information contained in the spreadsheets based on his ability to decipher the spreadsheets. Specifically, Mr. Whitaker could read the codes used in the spreadsheets to identify countries of origin, invoice numbers, billing codes, delivery sites, delivery dates, funding codes, stock numbers, fuel quantities, and fuel grades. Mr. Whitaker's knowledgeable deposition testimony about the spreadsheets and fuel deliveries in Iraq indicates that he was prepared to discuss a broad range of the topics plaintiff included in the RCFC 30(b)(6) deposition notice based on the information contained in DLA Energy's records.

Plaintiff, however, argues that Mr. Whitaker had no personal knowledge of actual deliveries to the Securiforce sites or of how the spreadsheets were prepared, and had done nothing to verify the accuracy of the information contained in the spreadsheets. Mr. Whitaker testified that, prior to his deposition, he had not spoken with any of the individuals who prepared the spreadsheets containing the fuel delivery information, nor had he spoken with anyone at the sites in Securiforce's contract as to whether fuel was received between September 7, 2011, the contract award date, and November 15, 2011, the contract termination date. Although Mr. Whitaker had not prepared the spreadsheets provided to plaintiff, he was thoroughly familiar with the information captured in the DLA databases and reflected in the spreadsheets. The deposition transcript also demonstrates that Mr. Whitaker believed the spreadsheets to be accurate based on his familiarity and knowledge as to how the information in the spreadsheets was assembled. Moreover, he was able to explain the information contained in the spreadsheets and define the various data entries. In response to plaintiff's counsel's question pertaining to the accuracy of the spreadsheets, Mr. Whitaker stated:

> I reviewed them, I looked at them and I know how the process works. I know what the origin is -- if you put parameters in and say give me a list of deliveries from these origins, that this document captures the origins that the fuel came from. So on that basis, I think they're accurate.

28

In their briefs regarding plaintiff's motion for sanctions, the parties submitted different portions of Mr. Whitaker's deposition transcript to support their opposing positions. A review of these combined submissions of Mr. Whitaker's deposition testimony indicates that Mr. Whitaker was not, as plaintiff argues, effectively a "No-show" witness. Given the breadth of the topics identified in Mr. Wagman's e-mail noticing the deposition, which, in the e-mail, Mr. Wagman explained was sent to "identify the appropriate 30(b)(6) witness(es)," it is unlikely that there could have been just a single witness to cover all of plaintiff's identified topics. Mr. Whitaker's deposition testimony was informed and helpful to explain the spreadsheets. Moreover, plaintiff cites to Mr. Whitaker's deposition transcript, undermining plaintiff's argument that Mr. Whitaker was a no show witness. To try to support its breach of contract claims, plaintiff points to several of Mr. Whitaker's statements indicating that the Army could have moved its fuel from closed military bases to Securiforce sites and that such fuel transfers may not have been captured on the spreadsheets because there were possible internal sales and deliveries of government-owned fuel.

Although plaintiff argues that Mr. Whitaker was not prepared to discuss all of the topics that plaintiff identified prior to the RCFC 30(b)(6) deposition, the deposition transcript indicates that Mr. Whitaker was prepared to discuss the fuel deliveries to Securiforce's sites based on the records kept by DLA Energy. At the time they were prepared, defendant believed that the spreadsheets produced to plaintiff by the government captured the information contained in DLA Energy's various systems regarding fuel deliveries in Iraq, and Mr. Whitaker was able to intelligently discuss, in detail, the information included in the spreadsheets. While this court recognizes that Mr. Whitaker could not answer all of the questions posed by plaintiff's counsel, an RCFC 30(b)(6) witness is not required to know every single fact surrounding a matter, and Mr. Whitaker's deposition testimony was not so inadequate as to warrant sanctions. See Dairyland Power Co-op v. United States, 79 Fed. Cl. at 715. It is clear from Mr. Whitaker's deposition testimony that, although he could not provide specific details for all of plaintiff's counsel's questions, he testified about information reasonably known by the government, based on DLA Energy's records, and was responsive to a significant portion of plaintiff's identified RCFC 30(b)(6) topics. Because Mr. Whitaker testified knowledgably about the DLA-prepared spreadsheets, and the information contained therein, his deposition testimony as a RCFC 30(b)(6) witness was not such that he was, as alleged by plaintiff, a "No-show" witness. Moreover, it would be hard to argue that only one witness could have testified to DLA Energy headquarters' records and whether onsite deliveries in the conflict theater of Iraq actually occurred, as well as to possible fuel deliveries by the Army. The government offered to provide additional RCFC 30(b)(6) witnesses, and identified possible further witnesses, but plaintiff declined to depose any additional witnesses who could speak to the onsite fuel deliveries in Iraq. Instead, plaintiff chose to file its motion for sanctions and seek monetary compensation.

Plaintiff cites Dairyland Power Co-op v. United States to support its argument that it should recover the costs incurred in conducting the RCFC 30(b)(6) deposition and in litigating its motion for sanctions. In Dairyland Power Co-op, the plaintiff filed a motion for sanctions after the government produced a RCFC 30(b)(6) witness who allegedly provided insufficient deposition testimony about specific topics on which an earlier RCFC

30(b)(6) government witness had previously testified. See Dairyland Power Co-op v. United States, 79 Fed. Cl. at 711. The court in Dairyland Power Co-op agreed with plaintiff that the RCFC 30(b)(6) witness was unprepared to testify on information that was certainly available to the government because of a prior RCFC 30(b)(6) witness' testimony. Dairyland Power Co-op v. United States, 79 Fed. Cl. at 716. The Dairyland Power Co-op court held, however, that "[w]ithout evidence of willful evasiveness" by the RCFC 30(b)(6) witness it would not order the government to compensate Dairyland for the costs of litigating its motion for sanctions. Dairyland Power Co-op v. United States, 79 Fed. Cl. at 716. Plaintiff in the above-captioned case draws an unpersuasive analogy between the RCFC 30(b)(6) witness in Dairyland Power Co-op and Mr. Whitaker.  In Dairyland Power Co-op, the court held that the government's RCFC 30(b)(6) witness should have been aware of a previous, published decision of the court that discussed deposition testimony of another RCFC 30(b)(6) government witness regarding the same contract as the underlying case. See Dairyland Power Co-op v. United States, 79 Fed. Cl. at 716. In the above-captioned case, plaintiff argues that Mr. Whitaker's RCFC 30(b)(6) deposition testimony should be held inadequate because, allegedly, "someone in the government knows the facts about deliveries to those [Securiforce's] sites." Apparently, plaintiff would have had Mr. Whitaker find and question this unidentified individual or have had the government produce a different witness who could have more expansively testified to onsite fuel deliveries in Iraq, while also testifying as competently as Mr. Whitaker did regarding the underlying details of the spreadsheets previously provided to plaintiff. Given the facts of this case and the distant locations of the personnel involved, as well as the dispersed records pertaining to fuel deliveries in Iraq, it is likely that no one witness could have testified about all the information contained in the spreadsheets produced by defendant in the same specific and knowledgeable way that Mr. Whitaker was able to testify. Defendant does not deserve to be sanctioned for producing Mr. Whitaker as the government's RCFC 30(b)(6) witness, especially since defendant offered to produce other, supplemental RCFC 30(b)(6) witnesses following Mr. Whitaker's deposition, which plaintiff declined.

## CONCLUSION

For the foregoing reasons, plaintiff's May 31, 2013 motion to compel and for payment of expenses is **DENIED**. Plaintiff's October 31, 2014 motion for sanctions also is **DENIED**.

**IT IS SO ORDERED**.

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**